```
 1                 UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON
   _____
 3
   LETICIA LUCERO,                )
 4                                )
            Plaintiff,            )   No. 2:13-cv-00602-RSL
 5                                )
         vs.                      )   Seattle, WA
 6                                )
   CENLAR FSB, et al.,            )
 7                                )   Court Trial, Day 1
            Defendants.           )   September 24, 2015
 8 _____

 9              VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE ROBERT S. LASNIK
10               UNITED STATES DISTRICT COURT
   _____
11

12 APPEARANCES:

13 FOR THE PLAINTIFF:    HA THU DAO
                         Attorney at Law
14                       787 Maynard Avenue South
                         SEATTLE, WA 98104
15                       hadaojd@gmail.com

16                       VICENTE OMAR BARRAZA
                         Barraza Law PLLC
17                       14245-F Ambaum Boulevard SW
                         Burien, WA 98166
18                       omar@barrazalaw.com

19 FOR THE DEFENDANTS:   LUKASZ I. WOZNIAK
                         Wright, Finlay & Zak, LLP
20                       4665 MacArthur Court, Suite 280
                         Newport Beach, CA 92660
21                       lwozniak@wrightlegal.net

22                       RENEE M. PARKER
                         Wright, Finlay & Zak, LLP
23                       4665 MacArthur Court, Suite 280
                         Newport Beach, CA 92660
24                       rmparker@wrightlegal.net

25
```

1   Andrea Ramirez, CRR, RPR
    Official Court Reporter
2   United States District Court
    Western District of Washington
3   700 Stewart Street, Suite 17205
    Seattle, WA 98101
4   andrea_ramirez@wawd.uscourts.gov

5   Reported by stenotype, transcribed by computer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lucero v. Cenlar, 9/24/15

I N D E X

Page No.

Witness:  LETICIA LUCERO
 Direct Examination by Ms. Dao                12
 Cross Examination by Mr. Wozniak            138

Witness:  PENELOPE BELL
 Direct Examination by Ms. Dao                98
 Cross Examination by Mr. Wozniak            120
 Redirect Examination by Ms. Dao             135


E X H I B I T S

Exhibit 1                                    140

Exhibit 2                                    141

Exhibit 12                                    23

Exhibit 13                                    28

Exhibit 14                                    45

Exhibit 19                                    84

Exhibit 22                                    34

Exhibit 23                                    34

Exhibit 24                                    37

Exhibit 25                                    37

Exhibit 26                                    55

Exhibit 27                                    55

Exhibit 28                                    64

Exhibit 29                                    64

Exhibit 30                                    71

Lucero v. Cenlar, 9/24/15

| | | |
|---|---|---|
| 1 | E X H I B I T S,  cont'd | |
| 2 | | Page No. |
| 3 | Exhibit 31 | 71 |
| 4 | Exhibit 32 | 72 |
| 5 | Exhibit 33 | 72 |
| 6 | Exhibit 35 | 78 |
| 7 | Exhibit 36 | 78 |
| 8 | Exhibit 38 | 41 |
| 9 | Exhibit 39 | 41 |
| 10 | Exhibit 40 | 68 |
| 11 | Exhibit 44 | 41 |
| 12 | Exhibit 45 | 47 |
| 13 | Exhibit 46 | 191 |
| 14 | Exhibit 47 | 65 |
| 15 | Exhibit 48 | 72 |
| 16 | Exhibit 49 | 72 |
| 17 | Exhibit 50 | 78 |
| 18 | Exhibit 51 | 78 |
| 19 | Exhibit 74 | 51 |
| 20 | Exhibit 75 | 51 |
| 21 | Exhibit 98 | 32 |
| 22 | Exhibit 99 | 53 |
| 23 | Exhibit 100 | 55 |
| 24 | Exhibit 101 | 45 |
| 25 | Exhibit 102 | 45 |

Lucero v. Cenlar, 9/24/15

| | |
|---|---|
| 1 | E X H I B I T S, cont'd |
| 2 | Page No. |
| 3 | Exhibit 103 | 53 |
| 4 | Exhibit 104 | 53 |
| 5 | Exhibit 105 | 84 |
| 6 | Exhibit 106 | 84 |
| 7 | Exhibit 107 | 84 |
| 8 | Exhibit 108 | 84 |

Lucero v. Cenlar, 9/24/15

```
 1            THE CLERK:  This is Case Number 13-602-RSL, Leticia
 2   Lucero vs. Cenlar.
 3        Counsel, would you please make your appearances.
 4            MS. DAO:  Good morning, Your Honor.  Ha Dao, on
 5   behalf of the plaintiff.  With me is my co-counsel Vicente
 6   Barraza, as well as the plaintiff, Ms. Leticia Lucero.
 7            THE COURT:  Great.  Hello, Ms. Lucero, Mr. Barraza,
 8   and Ms. Dao.
 9            MR. WOZNIAK:  Good morning, Your Honor.  Lucasz
10   Wozniak, appearing on behalf of Cenlar FSB, and with me is
11   Renee Parker.
12            THE COURT:  Great.  Mr. Wozniak and Ms. Parker.
13        Okay.  There are a number of issues that were raised,
14   either in the trial briefs or the motions in limine, and I'll
15   do an order granting in part some of defendant's motions in
16   limine.  But I just want to, for the purposes of going forward
17   here, you know, talk about a couple of things.
18        The remaining claims are the RESPA claim, the breach of
19   implied duty of good faith and fair dealing, and the outrage.
20   And plaintiff must prove both liability and damages on those
21   latter two cases, two claims.  I mean, just because the Court
22   used some more dramatic language in denying defendant's motions
23   for summary judgment doesn't mean I made a finding of
24   liability.  The only one I've made a finding of liability on is
25   the RESPA.  And that one the plaintiff still has the burden of
```

Lucero v. Cenlar, 9/24/15

1   proving damages on.

2       In regard to motions in limine that affect the

3   presentation of the case, I'm going to deny defendant's motions

4   in limine regarding untimely pretrial disclosures or failure to

5   specify or identify exhibits in the pretrial statement.  The

6   motion in limine is granted as to the expert testimony of

7   Bernard Patterson, but not to his general testimony about

8   treatment of the plaintiff.  And the testimony of not -- I'm

9   sorry -- it's Penelope Bell who will be allowed to give

10  testimony about treatment, diagnosis, et cetera.  The Bernard

11  Patterson one, the expert testimony objection is granted.  He

12  will not be allowed to testify.  On the patient/therapist

13  privilege, I'll take that under advisement and see how that

14  comes up; likewise, testimony regarding reports of the consumer

15  reporting agencies.  I will grant the defendant's motion

16  regarding public land records unrelated to plaintiff's

17  property.

18      The significant issue here is whether the defendant can,

19  at the very late stage, raise the issue of failure of the

20  plaintiff to take the steps talked about in the contract to

21  resolve disputes.  And I'll give Mr. Wozniak a chance to argue

22  that, but not right now.  Right now, I want to get right into

23  the testimony, if at all possible, since we missed yesterday.

24      And as I said, I've committed to do the plaintiff's case

25  today and tomorrow.  If the defense needs more time, either

Lucero v. Cenlar, 9/24/15

1   because of your witness who is recovering from surgery, or the

2   other witness, we'll deal with that.

3       But I'm hoping that, Ms. Dao, you and Mr. Barraza will

4   consider the trial brief kind of an opening statement, and

5   we'll get right into testimony.

6       Are you acceptable with that?

7           MS. DAO:  We are, Your Honor.

8           THE COURT:  And Mr. Wozniak, do you want to make an

9   opening statement, or can your trial brief satisfy that?

10          MR. WOZNIAK:  Your Honor, given the fact that this is

11  a court trial, I think we can dispense with the opening

12  statement.  However, if I may, just for the record, Your

13  Honor --

14          THE COURT:  Sure.

15          MR. WOZNIAK:  -- I'd like to -- I understand that the

16  Court would like to go forward with the plaintiff's case.

17  However, I would like to respectfully request that the Court

18  works with us with respect to the date or testimony of my

19  client's witness.  It is really not our fault that the person

20  who was designated and prepared for testifying in this case

21  broke his foot.  He's set for surgery, and he's going to be

22  medicated.  So there's no way he's going to be able to testify

23  on Monday, under the medication.  His testimony would be -- you

24  know, could be misconstrued, would be prejudicial to us,

25  because it cannot be relied on, given the fact that he would be

Lucero v. Cenlar, 9/24/15

1    medicated.  And it is very hard for my client right now to

2    exercise control over him, because he's on disability.  So we

3    cannot really produce him.  With respect to -- we will be able

4    to supplement the witness.

5        However, Ms. Bryant, I took the Court's order via e-mail

6    to mean that the Court agrees with the plaintiff that

7    Ms. Bryant is a witness in this case with personal knowledge.

8    I'd like to inform the Court that the way Ms. Bryant was

9    involved in this case is to review the file in connection with

10   motion for summary judgment, which was about three months ago,

11   I believe.  She reviewed the records then.  She signed the

12   declaration, which is much less detailed as the testimony for

13   the purposes of trial will be.  She's currently on vacation, so

14   there is no way for us to go over her testimony with her,

15   prepare her.  She's coming back on Monday.

16       And the problem I have is, if she's denied the opportunity

17   to review the file again in preparation for the testimony,

18   she's denied the opportunity to meet with her counsel in

19   preparation for her testimony in trial, that deprives us of a

20   fair trial, in my opinion, Your Honor.  And I just would like

21   to say that we are willing to move forward with the plaintiff's

22   case.

23       However, we would like the Court's understanding and

24   opportunity to allow us -- to work with us in our scheduling.

25   It's unfortunate that I'm going on vacation at the end of next

Lucero v. Cenlar, 9/24/15

```
1    week.  However, it was preplanned a long time ago, and I cannot
2    change it.
3           THE COURT:  Okay.  Well, understanding is my middle
4    name, Mr. Wozniak.  Actually, Steven is my middle name, but
5    understanding is what I do, and I will be very careful in
6    giving you an opportunity to present your case; okay?
7           MR. WOZNIAK:  Thank you.
8           THE COURT:  All right.  Ms. Dao, your first witness?
9           MS. DAO:  Thank you, Your Honor.  We'll call Leticia
10   Lucero to the stand.
11          THE COURT:  Ms. Lucero, come on forward.  And my
12   courtroom deputy, Ms. Simonds, will swear you in.
13          MR. WOZNIAK:  Your Honor, I apologize.  Can I just --
14   one more thing?  And I swear I will let the plaintiff proceed.
15          THE COURT:  Okay, Columbo.  Go ahead.
16          MR. WOZNIAK:  Your Honor, it came to my attention,
17   when we received the plaintiff's exhibits, there was a
18   miscommunication with the exhibits.  The exhibits were supposed
19   to be provided in the pretrial order.  And the exhibits that we
20   got are different from the pretrial order.  They're not in the
21   same order.  There are aberrant exhibits that were not included
22   in this.  So I just want to say that there's going to be
23   potential issues with respect to this, and we would like to
24   object to some of them, as well.
25          THE COURT:  Okay.  When they come up, let me know;
```

Lucero v. Cenlar, 9/24/15

1   okay?

2       Ms. Lucero, come on forward.  Please raise your right

3   hand.  You can come a little closer.  There is a good spot.

4   Right hand, and listen to the oath.

5       LETICIA LUCERO, having been duly sworn, was examined and

6   testified as follows:

7           MS. DAO:  Your Honor, is it our understanding that

8   Ms. Lucero will be able to utilize the binders?

9           THE COURT:  Yes, that's correct.

10          MS. DAO:  Thank you, Your Honor.

11          THE COURT:  And I neglected to say, you still have a

12  breach of contract claim also.  I should have indicated that.

13          MS. DAO:  Thank you, Your Honor.

14          THE COURT:  You may be seated.  Thanks, Ms. Lucero.

15          THE CLERK:  Please state your full name and spell

16  your last name for the court reporter.

17          THE WITNESS:  Leticia Lucero, L-U-C-E-R-O.

18          THE COURT:  Thanks, Ms. Lucero.  Don't be nervous;

19  okay?

20          THE WITNESS:  I'll try not to be.

21          THE COURT:  It's hard.  I know.  It's federal court

22  and everything.  But just getting here was the hard part today.

23  Not only did we have the Chinese president next door, but we

24  have the Attorney General of the United States here today,

25  Loretta Lynch.  And she met with the judges at 9:00 a.m. and --

LUCERO – Direct (by Ms. Dao)

1    she was supposed to meet with us at 9:00.  That's why I started

2    at 10:00.  But at the last minute yesterday, we got word that

3    she actually had a phone call with the President.  And I said:

4    Which one?  The President of the United States.  So we all

5    moved it up to 8:00, but I needed the time anyway.

6          So Ms. Dao, you may question Ms. Lucero.

7               MS. DAO:  Thank you, Your Honor.

8               THE COURT:  From the podium, please.

9               MS. DAO:  Thank you.

10                         DIRECT EXAMINATION

11   BY MS. DAO

12   Q    Ms. Lucero, would you please discuss briefly your

13   educational and professional background for the Court.

14   A    Yes.  I went to school at the University of Washington to

15   pursue a degree in art and architecture.  And currently, I work

16   for an architecture firm, and I oversee commercial residential

17   projects, mid-rise to high rise, and mixed use.

18               THE COURT:  Ms. Lucero, move a little closer to the

19   microphone so we can hear you better; okay?

20               THE WITNESS:  Sure.

21   BY MS. DAO

22   Q    We also understand you're a mother of two?

23   A    That is correct.  I'm a mother of two children, two boys.

24   Q    Can you tell us their sex and ages, please?

25   A    Yes.  I have two boys.  One is going to be 14, and one is

LUCERO - Direct (by Ms. Dao)

1   eight.

2   Q    And what are their names?

3   A    Richard Glidden and Maximus Glidden.

4   Q    How are you connected to this lawsuit?

5   A    I am the plaintiff.

6   Q    Okay.  So tell the Court why you sued Cenlar, the

7   defendant in this case.

8   A    I had -- I'm suing them because they had filed a report on

9   my credit that I was in foreclosure and owed over $52,000, in

10  2013.

11  Q    Now, let's -- give the Court some details on that.

12       At the time that you -- how did you discover the credit

13  reporting error, first of all?

14  A    After --

15            MR. WOZNIAK:  Objection.  Foundation.

16            THE COURT:  Overruled.

17       You can answer.  Go ahead.

18            THE WITNESS:  Okay.  So I had made some -- I entered

19  into the HAMP program, and I made three -- I made trial

20  payments.  And soon after the fourth mortgage payment I made, I

21  decided that I wanted to get a car loan.  And I was denied a

22  car loan, because the report said I was in foreclosure.  And

23  then I pulled my credit report, and sure enough, it showed that

24  I was -- it showed that I was in the process of foreclosure,

25  and that I owed over $52,000.

LUCERO – Direct (by Ms. Dao)

1    BY MS. DAO

2    Q    Okay.  I'm going to direct your attention to Plaintiff

3    Exhibit 80, which is Volume 2.

4    A    Yes.

5    Q    Do you recognize the document?

6    A    I do.

7    Q    Tell the Court what it is.

8    A    It's a letter on behalf of Open Road Lending, informing me

9    that they –– after reviewing my loan application, they had to

10   deny my credit because I was in delinquent past and/or present

11   obligations, repossession, or foreclosure.

12   Q    Okay.

13        MR. WOZNIAK:  Your Honor, I'm going to object to that

14   letter as hearsay, and I'm going to also object to it on the

15   grounds of relevance, and the motion in limine.

16        THE COURT:  Well, I think that it's not offered for

17   the truth of the matter asserted.  It's offered for why she

18   took the next step she did, so I'm going to allow it for a

19   limited purpose.

20        MR. WOZNIAK:  Okay.

21   BY MS. DAO

22   Q    Also directing you to Exhibit 78.

23   A    Yes.

24   Q    Can you identify the exhibit?

25   A    Yes.  This is a credit report.

LUCERO - Direct (by Ms. Dao)

1  Q    Okay.  Now, you associated Cenlar with being responsible

2  for reporting you to the credit bureau; is that correct?

3  A    That is correct.

4  Q    And why is that?  Can you tell us?

5  A    Because it says here that Cenlar had reported me.

6  Q    Okay.

7           MR. WOZNIAK:  Again, Your Honor, I'm going to

8  object --

9           THE COURT:  Seventy-eight, what is 78?

10          MS. DAO:  It's an excerpt of the credit report, Your

11 Honor.

12          THE COURT:  Is it a screen shot from a computer?

13          THE WITNESS:  No -- I'm sorry.

14          THE COURT:  Go ahead.

15          THE WITNESS:  No.  It's actually the -- it was a big

16 report that was sent to my home.  And it was dated January 31,

17 and it shows the reporting of --

18          MS. DAO:  So it's one page out of the multi-page

19 report that she received.

20          THE COURT:  Okay.

21          MR. WOZNIAK:  Again, Your Honor, I'm going to have

22 the same objections, including foundation.  And this time it is

23 offered for the truth of the matter asserted, so it is hearsay.

24          THE COURT:  So let me understand, though,

25 Mr. Wozniak.  Are you saying that this is an unreliable

LUCERO - Direct (by Ms. Dao)

| | |
|---|---|
| 1 | document, not a business record? |
| 2 | MR. WOZNIAK:  Well, it's not her business record. |
| 3 | There's no foundation for including that.  The document itself |
| 4 | is incomplete.  There's -- I don't know where it's come from. |
| 5 | There's no indicia of credibility.  And at the end of the day, |
| 6 | Your Honor, it goes to the credit reporting issue, as well. |
| 7 | THE COURT:  Well, do you have the entire document |
| 8 | marked at all? |
| 9 | MR. WOZNIAK:  No.  It's only the excerpt, Your Honor. |
| 10 | MS. DAO:  No, Your Honor.  Well, in terms of |
| 11 | foundation and authenticity, the witness received -- she |
| 12 | testified that she received the document herself.  So it's not |
| 13 | business records as to requiring us to have to bring in a |
| 14 | custodian, or someone to authenticate.  She was the recipient. |
| 15 | She ordered it.  She received it.  And this is one page out of |
| 16 | the multi-page. |
| 17 | THE COURT:  Sure.  But how do I know the reliability |
| 18 | of what's in the document?  I'm not disputing that she got it. |
| 19 | I'm not disputing that this is what it says.  But it's somebody |
| 20 | else's declaration that this is Cenlar reporting it, and |
| 21 | reporting the facts that are on there. |
| 22 | MS. DAO:  And we're not asking her to verify the |
| 23 | source of -- the reliability of the source.  We're asking her |
| 24 | to state her belief, as the recipient, and her understanding of |
| 25 | the document. |

LUCERO – Direct (by Ms. Dao)

```
 1              THE COURT:  For what purpose, though?
 2              MS. DAO:  For the purpose of contextual, as far as
 3  why --
 4              THE COURT:  Why she took future steps?
 5              MS. DAO:  Correct.
 6              THE COURT:  Okay.  All right.  I won't allow it for
 7  the truth of the matter asserted.  But again, if this alerted
 8  her to then take steps that can produce relevant probative
 9  evidence, I'll consider it for that purpose.  But this is not
10  evidence of the fact that Cenlar reported her to a credit
11  agency.
12              MS. DAO:  That's correct.
13              THE COURT:  Okay.
14  BY MS. DAO
15  Q    Now, at the time that you learned of the credit reporting
16  error, was there any other event that happened alongside with
17  that?
18  A    Yes.  I had received a letter from Bayview asking me to
19  call them immediately because my loan was in delinquent status.
20  Q    Can you tell the Court who Bayview is?
21  A    Yes.  When I entered into the mortgage mod program, Cenlar
22  directed me to talk to Bayview so that I could provide them
23  with the paperwork of the applications, so that I can go
24  through this mortgage modification.
25  Q    So you received a letter from Bayview telling you that
```

LUCERO – Direct (by Ms. Dao)

1    your loan was in default?

2              MR. WOZNIAK:  Objection.  Hearsay.

3              THE WITNESS:  Correct.  There was a true letter that

4    came to my home telling me to call them immediately, because my

5    mortgage was in default.

6              THE COURT:  Same ruling.  Go ahead.

7              MR. WOZNIAK:  And, Your Honor, also, again,

8    foundation, for the record.

9              THE COURT:  What do you mean by foundation?

10             MR. WOZNIAK:  Basically, she can testify she received

11   it.  She can't testify to who she received it from.  She cannot

12   identify that.

13             THE COURT:  She can say what the person on the other

14   side of the line said.  So the objection is overruled, but I

15   understand –– it's a bench trial.  We don't have to worry about

16   a jury here.

17        Go ahead, Ms. Dao.

18   BY MS. DAO

19   Q    Based on what you've learned, at that time in early 2013,

20   had you signed a permanent HAMP modification?

21   A    Yes.

22   Q    So at that time, in your mind, were you at all in default?

23   A    No.

24   Q    Were you in foreclosure?

25   A    No.

LUCERO - Direct (by Ms. Dao)

1    Q    So upon these happenings, did you take any specific
2    action?
3    A    Yes.  I called both Bayview and Cenlar to try to figure
4    out why is this showing up.  I had been making payments, and I
5    hadn't missed a payment.  And I was concerned and wasn't sure
6    why I was being reported in foreclosure, because I wasn't.
7    Q    Do you recall when you signed the HAMP modification, the
8    permanent one?
9    A    My ex-husband and I signed it in January.
10   Q    Of 2013?
11   A    2013.
12        MS. DAO:  I move to admit 80 and 78, Your Honor, for
13   the limited purpose of contextual evidence with regards to why
14   she was filing the lawsuit.
15        THE COURT:  Well, I see them, and I'll certainly
16   consider them for the limited purpose, but I'm not going to
17   admit them into evidence.
18        MS. DAO:  Thank you, Your Honor.
19   BY MS. DAO
20   Q    Do you understand the terms of the loan modification that
21   you received?
22   A    Yes, I did.
23   Q    Let me ask you, do you recall the original loan balance
24   when you first got it?
25   A    Can you repeat -- original loan modification?

LUCERO – Direct (by Ms. Dao)

```
 1   Q    No.  When you first borrowed money ––
 2   A    From my original lender?
 3   Q    Yes.  Do you remember the amount?
 4   A    Yes.  It was 389.
 5   Q    Approximately?
 6   A    Approximately, $389,000.
 7   Q    And when you received the HAMP modification, what was your
 8   new principal balance?
 9   A    My new principal balance from the HAMP was $406,000,
10   approximately.
11   Q    Do you understand why the amount, the new balance, was so
12   much greater than the original balance that you borrowed?
13   A    Yes.
14   Q    Why was that?
15            MR. WOZNIAK:  Objection.  Relevance.
16            THE COURT:  Overruled.  You can answer.
17            THE WITNESS:  Because I understood that in the new
18   mortgage mod, the amount –– the months where I didn't pay my
19   mortgage, and the fees incurred, and the mitigation fees and
20   all that were rolled into my new mortgage modification, so it
21   increased it, and also to get from a 30-year term to a 40-year
22   term.
23   BY MS. DAO
24   Q    I'm going to direct your attention to Exhibit 12.
25            Can you identify the exhibit?
```

LUCERO – Direct (by Ms. Dao)

1    A     Yes.

2    Q     What is it?

3    A     The exhibit is a letter from Cenlar, April 24, 2013, which

4    says:  Enclosed is a copy of your final executed modified

5    agreement -- modification agreement.  Please retain this

6    document for your records.

7    Q     Okay.  So, now, attached to that letter is the actual

8    permanent HAMP modification that you signed; is that correct?

9    A     That is correct.

10   Q     You just testified to the terms of the loan modification.

11         Where in that exhibit can you find those terms?

12   A     3B.

13         MS. DAO:  I move to admit the exhibit into evidence,

14   Your Honor.

15             THE COURT:  The number again is?

16             MS. DAO:  Twelve.

17             THE COURT:  Twelve.

18             MR. WOZNIAK:  Your Honor, and this is what I'm

19   wondering about.  In the pretrial statement, that's when we

20   have a problem here.  It's different -- it's got different

21   numbers in the pretrial statement, pretrial order.

22             MS. DAO:  We provided Counsel with the same binder,

23   Your Honor.

24             THE COURT:  Okay.  Well, you see what it is, Counsel.

25             MR. WOZNIAK:  I do.  I do.  But the problem is if --

LUCERO – Direct (by Ms. Dao)

1   the problem is, Your Honor, that I'm having is, if my client is

2   going to provide testimony via telephone, he's going to be

3   completely confused.  That's what I'm anticipating.  So if I

4   can, maybe we can go with the trial modification -- I mean,

5   with the pretrial statement.  And the pretrial statement is

6   identified as Exhibit 5.

7        THE COURT:  Well, it's Exhibit 12 now, and it's going

8   to be admitted into evidence as Exhibit 12.  It's no different

9   than dealing with a deposition where people use different

10  numbers during the deposition.  You know, we'll clarify it so

11  there's no confusion in there.

12      But do you have an objection to 12?

13       MR. WOZNIAK:  No, I don't.

14       THE COURT:  Twelve is admitted into evidence.

15  Thanks.

16                  (Exhibit 12 was admitted)

17  BY MS. DAO

18  Q    Could you please tell the Court how you felt when you

19  received the permanent HAMP modification, back in early of

20  2013?

21  A    I was totally relieved, excited, ready to put this behind

22  me; that I could keep my home, and have my children.  Part of

23  my divorce decree was that I had full custody of the children,

24  and I had the home.  So knowing that I was going to have my

25  children in our home was the most relief I've ever had in a

LUCERO – Direct (by Ms. Dao)

1   long time at that time.

2   Q    Under the modification, what was your regular monthly

3   payment going forward?

4   A    My regular monthly payment going forward was about $1553.

5   Q    So the goal in getting the loan modification was to make

6   it affordable every month?

7   A    That is correct.

8   Q    Okay.  And does this amount include taxes and insurance?

9   A    Yes, it does.

10  Q    And have you been paying your regular monthly payment

11  every month, ever since, what, October of 2012?

12  A    October 1, 2012, correct.

13  Q    Have you always paid between the 1st and the 5th of every

14  month?

15  A    No.

16  Q    Why is that?

17  A    Because I would pay kind of in the middle of the month,

18  based on my pay.

19  Q    Okay.  And when you pay in the middle of the month,

20  sometimes you make a payment after the 15th?

21  A    That is correct.

22  Q    And is that more of a norm for you than to pay it between

23  the 1st and the 5th?

24  A    That is correct.

25  Q    So when you made a payment that was late, or beyond the

LUCERO – Direct (by Ms. Dao)

1   1st and the 5th, what did you do?

2   A     In my statement, it would say that if it was going to be

3   received after the 15th, there was a $57.83 late fee that I

4   would have to pay, on top of my mortgage payment.  And so I

5   would not only pay that, but I would also pay for it to be

6   FedEx'd next day so that it would get there as soon as

7   possible.

8   Q     You testified that you contacted both Bayview and Cenlar

9   to help you with what you deemed to be an error in your credit

10  reporting, as well as the fact that your loan was in default.

11        Did you get any help from them?

12  A     No.  No.

13  Q     So failing to get help from them, what did you do next?

14  A     Well, after that, I became nervous because –– the letter

15  from Bayview triggered a panic in me, because I –– I thought,

16  "How could they have lost my file?  How did they not know that

17  I've been paying?  I've been paying."  And so I panicked.  And

18  so I reached out to my attorney.

19  Q     Is this the same attorney who had been helping you with

20  the modification and mediation?

21  A     Yes.

22  Q     And having discussed the problem with your lawyer, what

23  step did you take next?

24  A     We filed the lawsuit in April.

25  Q     April of?

LUCERO – Direct (by Ms. Dao)

1    A    2013.

2    Q    What happened in the months that follow your filing of the

3    lawsuit?

4              MR. WOZNIAK:  Objection.  Vague.

5              THE COURT:  It is kind of a vague question.

6              MS. DAO:  I'm sorry.  Let me rephrase.

7    BY MS. DAO

8    Q    Did you continue to make your regular monthly payment

9    after you filed the lawsuit?

10   A    Yes, I did.

11   Q    And were there any -- were you getting statements every

12   month from Cenlar as to the status of your loan during this

13   period of time?

14   A    Yes.

15   Q    So from January of 2013 until after you filed the lawsuit

16   in April of '13, things seemed normal to you?

17   A    Yes.

18   Q    Did they become -- did the statement become or were you

19   notified of some irregularity in your account?

20             MR. WOZNIAK:  Vague as to time.

21   BY MS. DAO

22   Q    Sometime in 2013.

23             THE COURT:  Okay.  You can answer.

24             THE WITNESS:  Yes.  Yes, there was some

25   irregularities.

LUCERO – Direct (by Ms. Dao)

1    BY MS. DAO

2    Q    Do you recall what it was that notified you?  Did you

3    receive some correspondence from Cenlar?

4    A    Yes, I did, in December.

5    Q    December of 2013?

6    A    2013.

7    Q    I'm going to direct your attention to Exhibit 13.

8    A    Yes.

9    Q    Can you identify the document?

10   A    Yes.  It's a letter from Cenlar, explaining to me that in

11   keeping with Washington law, that I was being advised that my

12   loan was being charged fees described below.  And when you go

13   down below, it says attorney fees, attorney costs accrued were

14   $10.52 and $1,251.  And they were all dated 11/25/2013.

15   Q    What is the date of that letter?

16   A    December 4, 2013.

17   Q    Tell us your reaction or feeling when you received

18   Exhibit 13.

19   A    I had a pit in my stomach.  It came to my home.  And I

20   remember thinking, Washington law -- you know, I work in the

21   field of architecture, life safety.  And everything has codes,

22   and every code has a citation of some sort so that you can

23   build and design accordingly.  And when I saw this, I panicked,

24   because I was what -- I'm not a lawyer, but I know that there's

25   got to be some sort of law number associated with this.  So I

LUCERO - Direct (by Ms. Dao)

1    panicked, and I called Omar immediately.

2    Q    Even though the reference "in keeping with Washington law"

3    did not have a citation, did you take it seriously?

4    A    Yes.

5    Q    And how did you interpret that phrase?

6    A    There were fees being -- there were some fees that were

7    going to be applied to my loan.

8    Q    Did you believe that you had any discretion about the fees

9    being charged?

10             MR. WOZNIAK:  Objection.  Vague.

11             THE COURT:  It is kind of vague.

12             THE WITNESS:  Can you repeat that?

13   BY MS. DAO

14   Q    Your testimony is that -- even though they didn't

15   reference a citation to Washington law, how serious did you

16   take that statement?

17   A    I took it very seriously, because it said that I was --

18   there was some law out there.

19   Q    So the fees that were shown on Exhibit 13, you believed

20   that they became your liability, or that you owe the amounts

21   stated there?

22   A    Yeah.  I did, actually.  And I didn't know why.  And I

23   didn't know what activities happened in November to figure out

24   why there was the attorney fees on my -- going to be on my

25   loan.

LUCERO – Direct (by Ms. Dao)

1          MS. DAO:  Move to admit Exhibit 13, Your Honor.

2          THE COURT:  Any objection besides numbering, Counsel?

3          MR. WOZNIAK:  No, Your Honor.  We stipulate to it.

4          THE COURT:  Thirteen is admitted into evidence.

5    Thanks.

6                    (Exhibit 13 was admitted)

7    BY MS. DAO

8    Q    Did you take any actions upon receipt of Exhibit 13?

9    A    Yes, I did.

10   Q    What did you do?

11   A    Well, I called my attorney --

12         THE COURT:  By your attorney, are you talking --

13         THE WITNESS:  Mr. Omar Barraza.

14         THE COURT:  Right here.

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.  Great.  Just wanted to make sure.

17   BY MS. DAO

18   Q    Do you recall when you received that letter dated

19   December 4?

20   A    What day?

21   Q    Do you remember -- yeah, what time period around that you

22   got it?

23   A    It was in the afternoon.

24   Q    Yeah, but -- the letter is dated December 4.  Do you

25   remember which day in December you received it?

LUCERO – Direct (by Ms. Dao)

1  A    No, I don't recall at this moment.

2  Q    And you contacted your attorney, and you wanted to meet

3  up?

4  A    I sure did.  I know that it was around the holidays,

5  because it was hard to get a meeting with him.  And I also know

6  that by the time we did get around to sitting down, it was

7  sometime at the last week of December.

8  Q    Did this letter interfere or affect your holiday season

9  with your family?

10  A    Yes, it did.

11  Q    How so?

12  A    I became overwhelmed, because all of a sudden, I had these

13  fees.  And I realized, well, if I have to pay them, you know, I

14  have to make room, I have to budget for it, and Christmas is

15  around the corner, and I didn't know if I should buy certain

16  presents, and so -- it had me worried.

17  Q    Okay.  As a result of your discussion with your attorney,

18  what action, if any, that you took afterwards?

19  A    In around --

20  Q    December --

21  A    -- December 29 we sent out a QWR.

22        MR. WOZNIAK:  Objection as to the legal meaning of

23  the letter.  At the time she wrote that, it wasn't a QWR.

24        THE COURT:  Right.  I understand your position.

25        MS. DAO:  That's fine, Your Honor.  We can refer to

LUCERO - Direct (by Ms. Dao)

1   it as a letter.

2            THE COURT:  She's not a lawyer.  She's sending out a

3   letter.

4   BY MS. DAO

5   Q    So in this letter that you composed -- I'm sorry.  Strike

6   that.

7        Did you get help from your lawyer in composing the letter?

8   A    Yes, I did.

9   Q    And what is the letter -- what is the date of the letter?

10  You said December 29?

11  A    Twenty-ninth.

12  Q    And did you personally mail it out?

13  A    On that day I think I did.

14  Q    Now, in -- what was your objective in writing that letter

15  and sending it to Cenlar?

16  A    I wanted to find out what those fees were about.

17  Q    And did you reference the letter that you received, the

18  December 4 letter?

19  A    Yes, that was included.

20  Q    In the letter that you sent out?

21  A    That's correct.

22  Q    And the objective, you said, is to get to the reason why

23  you were charged with attorney fees?

24  A    That is correct.

25  Q    So on or about December 29, when you sent out this letter,

LUCERO – Direct (by Ms. Dao)

```
1   how long had you been making your regular monthly payments to
2   Cenlar?
3   A     So December -- over 14 months.
4   Q     And during that time, did you receive any letter similar
5   to the Exhibit 13?
6   A     In December?  Pardon me?  No.
7   Q     Let me withdraw that question.  Let me move forward.
8         So you mail out -- you mail out a letter asking Cenlar to
9   explain to you attorney's fees; is that correct?
10  A     That is correct.
11  Q     I'm going to direct your attention to Exhibit 98.  And
12  that would be in Volume 2.
13  A     Yes.
14  Q     Can you tell the Court what it is?
15  A     Yes.  That's the letter, dated December 29, 2013.
16  Q     And you testified there's an attachment.  What is the
17  attachment?
18  A     The attachment to the letter I wrote is that same letter,
19  dated December 4, 2013.
20            MS. DAO:  I would move to admit 98, Your Honor.
21            THE COURT:  Any objection to 98?
22            MR. WOZNIAK:  Just the relevance, Your Honor.
23            THE COURT:  Ninety-eight is admitted into evidence.
24                 (Exhibit 98 was admitted)
25  ////
```

LUCERO – Direct (by Ms. Dao)

1   BY MS. DAO

2   Q    Let me focus you back to your testimony that you would

3   receive monthly statements about your loan.

4   A    Correct.

5   Q    And let me start with the month of January 2014, after you

6   sent out this letter.

7   A    Correct.

8   Q    Did you receive any statements from Cenlar in January of

9   2014?

10  A    No.

11  Q    Monthly statements.

12  A    Monthly statement?  Yes.  I thought you said letter.

13  Q    Do you recall how many statements, periodic or mortgage

14  statement, you received from Cenlar in month of January?

15  A    I believe I got two.

16  Q    I'm going to direct your attention to 22, which is

17  Volume 1.

18       Can you identify the exhibit?

19  A    It's a Cenlar statement, dated January 16, 2014.

20  Q    Does that statement include the attorney's fees that you

21  saw in the December 4 letter?

22  A    No.  It does not include any fees related to the

23  November 24 –– 25, 2013, fees.

24  Q    In receiving Exhibit 22, that statement, were you looking

25  for an explanation?

LUCERO – Direct (by Ms. Dao)

1    A    Yes, I was.

2    Q    What was your expectation?

3    A    My expectation was, I would see something described kind

4    of identifying what those fees might be related to.

5    Q    And it wasn't there?

6    A    It was not present.

7    Q    Directing your attention to 23 now, can you identify it?

8    A    Yes.  Exhibit 23 is also a statement from Cenlar, monthly

9    statement, that is dated January 21, 2014.

10   Q    Were there any explanations as to the attorney fees that

11   were charged according to the December 4 letter?

12   A    No, none.

13   Q    Were you expecting some expectations [sic] in receiving

14   this statement?

15   A    Yes, I was.

16             MS. DAO:  Move to admit Exhibit 22 and 23, Your

17   Honor.

18             THE COURT:  Twenty-two and 23 are admitted into

19   evidence.

20                  (Exhibits 22 and 23 were admitted)

21   BY MS. DAO

22   Q    Now, I'm getting you to February of 2014.

23        Did you also receive statements from Cenlar?

24   A    Yes, I did.

25   Q    How many did you receive in that month?

LUCERO - Direct (by Ms. Dao)

1   A     Two.

2   Q     Directing your attention to Exhibit 24, can you identify?

3   A     Yes.  It's a statement from Cenlar, the loan statement

4   dated February 18, 2014.

5   Q     Is there any attorney fees shown?

6   A     Yes, there are.

7   Q     And can you tell us, roughly, or approximately, how much?

8   A     Yes.  There are five entries, dated February 10, attorney

9   fees ranging from $500 to $1,700, which equaled out to be

10  $5,943.05.

11  Q     Now, that statement also gave you some other information;

12  is that correct?

13  A     Yes, that is correct.

14  Q     What is your understanding of the impact of that -- of

15  those attorney fees on your account, meaning -- let me be

16  specific.  Is there a total amount due specified?

17  A     Yes, there is, a large total amount of $10,255.21, due

18  immediately.

19  Q     And did they give you a due date?

20  A     Yes, February 1, 2014.

21  Q     All right.  So you -- the statement is dated the 16th of

22  February; is that correct?

23  A     It's actually dated the 18th of February 2014, and the due

24  date is February 1, 2014.

25  Q     So in your mind, did the due date pass?

LUCERO – Direct (by Ms. Dao)

1   A    Yes, it did.

2   Q    Is there any consequences that would flow from the due

3   date being in the past and the amount being as large as it was?

4              MR. WOZNIAK:  Vague, Your Honor.

5              THE COURT:  You mean any special concern?

6              MS. DAO:  Yes.

7              THE COURT:  Okay.

8              THE WITNESS:  Oh, yeah, immediate concerns.  I

9   couldn't afford to pay $10,000 immediately.

10             THE COURT:  Well, this question was about the due

11  date.

12             THE WITNESS:  The due date.  Yeah, that it was

13  impossible to do, because I got this statement in the middle of

14  the month, and it's due the 1st of February.

15             THE COURT:  Right.  But was there anything about

16  that -- I mean, anybody who got that would say, what?

17             THE WITNESS:  Exactly.

18             THE COURT:  But was there something especially

19  problematic for you about getting this?

20             THE WITNESS:  Yes.  I can't afford to pay that much.

21  And I also didn't have -- it doesn't show how that December 4

22  letter -- just nothing made sense.  Nothing added up for me.

23             THE COURT:  Okay.

24  BY MS. DAO

25  Q    And in looking at Exhibit 24, did you have any ideas where

LUCERO - Direct (by Ms. Dao)

1   the fees came from, and why you were charged?

2   A    No.  It's not -- the description was so vague.  It just

3   says attorney fees.

4   Q    And it appeared that they all occurred on the same date?

5   A    And they all occurred on February 10.

6   Q    Directing your attention now to 25.

7   A    Yes.

8   Q    What is 25?

9   A    That's a second statement I got in February, dated -- from

10  Cenlar, dated February 24, 2014.

11  Q    Do you detect any difference between 24 and 25?

12  A    Yes.  The difference is that it had taken my payment into

13  account.

14  Q    Okay.  So the over -- so the amount due is less than -- is

15  lessened by the amount of your monthly payment; is that

16  correct?

17  A    Yes.

18          MS. DAO:  Moving to admit Exhibit 24 and 25, Your

19  Honor.

20          THE COURT:  Twenty-four and 25 are admitted into

21  evidence.

22              (Exhibits 24 and 25 were admitted)

23  BY MS. DAO

24  Q    In addition to these monthly statements -- you call them

25  monthly, but you got two of them in a month; right?

LUCERO - Direct (by Ms. Dao)

1   A    Correct.

2   Q    Did you receive any other correspondence from Cenlar in

3   the month of February?

4   A    Yes, I did.

5   Q    What did you receive?

6   A    I received a delinquency notice from Cenlar.

7   Q    All right.  Directing your attention to 44 now, it will be

8   in the first -- or Binder Number 1.  Can you identify 44?

9   A    Yes.

10  Q    What is it?

11  A    It's a letter from Cenlar regarding delinquency notice.

12  Q    What was your understanding of this notice -- this

13  delinquent notice?  What did it inform you?

14  A    There's several things.  First, it states that my

15  February 1 payment hadn't been received, so that they had told

16  me that my regular monthly payment of $1,525.37 was not

17  received on the 1st; that there was an accrued late charge of

18  $57.84, which I knew about.  And then they gave me a total due

19  amount with an asterisk, right next to $1,583.21.

20  Q    So you testified earlier that you made your payment around

21  the middle of the month.

22  A    That is correct.

23  Q    So this statement -- this exhibit being dated the 18th of

24  February, your payment might have crossed; is that right?

25  A    Yeah, I think so.  That time, yes.

LUCERO – Direct (by Ms. Dao)

1    Q    And you recognized the regular payment and the late fee.

2    A    That is correct.

3    Q    But there is an asterisk, you said.

4    A    There is an asterisk, correct.

5    Q    What does the asterisk tell you?

6    A    The asterisk says here in words, "This does not include

7    other fees and costs that might be due on your loan."

8    Q    Did that raise any red flag or questions for you?

9    A    It did, absolutely.

10   Q    What word?

11   A    Because it says it doesn't include more costs and fees,

12   and I don't know what they were.  They didn't state on this

13   letter.

14   Q    What could they have been?

15   A    I'm going to relate that to the attorney fees that are

16   showing up on my statements.

17   Q    What other consequences did Cenlar convey to you through

18   that letter?

19   A    This letter also conveyed, at the very last paragraph, it

20   says, "Late payments, missed payments, or other default on your

21   account will be reflected on your credit report."

22   Q    What did you take that to mean?

23   A    It means that they're reporting me delinquent for these

24   fees that were showing up on my statement.

25   Q    Is there anything else about this exhibit that concerns

LUCERO - Direct (by Ms. Dao)

1   you?

2   A    Yeah.  I didn't know what that amount was.

3   Q    And you testified that by the time you got this delinquent

4   notice you had made your -- you would have made your February

5   payment; is that correct?

6   A    That is correct.

7   Q    Redirecting your attention to the letter that you sent out

8   in December of 2013 about attorney's fees, did you get a

9   response at all from Cenlar, based on that letter?

10  A    No, I did not.

11  Q    In February, did you get any response to that letter?

12  A    No, I did not.

13  Q    You did not.  But did your lawyer get a response?

14  A    Yes, he did.

15  Q    And did your lawyer share it with you?

16  A    Yes, he did, immediately.

17  Q    Let me direct your attention to 38, Volume 1.  Can you

18  identify the exhibit?

19  A    Yes.

20  Q    What is it?

21  A    It's a response to my QW -- the Qualified Written Request

22  I sent out in December.

23  Q    And it was addressed to your lawyer?

24  A    Yes, it was.

25  Q    Who wrote the letter?

LUCERO – Direct (by Ms. Dao)

1   A    Renee Parker.

2   Q    That would be Cenlar's lawyer?

3   A    Yes.

4   Q    Did the letter address your concern about the reason why

5   you were being charged with attorney's fees?

6   A    No, it did not.  No, it didn't.

7   Q    Were you made aware of another response by Cenlar ––

8   Cenlar's lawyer to your lawyer, in February?

9   A    Yes.

10   Q    I'm directing your attention to Exhibit 39 now.

11   A    Yes.  I'm there.

12   Q    All right.  What is 39?

13   A    Thirty-nine is a letter, again written on behalf of –– or

14   written by Wright Finlay & Zak, February 24, 2014.

15   Q    And does that letter –– what is the date of that letter?

16   A    The letter is February 24, 2014.

17   Q    Does the letter address your concern about the attorney

18   fees being charged to your account?

19   A    No, it does not.

20   Q    Did the letter make any promise to you as to whether or

21   not a response was forthcoming?

22            MR. WOZNIAK:  Objection.  Vague.

23            THE COURT:  Well, the letter speaks for itself.

24            THE WITNESS:  Right.  That's correct.  And it's

25   forthcoming.

LUCERO – Direct (by Ms. Dao)

1          MS. DAO:  Moving to admit 38 and 39, Your Honor.

2          THE COURT:  Thirty-eight and 39 are admitted into

3    evidence.

4               (Exhibits 38 and 39 were admitted)

5          MS. DAO:  And also 44.  I don't think I --

6          THE COURT:  Right.  Forty-four is admitted into

7    evidence.

8          MS. DAO:  Thank you, Your Honor.

9               (Exhibit 44 was admitted)

10   BY MS. DAO

11   Q    Now taking you to March of 2014, Ms. Lucero, did you

12   receive any correspondence from Cenlar in the month of March of

13   2014?

14   A    Yes.  I got a statement.

15   Q    Around the first part of the month, did you get a letter

16   of sort, from Cenlar?

17   A    Yes.

18   Q    Directing you to Exhibit 14, can you identify 14?

19   A    Yes.  This is another letter, dated March 6, 2014.

20   Q    What does it tell you?

21   A    It's a letter addressed to me, to my residence, saying

22   that, "In keeping with Washington law, please be advised that

23   we have charged your loan account for the fees described below,

24   on the dates and the amounts indicated."  So it goes on to give

25   me an entry of nine attorney fees, ranging from $8.21 to

LUCERO – Direct (by Ms. Dao)

1   $1,732.50.

2   Q    Did you have any reaction to this letter?

3   A    Yeah.  Yes, I did.

4   Q    What were your reactions?

5   A    I called my attorney immediately and said:  You know,

6   there's more fees being added.  They're adding more fees to my

7   statement, to my account.  And I was in shock, because I didn't

8   realize that -- wasn't sure what law.  I kept asking Omar:

9   What law are they referring to?  I need to understand this law.

10  Because I wasn't aware of any law, and no one can tell me.  And

11  it wasn't stated on this correspondence.

12  Q    Did this exhibit cause you to feel a sense of urgency?

13  A    Absolutely.

14  Q    Why?

15  A    Because it seemed like an avalanche of fees coming on to

16  my account, and I had no idea how to stop it.  I didn't

17  understand.  I didn't have any description.  What was I doing

18  wrong?  What laws were we breaking?  Why were they adding them

19  to my loan?

20  Q    Did you also receive some other correspondence from Cenlar

21  in March of 2014?

22  A    Yes.

23  Q    Were these monthly statements?

24  A    Yes.

25  Q    How many statements did you receive from Cenlar in the

LUCERO - Direct (by Ms. Dao)

1   month of April -- I mean, March of 2014?

2   A    Two.

3   Q    Directing your attention to 101 and 102, which would be

4   Volume 2, towards the end.

5        You're there at 101?

6   A    I'm at 101, correct.

7   Q    What is 101?

8   A    It's a Cenlar loan statement, dated March 17, 2014.

9   Q    What information within this exhibit as you received it?

10  A    This -- so the statement says that the amount of

11  $10,253.42 is due on March 1, 2014.

12  Q    Okay.  And is there another amount due as of another date?

13  A    It says, "Overdue payment."

14  Q    Okay.  And what was the overdue payment amount?

15  A    The overdue payment amount is $8,670.21.

16  Q    Now, at this point, in looking at those numbers as appear

17  on Exhibit 101, the statement for March, were you given any

18  additional information about your question of why the

19  attorney's fees were being charged to your account?

20  A     No, I was not given any additional information.

21           MR. WOZNIAK:  Your Honor, if I may just interpose as

22  to that line of questioning, it's -- the statements speak for

23  themselves, first of all.  And second, Your Honor, if I may

24  just interrupt for a second, our exhibit book ends at 98, I

25  believe.  So we don't have these -- 97, so we don't really have

LUCERO – Direct (by Ms. Dao)

```
1    these exhibits in our exhibit binder.
2              THE COURT:  Can we give them an exhibit book that
3    matches the Court's and goes through 108?
4              MR. BARRAZA:  Yes, Your Honor.
5              MR. WOZNIAK:  Thank you, Your Honor.  I appreciate
6    it.
7              MR. BARRAZA:  And for the record, they were e-mailed
8    to Counsel.  I did not send a hard copy, and I apologize.
9              MR. WOZNIAK:  Thanks.  I appreciate it.
10   BY MS. DAO
11   Q    I'm now directing your attention to Exhibit 102.
12             THE COURT:  The March 24 statement, okay.
13             MS. DAO:  That's correct, Your Honor.
14             THE COURT:  Right, which deducts the payment that was
15   received, but otherwise still has the same amount.
16             MS. DAO:  That's correct, Your Honor.
17             THE WITNESS:  That is correct.
18             THE COURT:  Remember, I actually have a brain up
19   here.  I can see what's going on.  Let's move it along.
20             MS. DAO:  Thank you, Your Honor.
21        Moving to admit 14, 101, 102.
22             THE COURT:  Fourteen, 101, and 102 are admitted into
23   evidence.
24             (Exhibits 14, 101, and 102 were admitted)
25             THE COURT:  We're going to go by month; right?
```

LUCERO – Direct (by Ms. Dao)

```
 1              MS. DAO:  Yes, Your Honor.
 2              THE COURT:  Okay.  So just tell me the exhibits in
 3    April.
 4              MS. DAO:  Yes, Your Honor.  April would be -- well,
 5    before I get there, may I pause and interject some other
 6    questions?
 7              THE COURT:  Sure.  Okay.
 8    BY MS. DAO
 9    Q    In the month of March, did you also receive a delinquent
10    notice?
11    A    Yes, I did.
12    Q    And directing you to 45.  And that would be the delinquent
13    notice of March 17, dated March 17.
14    A    That is correct.
15    Q    Now, I'm going to pause here and ask you, do these
16    delinquent notices appear to be form letters to you?
17    A    Form letters?  They're letters.  They're notices.
18    Q    Are they similar in appearance?
19    A    Form letter?
20              THE COURT:  Well, it's obvious by now that you're
21    dealing with a -- you're not dealing with a person.  You're
22    dealing with an entity, and they're sending you the same
23    letters with different amounts and things like that.
24              THE WITNESS:  Is that what the definition of form
25    letter is?
```

LUCERO - Direct (by Ms. Dao)

1          THE COURT:  I think that's what she means.

2          THE WITNESS:  Oh, okay.

3   BY MS. DAO

4   Q    Do you agree they seem similar?

5   A    Yes, they do.

6   Q    But did they lessen your worries at all about what's

7   happening?

8   A    No.

9   Q    Why not?

10  A    Because the form letters don't produce by themselves.

11  They're coming from somewhere, and the amounts due are similar

12  to my monthly statement, so that there is some connection to my

13  statements, my monthly statements.

14  Q    All right.  So they evoke certain feelings and reactions

15  from you --

16  A    That is correct.

17  Q    -- that were -- can you describe for the Court what kind

18  of feelings?

19  A    Yeah.  They were worries and panic.  Because, again, the

20  delinquency notices trigger credit reporting, because that's

21  what it says, and then there's fees applied to my statements.

22  And they are appearing now, so they're starting to show, and

23  they're also asking me that they're due.  So if I can't make

24  those payments, I'm delinquent, and then it will put me back

25  where I was in 2012, where I can't make payments, and so

LUCERO - Direct (by Ms. Dao)

1   therefore, they were going to start -- in my mind, they were

2   going to take my house.

3            MS. DAO:  Okay.  Move to admit 45, Your Honor.

4            THE COURT:  Forty-five is admitted into evidence.

5                    (Exhibit 45 was admitted)

6   BY MS. DAO

7   Q    Up to this point, by March of 2014, Ms. Lucero, you had

8   received a number of correspondence from Cenlar.

9        Did you try to figure out what's going on, on your own?

10  A    Yeah, I did.  It was pretty hard.

11  Q    How did you do that?

12  A    Well, I took all -- the delinquency notice, the Washington

13  law letters, that they were telling me I was breaking some sort

14  of law, that I needed to pay these fees, and I looked at my

15  statements.  Even in -- starting in the January, February --

16  like, they didn't add, because the first fees that showed up in

17  my statement were over, like, $10,000.  And it was supposed to

18  be -- I was expecting at least $1,270 that they had reported in

19  December, that was going to come into my statement.  And that

20  didn't even show up.  It was, like, $10,000.  So I didn't even

21  know where they were coming up with some of these ridiculous

22  fees.  I didn't even understand what laws I was breaking, and

23  that were due.

24  Q    This exercise of yours of trying to reconcile all these

25  correspondences from Cenlar, did that take some time away from

LUCERO – Direct (by Ms. Dao)

1    your other activities?

2    A    Yes.

3    Q    How much time, would you say?

4    A    Oh, I would -- I would just calculate that maybe a good

5    day after getting a letter.  And just kind of sitting there and

6    thinking about it, trying to figure it out, trying to work it

7    out, distracted me.

8    Q    What do you mean by distracting you?

9    A    Distracted me from my daily activities of dealing with

10   children and work and community commitments.  I just was

11   distracted.

12   Q    All right.  And by the end of March of 2014, did you feel

13   like you could figure out the problem on your own?

14   A    No, I couldn't.

15   Q    What did you do after determining that you couldn't do it

16   on your own?

17   A    I called Omar.

18   Q    And you and your lawyer had a discussion about all of the

19   correspondences; is that correct?

20   A    That is correct.

21   Q    And as a result of that discussion, did you and your

22   lawyer take some action?

23   A    Yes, we did.

24   Q    What were these actions?

25   A    We -- at this point, I asked him to help me out, and what

LUCERO - Direct (by Ms. Dao)

1    to do.  And I think we ended up sending out notices of error,
2    and trying to figure out what these fees were all about.
3    Q    So your understanding is that there were certain inquiries
4    that you could make under law; is that correct?
5    A    What was that question?
6    Q    Your understanding, then, you could send out some
7    inquiries to Cenlar about the attorney's fees situation?
8    A    That is correct.
9    Q    And this time, did you write the letters, or did your
10   lawyer?
11   A    My attorneys did.
12   Q    And how many letters did your lawyer help you to send out?
13   A    I think two.
14   Q    Directing your attention to 74, Volume 2, what is it?
15   A    That is a letter produced by Omar's firm, March 25, 2014.
16   Q    What is -- is there a name for that letter?
17   A    Yes.  It's in regards to "Request for information pursuant
18   to Section 1024.36 of Regulation X."
19   Q    Okay.  Directing your attention to 75.
20   A    Yes.
21   Q    Do you recognize that?
22   A    Yes.
23   Q    And what is it?
24   A    It's a letter from my attorney's office, March 25, 2014,
25   regarding notice of error under 12 CFR Section 1024.35.

LUCERO - Direct (by Ms. Dao)

1    Q    And the purpose of 74 and 75, Ms. Lucero, is to ascertain

2    the nature of the attorney's fees being charged?

3    A    That is correct.

4         MR. WOZNIAK:  Objection, Your Honor.  Misstates the

5    exhibit.

6         THE COURT:  The letters speak for themselves.  But

7    her motivation behind them is of relevance, so I'll overrule.

8         MR. WOZNIAK:  I understand that.  But if you look at

9    the request for information, that deals with attorney's fees.

10   Notice of error doesn't deal with attorney's fees.

11        THE COURT:  Yeah.  Like I say, the letters speak for

12   themselves.

13        MS. DAO:  Moving to admit 74 and 75, Your Honor.

14        THE COURT:  Seventy-four and 75, any objection,

15   Counsel?

16        MR. WOZNIAK:  No.

17        THE COURT:  They're admitted into evidence.

18             (Exhibits 74 and 75 were admitted)

19   BY MS. DAO

20   Q    So moving to April of 2014, it has become a regular thing

21   now, with Cenlar and you; is that correct?

22   A    That is correct.

23   Q    Did you receive any letter in keeping with Washington law

24   in April?

25   A    Yes, I did.

LUCERO – Direct (by Ms. Dao)

1   Q    And --

2   A    April 1.

3   Q    All right.  And is that -- does the April 1 letter show

4   you any attorney's fees?

5   A    Can you tell me what exhibit?

6   Q    Sure.  Ninety-nine.

7   A    Yes.

8   Q    How much attorney's fees?  Can you approximate?

9   A    On April 1, 2014, the fees that they're telling me they're

10  accruing is $360.

11  Q    Okay.  $306 only?

12  A    $360, correct.

13  Q    And that seems small compared to the prior letters that

14  you got; is that correct?

15  A    Yes, that is correct.

16  Q    You also received monthly statements in April; is that --

17  A    That is correct.

18  Q    All right.  Directing you to Exhibit 103.

19  A    Yes.

20  Q    Is that one of the statements?

21  A    Yes, it is.  It's a statement from Cenlar.

22  Q    What's the date?

23  A    The date on this is April 16, 2014.

24  Q    And is there any attorney fees appearing on the April

25  statement?

LUCERO - Direct (by Ms. Dao)

1    A    Yes, plenty.

2    Q    And what do you mean by plenty?

3    A    There is five entries of attorney fees, ranging between

4    $360, which is what appears on that letter previously, and then

5    there's up to $4,233 of attorney fees added on.  The total

6    amount of that is $9,012.50.

7    Q    What is the -- what is the amount due?

8    A    The amount due on my monthly statement is $19,208.08.

9    Q    What was the due date for that amount?

10   A    The due date on that was April 1, 2014.

11            MS. DAO:  Moving to admit 99 and 103, Your Honor.

12            THE COURT:  How about 104?

13            MS. DAO:  I'm sorry.

14            THE COURT:  103 and 104.

15            MS. DAO:  103 and 104, I'm sorry.

16            THE COURT:  The April letters.

17            MS. DAO:  That's correct.

18            THE COURT:  April letters -- 99, 103, and 104 are

19   admitted.

20            (Exhibits 99, 103, and 104 were admitted)

21            MS. DAO:  Thank you.

22   BY MS. DAO

23   Q    Moving you to May 2014, did you receive certain

24   communications from Cenlar in May of 2014?

25   A    Yes, I did.

LUCERO – Direct (by Ms. Dao)

1    Q    Directing your attention to 100, what is 100?

2    A    One hundred is dated -- it's a letter from Cenlar, dated

3    May 1, 2014.  It's another letter saying, "In keeping with

4    Washington law, please be advised that we have charged your

5    loan."  And they charged five entries, ranging from $306 all

6    the way up to the $4,233.

7    Q    You testified that you filed your lawsuit in early April

8    of '13?

9    A    Correct.

10   Q    And so by May of 2014 it's been a year into your lawsuit;

11   is that correct?

12   A    Yes, a year into my lawsuit and paying my mortgage.

13   Q    Did you feel like your lawsuit had any impact or any

14   effect on what Cenlar was doing?

15   A    No, not at all, not at all.

16   Q    In addition to this May 1 letter, did you receive your

17   monthly statements from Cenlar?

18   A    Yes.

19   Q    Directing your attention to Exhibit 26, can you identify

20   26?

21   A    Yes.  It's a Cenlar statement, loan statement, dated

22   May 16, 2014.

23   Q    Are there any attorney fees appearing on this letter, on

24   this statement?

25   A    Yes, there are.  There are attorney fees dated April 29,

LUCERO - Direct (by Ms. Dao)

1    for $306.

2    Q    Now, I want you to pay close attention to the information

3    that appears on the top right corner.

4         Are you following me?

5    A    Right.

6    Q    What is the -- what are the total fees charged, according

7    to this statement?

8    A    So according to the statement, they had added the attorney

9    fees and my late charge assessment of $57.84.  So the total fee

10   charged on that statement is $363.84.

11   Q    Your prior testimony is that the $57.84 is typically a

12   late fee that you pay because you pay -- you pay after the

13   15th; is that correct?

14   A    That is correct.

15   Q    And according to this statement, the late fee are now

16   attached to the attorney's fees.

17   A    That is correct.

18   Q    And they became the total fees charged.

19   A    That is correct.

20   Q    What is the total amount due on this statement?

21   A    The total amount due, as of May 1, 2014, is $19,513.29.

22   Q    Okay.  Is it your belief that this amount also included

23   the $57.84 late fee?

24   A    Yes.

25            MS. DAO:  I'm moving to admit 100 and 26, Your Honor.

LUCERO – Direct (by Ms. Dao)

1                   THE COURT:  And 27 too?

2                   MS. DAO:  Yes, Your Honor.

3                   THE COURT:  One hundred, 26, and 27 are admitted into

4      evidence.

5                        (Exhibits 100, 26, and 27 were admitted)

6      BY MS. DAO

7      Q    I'm going to shift focus a little bit, Ms. Lucero, and ask

8      you about your mental health as of May 2014.

9           Can you tell the Court how you felt during this period of

10     time?

11     A    Well, I was definitely overwhelmed, definitely overwhelmed

12     with the delinquency notices, and the Washington law inquiries

13     that I would -- I was accruing these fees, and how I was going

14     to make these payments, or lose my house and kids.  I just -- I

15     started to have a nervous breakdown.  I had a nervous

16     breakdown, in May, and I sought help.  I sought counseling.

17     Q    How did you mean by a nervous breakdown?  Because that

18     seems to carry --

19     A    I would have these outbursts of crying and uncontrollable

20     emotions.  I'd shake.  I'd have sleepless nights, for sure, but

21     I was definitely a wreck.  I couldn't function anymore.  I was,

22     like, numb.  I was in a daze.  I felt like this was a bad dream

23     I was living, and I couldn't control my emotions.  I was

24     getting a little -- I just couldn't function.  I would have

25     crying sessions in my car, just so that my kids wouldn't see it

LUCERO – Direct (by Ms. Dao)

1    in the house.  And I was trying really hard to keep it

2    together.

3    Q    Why did you believe so fervently that you would lose the

4    house?

5    A    Because it was all there, my delinquency notice, being

6    reported, amounts due that I couldn't afford.  I mean, they

7    could easily just say, "She's not paying her bills.  They're

8    due."  But people don't know that the amount due is totally out

9    of my capacity to pay.

10   Q    But why was the fear of foreclosure so real to you, when

11   there was no --

12   A    Because it happened before, in 2012, which is why I was

13   doing the mortgage mod.  I went through that HAMP program.  I

14   had been there.

15   Q    So let me focus you on that a little bit.

16        When you sought modification back in 2012, you knew what

17   you were able to make per month; is that correct?

18   A    That is correct.

19   Q    And you sought to get a loan mod so that you can pay every

20   month.

21   A    That is correct.

22   Q    What is the difference between that situation and the

23   attorney fees that are being imposed, or assessed against your

24   account in May of 2014?

25             MR. WOZNIAK:  I'm going to object on vague.

LUCERO - Direct (by Ms. Dao)

 1              THE COURT:  Well, overruled.  You can answer.

 2              THE WITNESS:  The difference is that when I signed my

 3    mortgage mod, all of those fees were -- anything that I didn't

 4    pay, or fees that I accrued through the mitigations of

 5    mediations of getting my home modification were rolled in.

 6    That's why I paid a little bit more.  That's why it appeared

 7    that my new mortgage mod was $406,000, plus a 40-year term,

 8    because I was paying back what I owed.  And so all of these

 9    fees are showing up now were -- made no sense.  I didn't know

10    where they were coming from, and I was trying to understand.

11    And the amounts that were due are out of control.

12    BY MS. DAO

13    Q    Did you feel like you had any power over what was being

14    charged?

15    A    No, none.  None at all.

16              THE COURT:  Ms. Lucero, what were you doing in May of

17    2000?  Were you employed?

18              THE WITNESS:  2014?

19              THE COURT:  Yes.

20              THE WITNESS:  Yes, I was.

21              THE COURT:  In what job?

22              THE WITNESS:  I was with a different firm called

23    Caron Architecture.

24              THE COURT:  And you describe being emotional,

25    overwhelmed, and having these things.

LUCERO - Direct (by Ms. Dao)

1      Did it interfere with your work at all?

2            THE WITNESS:  Yes, it did.

3            THE COURT:  How so?

4            THE WITNESS:  Sometimes I would have to take little

5      walks.  At one point, I had been so stressed out that I asked

6      one of the supervisors if I could use his office so I could

7      just have a moment to breathe.  One my co-workers came over and

8      had to break a knot from my neck, because I was so stressed

9      out.  And I wasn't concentrating at work.

10           THE COURT:  Did you suffer any damages at work in

11     terms of having to take time off?

12           THE WITNESS:  It was just hard on me.  It was a small

13     firm.  So, you know, with small firms, you know, you have to

14     keep it together, because it's a small firm.  It really kind of

15     impacts work performances with everybody else.  So I realized

16     then I really needed to kind of, like, keep this as far away

17     from them as possible, which is why I asked to be in one of

18     their rooms.  I was losing concentration.  I even burned my arm

19     on accident, trying to make dinner.  I was -- I have this burn

20     right now.  Because I was steaming vegetables, and I wasn't

21     paying attention, and I --

22           THE COURT:  Okay.  What was the status of your

23     divorce at this time?  Was it finalized?

24           THE WITNESS:  Oh, yeah.

25           THE COURT:  That was long --

LUCERO - Direct (by Ms. Dao)

1           THE WITNESS:  Yeah, that was 2010.

2           THE COURT:  2010.  All right.  And were there any

3    issues with the kids, or your husband, about visitation?

4           THE WITNESS:  No.  We had an amicable separation.  I

5    mean, we didn't even say the word divorce.  Because it was an

6    amicable separation, we hired attorneys and counselors.  We sat

7    in a room together.  We talked about how we were going to

8    separate, how we were going to talk to the children, what words

9    to use.  So there was -- you know, it was amicable.

10          THE COURT:  I'm not asking you what Mr. Barraza, or

11   your lawyer, was telling you in terms of advice.  But were you

12   getting any reassurance from the conversation with him that,

13   you know:  Don't worry.  We can take care of this.  Or let me

14   deal with the lawyers --

15          THE WITNESS:  Yeah.  He would try to tell me not to

16   worry.  He'd say, you know, we'll have to -- you know, just

17   keep -- try to relax.  We've got this.  But it was really hard.

18   It was really hard.

19          THE COURT:  Okay.  Thanks.

20       Go ahead, Ms. Dao.

21   BY MS. DAO

22   Q   I'm focusing your attention to the family situation in May

23   of 2014.

24       Were you living with your two boys?

25   A   Yes.  They were living with me at the house.

LUCERO – Direct (by Ms. Dao)

1   Q    And did you live with anyone else?

2   A    No.

3   Q    So aside from your job, you were quite busy being a

4   mother?

5   A    Yes, I was.

6   Q    And you said that you hid from your boys when you were

7   having these crying fits?

8   A    Yes.

9   Q    Why did you hide from them?

10  A    I don't think it was necessary for the children to see me

11  in this state.  I don't think it's necessary that they see

12  their parents cry.  It's not their problem.

13  Q    During this period of time, were you participating in any

14  PTA?

15  A    Yeah.  I was actually pretty involved in the community.  I

16  was a PTA –– I was in the PTA since 2006, when we moved into

17  the house.  My son started kindergarten, so I really tried to

18  be involved.  And I was really involved, actually.  I was one

19  of the coordinators.  I was a fundraising coordinator.  I was

20  on the board.  I was on a committee chair.  I was very involved

21  in my children's lives, and also in the community.

22  Q    In 2014, were you involved in these activities?

23  A    No.  No, not at all.

24  Q    And can you tell the Court, typically, what you would do

25  with your children after a day from work during this time,

LUCERO – Direct (by Ms. Dao)

1   mid-year of 2014?

2   A    Yeah.  The kids would come home.  I'd come home from work,

3   and I would make dinner, work with their homework.  And

4   sometimes when I wasn't -- when I wasn't doing things like

5   picking up, or dinner, I would have my older son read to my

6   youngest son, kind of help me out, kind of give me some time.

7   Q    And so during this time, were your worries cutting into

8   your family time with the boys?

9   A    Yeah.  Yeah, they were.  They were cutting in.  I was

10  dropping appointments, missing things.  I was trying to -- I

11  really was.  And that's when one of my girlfriends told me

12  about Penelope.

13  Q    In addition to the feelings that you described to the

14  Court, worries, panic, did you have any physical symptoms?  Do

15  you know what I mean by that?

16  A    Yeah.  You know, like I said, you know, I'd get these

17  sharp pains in my back, like this, especially when I would see

18  these statements, and I would digest them.  It's -- I just got,

19  you know, a pit in my stomach.  I get upset.  I wouldn't know

20  what to do.  I felt like I was being ambushed.  I just didn't

21  know how to deal with it.  And it was in May when I finally had

22  this breakdown, where I just really needed someone to talk to,

23  and that's when I reached out to my counselor.

24  Q    And you sought out Penelope Bell?

25  A    That's correct.

LUCERO – Direct (by Ms. Dao)

1   Q    And you know what kind of credentials or what kind of

2   counselor she is?

3   A    She was a coach.

4   Q    And, you know, maybe it's an odd question to you, but most

5   people, when they go through these kind of situations, they

6   would go and see a doctor or a psychiatrist or a psychologist.

7        Why did you choose a coach over these other professionals?

8   A    Because I really couldn't afford to not be around my

9   children.  I needed to be focused.  I just needed to figure out

10  how to deal with the emotions and the stress that was being

11  imposed by all of this distraction.  And so I just -- I needed

12  someone to work through these emotions with me, help me get

13  through the day, understand how to compartmentalize my emotions

14  and keep focused, and not to get over-worked up; and try to be

15  there for my kids, because they didn't need to see this.

16  Q    And the feelings and the physical symptoms that you had as

17  of May 2014, how often did you have them?

18  A    Well, it seemed like they were especially when the two

19  statements coming in, and I look immediately at the amount

20  that's due, and it's always different.  So it was -- you know,

21  it was escalating in a month, because I'd get two in a month,

22  and then I'd get these letters of delinquency.  And so, you

23  know, it was just always escalating.  I was always -- I was

24  always on that moment of freaking out all the time.  And so I

25  was -- I just -- I wasn't functioning properly.

LUCERO – Direct (by Ms. Dao)

1    Q    And so you -- when did you begin to see Ms. Bell?

2    A    May, the first week of May, the 7th of May, 2014.

3    Q    And in May have you gotten any responses to either your

4    December letter or the two letters that your lawyer sent out in

5    March of 14?

6    A    For my inquiry, no.

7    Q    Moving you on to June of 2014, you testified that you

8    got -- you would get statements from Cenlar; right?

9    A    Correct.

10   Q    Did you get -- how many did you get in June?

11   A    Two.

12   Q    Directing your attention to 28.

13   A    Yes.

14   Q    Is that one of the statements?

15   A    Yes, it is, a statement from Cenlar, a loan statement,

16   dated June 16, 2014.

17   Q    Were there any attorney fees on that statement?

18   A    No, not on this one.

19   Q    Okay.  Even though there was no fees, what was the amount

20   due?

21   A    The amount due on June 1, 2014, is $19,544.10.

22   Q    Moving you and directing your attention to Exhibit 29,

23   what is it?

24   A    This is a Cenlar statement, dated June 23, 2014.

25   Q    And I notice that the amount due has changed.

LUCERO - Direct (by Ms. Dao)

1        Do you know why it was changed?

2   A    Yes.  It reflects my payment.

3            MS. DAO:  Okay.  Moving to admit 28 and 29, Your

4   Honor.

5            THE COURT:  Twenty-eight and 29 are admitted.

6                (Exhibits 28 and 29 were admitted)

7   BY MS. DAO

8   Q    Did you happen to receive any delinquent notice in July of

9   2014?

10           THE COURT:  You can direct her to the exhibit.

11           MS. DAO:  Yes.  I think it's 47.

12           THE WITNESS:  Yes, I did.

13  BY MS. DAO

14  Q    Is that the delinquent notice, dated --

15  A    June 16, 2014.

16           THE COURT:  Forty-seven is admitted into evidence.

17                (Exhibit 47 was admitted)

18           MS. DAO:  Thank you, Your Honor.

19           THE WITNESS:  Thank you.

20  BY MS. DAO

21  Q    In June of 2014, were you aware of any responses that were

22  given by Cenlar to your general question about attorney's fees?

23  A    Yes, there was a response.

24  Q    I'm directing you to 40.  Do you recognize the exhibit?

25  A    Yes, I do.

LUCERO - Direct (by Ms. Dao)

1   Q    What is it?

2   A    It's a letter dated June 18, 2014, from Cenlar's

3   attorneys.

4   Q    And you -- your attorney shared this with you; is that

5   correct?

6   A    Oh, yes.

7   Q    And what did -- what did this letter convey to you?

8   A    It says that, "This is our final correspondence in

9   response to your request of the QWR."

10  Q    So that's referring to back --

11  A    Yes.

12  Q    I'm sorry.  Referring back to the letter you wrote back in

13  December?

14  A    December of 2013.

15  Q    Year prior?

16  A    Yes, correct.

17  Q    And what -- did this exhibit finally give you the reasons

18  for the attorney's fees and costs?

19  A    Yes, it did.

20  Q    All right.  And what was the first reason that they gave

21  you, in this exhibit?

22  A    Well, it says here:  Attorney fees and costs, dated

23  November 25, 2013.  There is a requirement to reflect all

24  account activity under CFR 1026.41(d).

25  Q    And did you understand that to be Washington law?

LUCERO - Direct (by Ms. Dao)

1   A     No.  No, it was -- that citation is a federal law.

2   Q     And then it refers to a duty or --

3   A     Yeah.  The statement sent showing a detail of the legal

4   fees and costs complied with the required -- I'm not sure what

5   that says but -- yeah.

6   Q     All right.  So that's fine.

7   A     But most importantly to me, it says that these fees and

8   costs that have been incurred in litigation are authorized by

9   the deed of trust.  And then it goes on to say:  Specifically,

10  Paragraph 9, 14, and 22, Paragraph 6E of the note.

11  Q     Why was it disconcerting to you that they're relying on

12  the deed of trust?

13  A     Because the deed of trust only becomes active when the

14  lenders and I are inactive, in foreclosure or bankruptcy or

15  forfeiture, anything that would cause the lender to feel like

16  their equity was in -- in other words, like, if I was in any --

17            THE COURT:  Ms. Lucero, now you sound like a lawyer.

18            THE WITNESS:  But it was -- it's true.

19            THE COURT:  Well, I know.  But that's not what you're

20  here for, so don't tell us what you think the law is.

21            THE WITNESS:  Okay.  I'm sorry.

22            MR. WOZNIAK:  Thank you.

23            THE WITNESS:  Thank you.

24            THE COURT:  Sure.  No problem.  Unfortunately, you

25  know too much about the law now.

LUCERO - Direct (by Ms. Dao)

```
 1              THE WITNESS:  Well, I do, thanks to this exercise.
 2              THE COURT:  So wait for another question.
 3         Ms. Dao?
 4              THE WITNESS:  Okay.  Thank you.
 5    BY MS. DAO
 6    Q    So let me ask you the question this way.
 7         When you were in default, back in 2012 --
 8    A    Correct.
 9    Q    -- you understood that there are fees and costs relating
10    to the default, and curing it; is that correct?
11    A    Correct.
12    Q    And you agreed to pay those fees and costs.
13    A    That is correct.
14    Q    And they -- your belief is that they would roll into your
15    new principal balance.
16    A    That is correct.
17    Q    So now, as you're being told that these fees and costs
18    were incurred by Cenlar in defense against your lawsuit, you
19    did not agree.
20    A    That is correct.
21    Q    Because you were not in default.
22    A    No, I was not in default at all.
23    Q    Were you in foreclosure at this time?
24    A    No, I was not in foreclosure.
25              MS. DAO:  Move to admit Exhibit 40, Your Honor.
```

LUCERO - Direct (by Ms. Dao)

```
1                    THE COURT:  Forty?

2                    MS. DAO:  Yes.

3                    THE COURT:  Forty is admitted into evidence.

4                         (Exhibit 40 was admitted)

5    BY MS. DAO

6    Q     Did you have -- did this letter that you were reviewing,

7    dated June 18, evoke some feelings in you, when you finally got

8    the answers?

9    A     Yes, it did.

10   Q     How did it make you feel?

11   A     I was angry.

12   Q     Why?

13   A     I was upset.  Because this whole time, you know, I'm

14   asking to find out what -- why are these fees happening, what

15   laws am I breaking?  And then these guys come back and send me

16   a letter that said that it's a federal law that requires for

17   them to reflect, like, their accounting on my statements, for

18   the litigation that we're involved in.

19   Q     So now they're telling you that they charge you their fees

20   because you dare sue them; is that your perception?

21   A     That is my perception.

22   Q     And how did you react to that?

23   A     I was appalled.

24   Q     Why?

25   A     Because.  I mean, we hadn't even been to court.  We
```

LUCERO - Direct (by Ms. Dao)

```
 1    haven't -- why -- it doesn't make any sense what they were
 2    doing.  It only made me feel like they were after my home.
 3    They wanted me out.
 4    Q    Now, you testified earlier that you borrowed money from
 5    someone else, not Cenlar.
 6    A    My --
 7    Q    Your original lender.
 8    A    My original lender was Taylor, Bean, Whitaker.
 9    Q    Did you, in fact, make some payments to Taylor, Bean,
10    Whitaker?
11    A    Yes.  In fact, I was married at the time, in 2006.  So we
12    divorced in 2010.  We made payments.
13    Q    So during the course of your default and loan mod, you
14    also learned that Cenlar is not the owner of the lender; is
15    that correct?
16    A    That is correct.
17    Q    Who did you learn to be so-called investor or owner of
18    your loan?
19    A    Freddie Mac.
20    Q    So when you learned that Cenlar was charging you their
21    attorney's fees in defense of your lawsuit, your reaction is
22    that they couldn't do that; is that correct?
23    A    That is correct.
24    Q    Why don't you think that they had the legal right to do
25    that?
```

LUCERO – Direct (by Ms. Dao)

```
 1              THE COURT:  That's not important to me.
 2              MS. DAO:  Thank you, Your Honor.  I can move on.
 3              THE COURT:  Sure.
 4   BY MS. DAO
 5   Q    I'm going to move you to July -- the month of July 2014.
 6   And I'm directing your attention to Exhibit 30.
 7   A    Yes.
 8   Q    What is 30?
 9   A    It's a Cenlar loan statement, dated July 16, 2014.
10   Q    And there's some fees on this statement?
11   A    Yes, there are.
12   Q    What is the amount due as of July?
13   A    The amount -- the total due is $19,755.41, due on
14   August 1.
15   Q    All right.  And in July you also receive a second
16   statement?
17   A    That's correct.
18   Q    Directing your attention to 31, is that the second
19   statement in July?
20   A    Yes, it is.
21   Q    And the amount has changed.  Can you account for that?
22   A    Yes.  The Cenlar loan statement, dated July 23, 2014,
23   reflects the credit of having paid my mortgage that month.
24              MS. DAO:  Moving to admit.
25              THE COURT:  Thirty and 31 are admitted into evidence.
```

LUCERO – Direct (by Ms. Dao)

```
 1    And I notice that there are more attorney's fees on 30.

 2              MS. DAO:  Yeah.

 3              THE COURT:  Okay.

 4                   (Exhibits 30 and 31 were admitted)

 5    BY MS. DAO

 6    Q    In July of 2014, did you also receive a delinquent notice?

 7              THE COURT:  You can direct her to the exhibit number.

 8              MS. DAO:  Yeah, 48, please.

 9              THE WITNESS:  Yes, I did, July 17, 2014.

10              MS. DAO:  Moving to admit 48, Your Honor.

11              THE COURT:  Forty-eight is admitted.

12                   (Exhibit 48 was admitted)

13    BY MS. DAO

14    Q    Moving to August of 2014, did you also receive two

15    statements from Cenlar?

16    A    August?

17    Q    Yes.

18    A    Yes.

19    Q    Directing you to 32 and 33.

20              THE COURT:  Thirty-two and 33 are admitted into

21    evidence.

22              MS. DAO:  Thank you, Your Honor.

23                   (Exhibits 32 and 33 were admitted)

24    BY MS. DAO

25    Q    Did you also receive a delinquent notice from Cenlar in
```

LUCERO – Direct (by Ms. Dao)

1 | August of 2014?

2 |                THE COURT:  Would that be 49?

3 |                MS. DAO:  Forty-nine, Your Honor.

4 |                THE WITNESS:  Yes.

5 |                THE COURT:  Forty-nine is admitted into evidence.

6 |                       (Exhibit 49 was admitted)

7 | BY MS. DAO

8 | Q    I'm calling your attention to August of 2014 because there

9 | were some events in your life.

10 | A    Yes.

11 | Q    Can you tell us what was going on in August of 2014?

12 | A    Well, it actually started in 2013, when this whole

13 | thing -- I mean, I didn't -- I mean, the whole thing just --

14 | the thought of losing my house was distracting.  So my son's

15 | birthday is in August.

16 | Q    Which son?

17 | A    My youngest son, Max.  And 2013, around that time, around

18 | his birthday, August 12, I also had a deposition happening, and

19 | I kind of screwed up his birthday, a little bit.  Kind of gave

20 | the wrong times, and only one kid showed up, so it was a pretty

21 | sad birthday for him that summer.  But then in 2014, I really

22 | screwed it up, so much so that this year I lost my privileges

23 | of doing the birthday.

24 | Q    What do you mean by that?

25 | A    You know, their dad -- you know, we don't argue much.  We

LUCERO – Direct (by Ms. Dao)

```
1    only -- we only do things for the kids.  But he was very
2    concerned this time.  He said:  You know, the last couple of
3    birthdays you haven't really been there, so let me do the
4    birthday this year.
5    Q    So this year in August you did not get to organize Max's
6    birthday.
7    A    No.
8    Q    I'm now asking you to --
9    A    Sorry.  I'm sorry.
10        THE COURT:  It's okay.
11        It's not -- Ms. Dao, let's take the lunch a little bit
12   early now, and we'll start up again at 1:00.
13        MS. DAO:  That's fine, Your Honor.
14        THE COURT:  And we'll take from 1:00 to about 4:00.
15   But, you know, if we're just going to go month by month, just
16   tell me the exhibits --
17        MS. DAO:  I'm almost done, Your Honor.
18        THE COURT:  That's fine.  It's okay.  But, I mean, we
19   can shorten it, and we'll -- how much more time do you think --
20   you can step down, Ms. Lucero.  Sorry.
21        How much time do you think you have with Ms. Lucero?
22        MS. DAO:  An hour, hour and a half.
23        THE COURT:  Try to shorten it up to 45 minutes; okay?
24        MS. DAO:  I will.
25        THE COURT:  And then do you have Ms. Bell coming in
```

LUCERO – Direct (by Ms. Dao)

1     this afternoon?

2             MS. DAO:  Ms. Bell is on standby.  Yes, Your Honor.

3             THE COURT:  Those are your two witnesses?

4             MS. DAO:  That's it, Your Honor.

5             THE COURT:  Okay.  Great.  We're right on schedule.

6     Thanks.  I'll see you at 1:00.

7             MS. DAO:  Thank you, Your Honor.

8             MR. WOZNIAK:  Your Honor, can I just ask when I'm

9     going to get the opportunity to cross?  So it's going to be

10    Ms. Lucero, Ms. Bell, and then I can cross Ms. Lucero?

11            THE COURT:  No.  You can cross Ms. Lucero after.  I

12    was just wondering when Ms. Bell was coming in.

13            MR. WOZNIAK:  Oh, no problem.  Thank you.

14            THE COURT:  Yeah.  And then, of course, if we don't

15    finish up, do you just have Ms. Bell this afternoon?

16            MS. DAO:  That's correct.

17            THE COURT:  We may interrupt your cross to do

18    Ms. Bell, and then do cross of Ms. Lucero tomorrow morning.

19            MR. WOZNIAK:  Yeah, why don't we just do that.  Why

20    doesn't Ms. Bell go after Ms. Lucero, and then we'll resume --

21            THE COURT:  Sounds great.

22            MS. DAO:  That would save her a whole day of work.

23            THE COURT:  In fact, if she's coming at, you know,

24    1:00, we can interrupt your direct, even, and get her up and

25    out.  It's up to you.

LUCERO - Direct (by Ms. Dao)

1          MS. DAO:  Yes.  We're going to try, Your Honor.

2    Thank you.

3          THE COURT:  Okay.  Thank you.

4                    (Recess)

5          THE COURT:  All right.  You may continue with direct

6    examination of Ms. Lucero.

7          MS. DAO:  Thank you, Your Honor.

8    BY MS. DAO

9    Q    Ms. Lucero, when we left off, we talked about your son's

10   birthday and the relationship that you had -- or you have with

11   their father.

12   A    Correct.

13   Q    You also testified that your ex-husband, Mr. Glidden, also

14   had to sign the loan modification; is that correct?

15   A    That's correct.

16   Q    Because his name was still on the loan?

17   A    His name still is on the note.

18   Q    And you alluded to the fact that in the divorce decree you

19   agreed to take the house and the responsibility that goes with?

20   A    Yes.  That would be the children.

21   Q    And any delinquent status or default status of the loan,

22   would that affect Mr. Glidden, as well?

23   A    Yes.

24          MR. WOZNIAK:  Speculation.

25          THE COURT:  It's not important to my decision.

LUCERO – Direct (by Ms. Dao)

1       Go ahead.

2   BY MS. DAO

3   Q    I am going to ask you to direct your attention to

4   Exhibit 35.

5   A    Yes.

6   Q    Exhibit 35, can you identify it?

7   A    Yes.  Exhibit 35 is a Cenlar loan statement, dated

8   September 22, 2014.

9   Q    Any fees appearing on that statement?

10  A    No fees are appearing in the statement.

11  Q    How about 36, Exhibit 36?

12  A    Exhibit 36, that is a Cenlar loan statement, dated

13  October 16, 2014.

14  Q    Any fees appearing on 36?

15  A    Yes, there are.

16  Q    And do you notice anything unusual about the October

17  statement?

18      First of all, let me break it down.  How much attorney's

19  fees appearing on 36, or the October statement?

20  A    October -- the Exhibit 36, dated October 16, 2014, shows

21  there's $8,745.35 of total charges of fees from the last

22  statement.

23  Q    Okay.  But where are these charges shown?

24  A    The charges are shown in transaction activity, in a box.

25  Q    Did you notice whether they were carried over in the

LUCERO - Direct (by Ms. Dao)

1    overdue payment or the amount due?

2    A    Yes -- no, actually, this time they're not shown in the

3    over -- the total amount due.  They're not.

4    Q    So even though there was over $8,000 shown in the box,

5    they are not carried up --

6    A    No.

7    Q    -- to the amount due?

8    A    Not to the amount due, correct.

9            MS. DAO:  Moving to admit 35 and 36, Your Honor?

10           THE COURT:  Thirty-five and 36 are admitted into

11   evidence.

12               (Exhibits 35 and 36 were admitted)

13   BY MS. DAO

14   Q    Now, in September of 2014, did you receive a delinquent

15   notice from Cenlar?  And I'm directing your attention to 50,

16   which would be the first of the second binder.

17   A    Yes, I did.

18   Q    And referring you to 51, as well.

19   A    Yes.  That would be another delinquent notice sent to me

20   by Cenlar, dated October 17, 2014.  And that would be the last

21   one I received.

22   Q    So even though the October statement doesn't carry over a

23   large sum of attorney fees anymore, you still received a

24   delinquent notice for each of those two months, September and

25   October?

LUCERO – Direct (by Ms. Dao)

1   A     That is correct.

2              MS. DAO:  Moving to admit 50 and 51, Your Honor.

3              THE COURT:  Fifty and 51 are admitted into evidence.

4                  (Exhibits 50 and 51 were admitted)

5   BY MS. DAO

6   Q     Now, in October 2014, do you recall whether you received a

7   response from Cenlar, finally, about the attorney fees issue?

8   A     Yes, we did.

9              MR. WOZNIAK:  Objection.  Argumentative.

10             THE COURT:  Yeah.  The word "finally" is stricken.

11      Go ahead.

12  BY MS. DAO

13  Q     So I'm directing your attention to Exhibit 19.

14      Can you turn to 19, please?

15  A     Yes.

16  Q     Ms. Lucero, 19 has multiple pages; do you see that?

17  A     Yes, I do.

18  Q     And I'm going to ask you to search and go from the bottom

19  up, to the last page of the exhibit, please.

20  A     Okay.

21  Q     So does Exhibit 19 provide you with a breakdown of

22  attorney's fees and costs that Cenlar charged you?

23  A     Yes, it does.

24  Q     And 19 comprises a cover letter and then many pages of

25  attachment; is that correct?

LUCERO – Direct (by Ms. Dao)

1    A    That is correct.

2    Q    Okay.  So now I'm directing you to the itemization

3    schedule alone.

4         Are you following me?

5    A    Yes.  It's, like, the last four pages of the document.

6    Q    Yes.  So you recognize the itemization there?

7    A    Yes, I do.

8    Q    And is it your understanding that Exhibit 19 represents to

9    you that these are the fees and costs that Cenlar has charged

10   your account?

11   A    Yes.

12   Q    All right.  And can you tell the Court whether there is a

13   total to the itemization list?

14   A    Yes.  I actually took a calculator, and I added all these

15   up, and they totaled $26,724.

16   Q    Now, I'm going to ask you to look at the -- okay.  I see

17   that there's a subtotal on the last two pages.

18   A    Yeah.

19   Q    But you did your independent calculations?

20   A    Yes.

21   Q    And the figure was how much again?

22   A    $26,724.

23   Q    Was there anything unusual about this itemization that

24   caught your attention?

25   A    Yes.  Yes, there was something very particular about this

LUCERO - Direct (by Ms. Dao)

1   number.  I could mention, my new statements that I have with

2   the new servicer shows that I owed --

3           MR. WOZNIAK:  Objection.  Hearsay.  Speculation.

4   Lack of foundation.

5           THE WITNESS:  It's my mortgage --

6           THE COURT:  Okay.  I'll take care of the rulings,

7   Ms. Lucero.

8       The objection is overruled.  Go ahead.  You can finish the

9   answer.

10          THE WITNESS:  Yes.  This number, it does appear on my

11  current statements.

12  BY MS. DAO

13  Q    So you noticed that there were some new amounts that you

14  did not see before, in all of the correspondences that Cenlar

15  sent to you; is that a fair statement?

16  A    That's correct.  That's a fair statement.

17  Q    Can you decipher these new amounts that you just testified

18  to?  Are they -- which page are they on?

19  A    The last two pages.

20  Q    So let's start with the very last page first, Ms. Lucero.

21  A    Yes.

22  Q    Are you contending that these charges appearing on the

23  last page here, you did not see them in the previous

24  correspondence sent by Cenlar?

25  A    No, not at all.

LUCERO - Direct (by Ms. Dao)

```
1    Q    And did you form an independent understanding meaning,
2    when you read these --
3    A    Yeah, I did, actually.  Because when we sat down and
4    discussed the October -- the October 22 letter --
5    Q    Yeah, statement.
6    A    The statement, sorry.  It said that those fees were
7    incurred -- the attorney fees were incurred because of the
8    litigation; and that we didn't do our -- we didn't issue our
9    lawsuit until April, but these dates are dated in February of
10   2013, which is outside the litigation.
11   Q    There is an exception -- would you look on the second
12   line?  There's a line item for $10.42; do you see that?
13   A    That's correct.  Yes, I see that.
14   Q    And that is -- the date of that is what?
15   A    It says here November 25, 2013.
16   Q    You were notified of that fee; were you not?
17   A    I was notified of that fee on the December 4 letter, 2013.
18   Q    Okay.  But you're contending that some of these fees are
19   not in line with the date that you filed the lawsuit; is that
20   what you're saying?
21   A    Yes, I am.
22   Q    And what line items would that be?
23   A    Well, all of them.
24   Q    All of the ones that are for --
25   A    Yes, all of the ones that are on this page.
```

LUCERO - Direct (by Ms. Dao)

1    Q    Well, let me be clear.  You said you filed a lawsuit in

2    April of 2013?

3    A    Correct.

4    Q    So on this page, there were actually two line items that

5    occurred after April of '13; do you agree?  The first -- the

6    very top two.

7              MR. WOZNIAK:  I'm going to object --

8              THE COURT:  The objection is sustained.  She's

9    testified -- you know, you may not think she testified

10   correctly, but let's move on.

11        And, you know, the documents refer to attorney costs and

12   attorney fees separately, and we've just been calling them fees

13   separately.  So you might be more precise about that too.

14             MS. DAO:  Sure.  Thank you, Your Honor.

15             THE COURT:  But let's move on.

16   BY MS. DAO

17   Q    So your contention is that you've been charged with fees

18   that are not related to the defense of your lawsuit?

19   A    That's correct.

20   Q    Now, after October of 2014, did you receive more

21   statements?

22   A    Yes, monthly statements.

23   Q    All right.  I'm going to direct you to Exhibit 105,

24   please.

25   A    Okay.

LUCERO - Direct (by Ms. Dao)

1  Q     And is 105 a December statement?

2  A     Yes.  It's a Cenlar loan statement, dated December 1,

3  2014.

4  Q     Are there any attorney fees on that statement?

5  A     No.  They've disappeared.

6  Q     Are there any amounts due that would carry the large

7  attorney's fees that you saw in the previous month?

8  A     No.  There's none on this statement.

9  Q     Referring you to 106.

10  A     Yes.

11  Q     And that's a January statement?

12  A     Yes.  It's a Cenlar loan statement, dated January 6, 2015.

13  Q     No fees and no carry-over.

14  A     No fees and no carry-overs.

15  Q     And 107?

16  A     107 is a Cenlar loan statement, dated February 5, 2015.

17  Q     Same situation?  No fees and no carry-over?

18  A     Same situation.  No more attorney fees are showing up --

19  Q     108 -- I'm sorry.  108, finally.

20  A     Yes.  108 is the Cenlar loan statement, dated March 10,

21  2015.

22  Q     And you no longer see any fees or the carry-over?

23  A     No, no more attorney fees or costs.

24         MS. DAO:  Moving to admit 19, 105 through 108, Your

25  Honor.

LUCERO – Direct (by Ms. Dao)

1          THE COURT:  Nineteen is admitted into evidence, and.

2          (Exhibits 19, 105, 106, 107, and 108 were admitted)

3    BY MS. DAO

4    Q    In March of 2015, were you informed that your loan was

5    transferred?

6    A    Yes.  I was informed that my loan was transferred to a new

7    servicer, Nationstar.

8    Q    Directing your attention to Exhibit 53.

9          MR. WOZNIAK:  I'm going to object, Your Honor.  This

10   has not been disclosed.  This has not been disclosed during

11   discovery.  It has not been disclosed until I received the

12   exhibit list from the plaintiffs.  It's hearsay, and it lacks

13   foundation.

14         THE COURT:  Are you objecting to the testimony that

15   the loan was transferred to Nationstar or –-

16         MR. WOZNIAK:  No.  I'm objecting to all the documents

17   with respect to Nationstar.  I'm not objecting to the testimony

18   the loan was transferred.

19         THE COURT:  Okay.

20         MR. WOZNIAK:  I'm objecting to the fact that the

21   exhibits have not been disclosed.

22         THE COURT:  Ms. Dao?

23         MS. DAO:  Your Honor, these were not disclosed in

24   discovery, because the discovery deadline had passed for some

25   of them, as they came in to the client.  And then also, as far

LUCERO - Direct (by Ms. Dao)

1    as disclosing it, I believe that Mr. Barraza had spoken to

2    Mr. Wozniak about that.

3         THE COURT:  Well, I'd have to look at them one by one

4    and determine, you know, whether I would still allow them.

5    But, you know, even if they came in late, you have to

6    supplement your exhibit list and send them to them as soon as

7    you know.  And that you're going to -- that you have them and

8    you might use them.  So they're presumptively not admissible,

9    but you can certainly elicit testimony about them.

10        MS. DAO:  Sure, Your Honor.  I can do that.

11   BY MS. DAO

12   Q    Ms. Lucero, before the break we talked about the fact that

13   you -- or actually, not before the break -- but we just

14   discussed the fact that you added all the fees and costs of

15   Exhibit 19, and you came up with a number.

16        Do you remember that number?

17   A    $26,724.

18   Q    And that number carries some significance after the loan

19   was transferred to Nationstar, in your mind?

20   A    Yes, it does.

21   Q    Can you tell the Court what information that you learned

22   from your loan being transferred to Nationstar?

23        MR. WOZNIAK:  Objection.  Your Honor, best evidence.

24        THE COURT:  Well, I mean, the documents seem to say

25   that the $26,724 appears on these statements as attorney's

LUCERO - Direct (by Ms. Dao)

1   fees.

2           MR. WOZNIAK:  But, Your Honor, these statements lack

3   foundation.  They're business records of an entity that's not

4   party to this lawsuit.  There's nobody to identify these

5   records.  So for all I know, and the fact that it hasn't been

6   disclosed, these statements could have been fabricated.

7           THE COURT:  Right.

8           MR. WOZNIAK:  I don't know --

9           THE COURT:  You don't -- I mean, you're not saying

10  they're fabricated.  You're saying --

11          MR. WOZNIAK:  They could have been.  There is nothing

12  here to prove that these statements came from Nationstar.

13          THE COURT:  Well, if they were going to fabricate

14  them, they could fabricate them from Cenlar too.

15          MR. WOZNIAK:  I understand that, but there's

16  really -- before this trial, we reached an agreement as to

17  which documents we were going to admit as foundation, and we

18  were not going to object on these grounds.

19          THE COURT:  Right.  And I'm not going to admit them.

20  But if Ms. Lucero says, "I start getting these documents from

21  my new loan servicer, and the attorney fees in the same amount

22  as Cenlar was saying I owed them suddenly appear on this

23  document," that's testimony that I'm going to allow.  It's

24  not -- I'm not going to admit the exhibits into evidence.  But

25  even if that's inaccurate, even if these are mistakes, their

LUCERO – Direct (by Ms. Dao)

1  effect on her is something she's entitled to testify to.

2      MR. WOZNIAK:  I understand, Your Honor.  But the fact

3  is that that testimony is hearsay.  It's taken from a hearsay

4  document.  And maybe she can testify as to effect that it has

5  on her, but these statements cannot come in for their truth.

6  They cannot come in for the fact that she owes these fees to

7  Nationstar.

8      THE COURT:  Right.  But they can come in about the

9  impact they had on her to read these things when they showed

10 up.  So you can inquire about that.

11     MS. DAO:  Thank you, Your Honor.

12 BY MS. DAO

13 Q  So in receiving -- so after the transfer to Nationstar,

14 did you receive certain documents from Nationstar, and I'm not

15 alluding to any specific document, but did you form an

16 understanding upon receipt of these statements and

17 correspondences from Nationstar?

18     MR. WOZNIAK:  Objection.  Leading.

19     THE COURT:  Overruled.

20     THE WITNESS:  Besides receiving a letter from Cenlar

21 that my mortgage was going to be transferred to a new servicer,

22 Nationstar, I got a welcoming letter from Nationstar confirming

23 that Cenlar had transferred my mortgage -- my servicer to

24 Nationstar.  So when I did get my first statement from

25 Nationstar, I did see in a box that said, "Lender paid" --

LUCERO - Direct (by Ms. Dao)

1              MR. WOZNIAK:  Objection.

2              THE WITNESS:  -- "expenses," and the amount was

3      $26,724 plus a $39 inspection fee.

4              THE COURT:  Okay.  The objection is overruled.

5         And how did it make you feel when you got that?

6              THE WITNESS:  I was so upset.  Because they got paid,

7      and now I have to pay it back.  It's not going away.

8              THE COURT:  Anything else, Ms. Dao?

9              MS. DAO:  No, Your Honor.

10             THE COURT:  Okay.  Mr. Wozniak, do you want to start

11     your cross examination now?

12             MR. WOZNIAK:  Your Honor, I understand that --

13             THE COURT:  Oh, you're not done?

14             MS. DAO:  I'm not done.  Let me move through damages

15     very quickly, Your Honor.  I promise.

16             THE COURT:  Sure.

17     BY MS. DAO

18     Q    Ms. Lucero, you contend in the lawsuit that you suffered

19     damages at the hands of Cenlar; is that correct?

20     A    That is correct.

21     Q    And so let me go through the list of damages that you

22     believe -- or that you have at least relayed to us that you

23     have been out of pocket.  So let's talk about the out-of-pocket

24     first.

25     A    Sure.

LUCERO - Direct (by Ms. Dao)

1    Q    You indicated that you talked to your lawyer separately
2    about sending all these inquiries to Cenlar regarding the
3    attorney's fees.
4    A    Yes, that's correct.
5    Q    How much time did you spend with your lawyer?
6    A    I would say about six and a half hours or so.
7    Q    And you -- you owe attorney fees on six and a half hours
8    of time with your lawyer; is that correct?
9    A    That is correct.
10   Q    And what -- what did your lawyer charge you for the time?
11   A    My attorney charges me $300 an hour.
12   Q    And on your -- did you spend any of your own time
13   reviewing any of the correspondence that was sent to you about
14   attorney's fees?
15   A    About that amount of time.
16   Q    And at the time that you were going through this
17   experience, how much were you making an hour?
18   A    About $32 an hour.
19   Q    So you're saying that you'd spent at least six and a half
20   hours reviewing the documents on your own, before meeting with
21   your lawyer?
22   A    That's correct.
23   Q    And did you spend money for mileage in going to see your
24   lawyer?
25   A    Yes.

LUCERO – Direct (by Ms. Dao)

1    Q    And how much is that?

2    A    His office is in Burien, and I'm in Seattle.  So it was

3    quite a bit of time going back and forth, about $30 of gas

4    money, total.

5    Q    Did you spend any money on postage or copying when you

6    were sending out letters?

7    A    Yes.  I would spend about $12, I would say, copying and

8    stamps and postage.

9    Q    And you indicated that you start seeing Ms. Bell in May of

10   2014.

11        Are you still seeing her?

12   A    Yes, I am.

13   Q    And are you seeing her on a monthly basis?

14   A    I am.

15   Q    And how much do you pay for her time?

16   A    Right now I'm at $2,700.

17   Q    To date?

18   A    To date, yes.

19   Q    And were there months that you saw her more than once?

20   A    Yes, around the holidays, mostly, or when things were

21   getting a little crazy.

22   Q    In terms of the number that you just testified to,

23   $26,724, you said?

24   A    Yes.

25   Q    How do you treat that number?

LUCERO – Direct (by Ms. Dao)

1          MR. WOZNIAK:  Objection.  Vague.

2          THE COURT:  I don't understand what that means.

3   BY MS. DAO

4   Q    What do you take that number to mean to you?

5          THE COURT:  I still don't understand.

6   BY MS. DAO

7   Q    Let me ask the question this way.

8        As you sit here, do you believe that you have incurred

9   some new debt?

10  A    Yes, I have.  I have incurred new debt that I have to pay

11  back.

12  Q    And what is the amount of this debt?

13  A    The amount of the debt, this new debt?

14  Q    Yes.

15  A    $26,724.

16  Q    And who would you owe it to?

17  A    Nationstar.

18  Q    You also testified that you had experienced some credit

19  damage, as well?

20          MR. WOZNIAK:  Objection, Your Honor.  That motion in

21  limine.

22          THE WITNESS:  Yeah.

23          THE COURT:  Yeah.  I said there wasn't going to be

24  any evidence about credit damage.

25          THE WITNESS:  That's correct.

LUCERO – Direct (by Ms. Dao)

1            THE COURT:  I'm not going to consider it for damages.

2   BY MS. DAO

3   Q    I do want to go through your experience with emotional

4   distress a little bit.

5        You testified to feelings, and you told the Court certain

6   feelings that you felt; correct?

7   A    Correct.

8   Q    Are you still feeling those?

9   A    Yes.  I still go through the emotions when I think about

10  what I'm going through.  Also, for the record, I did get fired,

11  in October of last year.

12  Q    And how did that happen?  I'm sorry.  How did that happen?

13  A    Just lack of focus, and they dismissed me.

14  Q    So from August of 2014, you were having some issues; is

15  that correct?  You told the Court.

16  A    Uh-huh.

17  Q    Is it your testimony it culminated into a discharge in

18  October?

19  A    Yes.

20  Q    And how long were you -- so at the time that you were

21  discharged, how much were you making?

22  A    About $32 an hour.

23  Q    And were you working full time?

24  A    Yes, I was.

25  Q    And how long did you become unemployed because of that

LUCERO – Direct (by Ms. Dao)

1    discharge?

2    A    Well, mind you, it was the last quarter of the year, and

3    not a lot of people are hiring, so I had to wait until January,

4    February.

5    Q    Okay.  When did you find your new job?

6    A    I found my job in -- towards the end of February.

7    Q    And what are you making now?

8    A    Well, it's an interesting business model --

9    Q    Just basically your hourly rate.

10   A    Not much.  I'm bringing home, like, $4,000 a month right

11   now.

12   Q    Bring home meaning gross or net?

13   A    Net.

14   Q    Are you still experiencing the physical symptoms that you

15   explained, including loss of sleep?

16   A    Yes.

17   Q    How often do you experience loss of sleep?

18   A    Oh, gosh, definitely around statements and just -- you

19   know, it's mostly -- it's cyclical, because of whenever I see a

20   statement from Nationstar, around the first week of the month,

21   and then that's when I schedule time to be with Penelope to

22   walk me through my emotions, I still get a pit in my stomach.

23   And sometimes I just kind of, like, zone out, and -- which is

24   probably what happened with my arm being burned.  And --

25   Q    Besides from the burn incident, did you have other

LUCERO - Direct (by Ms. Dao)

1  mishaps?

2  A    You know, I tend to -- I mean, I get bruises sometimes,

3  and I don't even know how I got them.  But I think it's

4  because, you know, just walking around and bumping into things

5  and stuff.  But that's about it.

6  Q    In the past, you had related to your lawyer certain

7  incidents where you felt paranoid.

8       Were you feeling paranoid at all?

9  A    Yeah.  There is definitely a lot of times when there would

10 be someone in a car outside my house, and would take pictures.

11 And the one particular time I remember, they had followed me to

12 drop off my son.  And they also -- and so I got a little

13 frightened.  And I knew a father who was in law enforcement,

14 who also has a child in my school, and I stopped him and waved

15 him down and told him that gentleman was following me.  And he

16 said, "Okay, well" --

17            MR. WOZNIAK:  I'm sorry.  Hearsay, Your Honor.

18 BY MS. DAO

19 Q    That's fine.  So you were paranoid about somebody --

20 A    Because they were always constantly coming around.

21 There's people coming to my house and just sitting outside.  So

22 I just figured they were seeing to make sure that I was still

23 in my house, that I was still living there, that -- you know,

24 people do that.

25 Q    So let me ask you this, though.  Because up to this point,

LUCERO - Direct (by Ms. Dao)

1    you haven't been paying any of the attorney fees that were

2    charged by Cenlar; is that correct?

3    A    Correct.

4    Q    And when you testified that in October they seemed to drop

5    off, they show, but then they don't add on to the amount due --

6    A    Right.

7    Q    -- didn't that lessen your worry?

8    A    No.  I just -- I got nervous.  I got nervous, because they

9    still didn't explain themselves, why any of this was happening.

10   It didn't explain.  When we discovered that it was because of

11   litigation, and then we find that there's stuff in there that

12   didn't deal with litigation, nothing made sense.  And I felt

13   like any minute something was going to happen, and they're

14   going to take my house.

15   Q    What could happen?  What could possibly happen?

16        MR. WOZNIAK:  Speculation, Your Honor.

17        MS. DAO:  She's testifying that she's worrying, Your

18   Honor, and I think we're entitled to explore as to why.

19        THE COURT:  Do you have anything to add?

20        THE WITNESS:  Yeah.  That I'm just worried that any

21   minute they're going to come at me and say, "You owe this, and

22   this is what you owe, and, you know, you're delinquent."

23        THE COURT:  Okay.

24        MS. DAO:  That's all I have, Your Honor.

25        THE COURT:  All right.  And Mr. Wozniak, you were

LUCERO – Direct (by Ms. Dao)

1    starting to say something to me.

2        Did you not want to break up your cross?  Is that --

3            MR. WOZNIAK:  I think, Your Honor, because what I

4    understood is that Ms. Bell is coming in.

5            THE COURT:  At 2:00, right.

6            MR. WOZNIAK:  So do you want me to start the cross

7    right now and then interrupt and go forward?

8            THE COURT:  If you don't mind.  But if you think it's

9    going to throw you off your stride, we can do the cross

10   afterwards.

11           MR. WOZNIAK:  I think it would be better just to do

12   it all at once.

13           THE COURT:  Okay.  So I'll get off the bench.  When

14   Ms. Bell arrives, if she comes a little sooner, just let Kerry

15   know, and we'll come back out.  But we'll take at least a

16   15-minute break so my court reporter knows that she needs to be

17   back no sooner than 1:45.  And let us know if it's 1:45 to

18   2:00.

19           MS. DAO:  We'll check, Your Honor.

20           THE COURT:  Okay.  Great.  Thanks.  We'll be

21   adjourned.

22                      (Recess)

23           THE COURT:  All right.  Do you want to call your next

24   witness?

25           MS. DAO:  Yes, Your Honor.  We call Penelope Bell to

BELL – Direct (by Ms. Dao)

1   the stand.

2          THE COURT:  Ms. Bell, if you'll come forward, please,

3   my court clerk will swear you in.

4       PENELOPE BELL, having been duly sworn, was examined and

5   testified as follows:

6          THE CLERK:  Please state your full name and spell

7   your last name for the court reporter.

8          THE WITNESS:  Penelope Bell, B-E-L-L.

9          THE COURT:  Thanks very much.

10      Go ahead, Ms. Dao.

11         MS. DAO:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13  BY MS. DAO

14  Q   Ms. Bell, could you please relate your professional

15  background and what you do for the Court?

16  A   I'm a certified counselor and an executive coach.

17  Eighty-five percent of my practice is comprised of

18  entrepreneurs and women in leadership.  I have a 25-year

19  history in somatic psychology.  I'm licensed with the State of

20  Washington since 2008.

21  Q   You are familiar with Leticia Lucero; are you not?

22  A   Correct.

23  Q   And it's our understanding that you began -- or that

24  Ms. Lucero sought you out in May of 2014; do you recall?

25  A   Correct.

BELL – Direct (by Ms. Dao)

1    Q    And can you tell us whether she's still seeing you at the
2    present?
3    A    Yes, she is.
4    Q    And how often has she been seeing you since May of 2014?
5    A    One to two times a month, sometimes more frequently.
6    Q    So let's go to the period of May 2014, if you don't mind.
7         When you first met Ms. Lucero, what observations did you
8    make, if any, about her?
9    A    She came in for help with stress reduction.  She was
10   feeling very emotional.  I'm going to grab my notes, if that's
11   all right?
12              THE COURT:  Sure.
13              THE WITNESS:  Thank you.
14        She specifically came to see me for help with stress
15   reduction.  She had very high stress due to modification of the
16   loan modification, plus high-level positions at work.
17   BY MS. DAO
18   Q    Okay.  So let me ask you to break it down for us.
19        She came in to see you, and she gave the reason of being
20   in high stress situation; is that correct?
21   A    Correct.
22   Q    Did you, at that time in May of 2014, make any
23   observations physically about her demeanor or her physical
24   appearances?
25   A    I gave her a standard stress reduction test -- not stress

BELL – Direct (by Ms. Dao)

1    reduction, stress assessment test.  She scored 16 out of a

2    possible 18, which is one of the highest stress levels I've

3    received in my practice.

4    Q    And she related to you that her stress was due to both

5    fronts.  One is something having to do with her mortgage loan;

6    is that correct?

7    A    That was predominantly why she was seeing me.  She was

8    worried, concerned about losing her home, and was terrified.

9    That was the primary reason why she was coming to see me.  She

10   deals with a lot of stress in her life, very high-functioning.

11   But what was happening with her house had tipped her over to a

12   state where there was -- she was having difficulty sleeping,

13   digestion -- I mean, there were a lot of symptoms she was

14   presenting with.

15   Q    All right.  So before we get to that point, Ms. Bell, I'd

16   like to -- for you to elaborate on the statement that you made

17   that she had experienced other life stresses; right?  Can you

18   explain if she related to you any other events in her life that

19   were considered to be high stress?

20   A    Not at that time.  I always ask, especially in the first

21   sessions, what work is like, what home is like, what her

22   relationships are like with her co-parent, with her father's --

23   with her boys' father.  And none of those things scored at

24   high, except that there were some -- that just she has a

25   higher-level position, which always has stress involved with

BELL – Direct (by Ms. Dao)

1   it.  That's normal.

2   Q    So you began to tell the Court about physical

3   manifestation from her stress?

4   A    Uh-huh.

5   Q    And what were these manifestations, if you will?

6   A    Difficulty sleeping.  She had chronic insomnia.  She had

7   pain in her neck and shoulders.  She felt tense all the time,

8   at work, at home.  She couldn't relax.  She was feeling anxious

9   all the time.  Her digestion was affected daily, headaches,

10  those are –– yeah.

11  Q    And when she came in in May of 2014, did she appear to you

12  to be someone who was exasperated with whatever that she was

13  coping with?

14  A    Absolutely, yes.  She was –– at a very high level.

15  Q    Have you dealt with people who were facing foreclosure or

16  financial difficulties before?

17  A    Lots of people.  Because I work with entrepreneurs and

18  people in leadership positions since 2008, I've dealt with a

19  lot of people who have been faced with losing their homes or

20  losing –– or who have lost most of their income or assets.

21  Q    So were there anything typical about the fear of losing

22  one's home that you found in Ms. Lucero?

23              MR. WOZNIAK:  Objection.  Vague.

24              THE WITNESS:  Could you restate that?

25              THE COURT:  Yeah.  Ask it again.  I think we all had

BELL – Direct (by Ms. Dao)

1    trouble with it.

2    BY MS. DAO

3    Q    You dealt with people who were having financial

4    difficulties, including losing their homes; correct?

5    A    Uh-huh.

6    Q    Were there a list of characteristics, if you will, in

7    these people, that you recognized in Ms. Lucero?

8    A    Oh, absolutely.  Yeah.  When you're faced with losing your

9    income, losing your home, it takes you into the limbic system

10   part of your brain, which sets off this extreme reactivity

11   around survival that's very common.

12   Q    Did Ms. Lucero relate to you why or how she was afraid of

13   losing her home?

14   A    I wasn't clear about the finer points of what was

15   happening.  There's so many people who were underwater.  It

16   was, like, I didn't understand fully what was happening with

17   her -- at risk.  What I did understand was that the custody of

18   her sons was contingent upon her maintaining ownership of her

19   home, was my understanding.  So it wasn't just losing her home.

20   It was exacerbated by the fear of potentially losing the

21   greater amount of custody of her children.  So it was more

22   extreme than some of the other people that I was dealing with.

23            MR. WOZNIAK:  And, Your Honor, I'm going to, at this

24   point in time, interpose my motion in limine.  This has not

25   been disclosed in the deposition, as Ms. Bell asserted

BELL - Direct (by Ms. Dao)

 1 | privilege.
 2 |        THE COURT:  Oh.  When you asked her about this?
 3 |        MR. WOZNIAK:  I asked her about the contents of her
 4 | communications with her client.  And basically, it was
 5 | privileged.
 6 |        THE WITNESS:  I had not received release from my
 7 | client, at the time of the deposition, to disclose any of these
 8 | things.  And I have since received that.
 9 |        THE COURT:  Right.  Okay.
10 |        MS. DAO:  Your Honor, our position, if I may offer --
11 |        THE COURT:  Sure.
12 |        MS. DAO:  -- a response to that objection?
13 |     As you know, the routine is that counsel, in seeking a
14 | deposition of someone as a treating person, they would secure a
15 | release from my client.  And we never said that we would not
16 | give that.  Mr. Wozniak went ahead and took the deposition
17 | without securing the release.  And when he went there,
18 | rightfully Ms. Bell said, "I haven't been able to -- I haven't
19 | gotten authorization to talk to you about the contents."
20 |     The remedy, then, should have been:  Table the deposition,
21 | get the release, and then depose her again.  He didn't do that.
22 | Months went by.  He didn't do that.  Now, at trial, he's saying
23 | that he wants to tie her to whatever that she was able to
24 | disclose, which was really nothing.  So I don't think it's
25 | fair, at this point in time, for Mr. Wozniak to cry about it.

BELL – Direct (by Ms. Dao)

1              THE COURT:  Well, but don't you think that you should

2     have obtained the permission of your client before the

3     deposition, since you have more access to her than he does?

4              MS. DAO:  I didn't see that it was our burden to get

5     it for him.

6              THE COURT:  Really?

7              MS. DAO:  Yeah.  Normally, you know, it –– again, I'm

8     saying that to my experience, when I do a deposition of someone

9     of this nature, I would do –– I would secure the release with

10    my opposing counsel.  I would say, "Hey, can I" ––

11             THE COURT:  Right.

12             MS. DAO:  And he didn't do that.

13             THE COURT:  But he wouldn't go to her and get the

14    release.  He would go to you, and you would get the release.

15             MS. DAO:  And he never did.

16             THE COURT:  Right.  And what I'm saying is, I don't

17    know why you would want to wait for that, when you know it's

18    going to be important.

19             MS. DAO:  I wasn't waiting at all, Your Honor.  I was

20    just expecting that he would do what he knew to be the right

21    thing to do.

22         Now, as to prejudice, what is the prejudice here?  What he

23    knew then and what he knows now, what is the difference?

24             THE COURT:  Well, it depends on what she says.  I

25    don't know what she's going to say yet.

BELL – Direct (by Ms. Dao)

1        But, you know, I think that especially in a case where
2   you're claiming that the other side is being hypertechnical,
3   and using lawyerly tactics to hurt your client, it seems to me
4   that what you just said is kind of a lawyerly tactic; that you
5   should have just got the release, and get the information we
6   need so counsel can prepare for trial.  I don't understand it.
7   I really just don't understand it.
8        MS. DAO:  I apologize that the Court feels that way.
9   I didn't -- I truly did not think that it was my job to really
10  go and tell the opposing counsel what to do.
11       THE COURT:  But are we trying to find the truth out
12  or not?  Is that what we're doing here?  That's what I'm doing
13  here.  And barriers to the truth, whether they're objections by
14  Mr. Wozniak that are hypertechnical, that I have to overrule,
15  or you standing on, "Well, that's not the way it happens," so
16  that the witness is now -- we're wasting time that should have
17  been all taken care of at the deposition.  It's just
18  frustrating to me.  I don't understand it.  I don't get it.
19  You know, that's not why we went to law school, to become
20  hypertechnical bureaucrats.  You know, we're in the
21  truth-seeking, justice-seeking business.  And that means that
22  we cooperate with each other, we assist each other, and we work
23  towards getting the facts in front of the trier of fact, which
24  this time happens to be me.  And I just find it very
25  frustrating.

BELL – Direct (by Ms. Dao)

1          Now, having said that, we'll just have to see where we go.

2     But, you know, let me just say this.  I was a Superior Court

3     judge for almost ten years.  And nobody would ever make custody

4     of the children contingent on the party retaining the home.

5     That might be in Ms. Lucero's head, how she heard things, but

6     it's just simply not the way judges operate.  Their jobs are

7     much more complex than that.

8          So this particular objection, that the custody of her sons

9     was linked to her retaining her home, is something she

10    testified to already.  I'm not going to strike it or anything

11    like that.  Let's see where we go from there.

12         Go ahead.  Ask another question, Ms. Dao.

13             MS. DAO:  Thank you, Your Honor.

14    BY MS. DAO

15    Q    You testified that Ms. Lucero saw you monthly, or at least

16    monthly, and then sometimes more often than once a month.

17    A    And sometimes less, but much less infrequently -- there

18    was fewer gaps between the months.  There was only a couple of

19    times when I didn't see her for two months.  But it was more

20    frequently.

21    Q    And each time that she came in to see you, was it the same

22    time every month, or did it vary from month to month?

23    A    It varied.

24    Q    And was there a particular trigger at all that she related

25    to you each time she came in?

BELL – Direct (by Ms. Dao)

1    A    It varied.  You know, there are a lot of things that

2    happen in life.  But she would notice that her stress level

3    would get very high, and would call me at that point.  And

4    frequently, we would just schedule out the next month.

5    Q    Got it.  Okay.

6         In August of 2014 -- Ms. Lucero testified today that in

7    August of 2014 she had some problems scheduling or organizing a

8    birthday party for her son.

9         Do you have anything in your notes that reflect whether

10   she related that to you?

11            MR. WOZNIAK:  I'm going to object on the grounds of

12   privilege.

13            THE COURT:  You can answer this question.

14       Does that ring a bell for you at all?

15            THE WITNESS:  No.

16            THE COURT:  Okay.  Let's leave it at that.

17   BY MS. DAO

18   Q    And in October of 2014, were you made aware that she had

19   lost her job?

20            MR. WOZNIAK:  Again, privilege.

21            THE COURT:  This is overruled.  You can answer it.

22       Did you know she had been fired?

23            THE WITNESS:  Yes, absolutely.

24            THE COURT:  Okay.

25   ////

BELL – Direct (by Ms. Dao)

1   BY MS. DAO

2   Q    And what, if anything, you drew from Ms. Lucero about

3   losing her job at that time?

4             THE COURT:  Well, just in general, not what she said,

5   but how did you factor in being fired from an important

6   position and the other stresses that were going on?

7             THE WITNESS:  One of the things that was coming up

8   frequently is that she was very distracted.  It was hard to

9   stay focused.  So that was one of the things that we worked on

10  a lot, was how to take your attention off the stress and focus

11  on what you need to.  But when the stress would hit a certain

12  point, she would lose her ability to stay focused.  So in my

13  professional opinion, that is one of the things that starts

14  building up in a professional situation.

15            THE COURT:  Sure.  And then -- so were you surprised

16  when you heard she lost her job or --

17            THE WITNESS:  I was, because she's so high

18  functioning.  And -- yeah, I was surprised.

19            MS. DAO:  May I?

20            THE COURT:  Go ahead, Ms. Dao.

21  BY MS. DAO

22  Q    Can you explain or elaborate on high functioning, for us

23  and the Court?

24  A    Well, it's a scope of practice.  So the scope of my

25  practice, because I'm a certified counselor, I need to be able

BELL – Direct (by Ms. Dao)

1   to ascertain how high functioning my clients are.  Because if

2   they have serious mental health issues, by law I need to refer

3   them out.  So when I say high functioning, it's someone who's

4   able to maintain relationships, maintain a job, maintain

5   hygiene, maintain basic higher-level just life skills.  So

6   that's what I'm referring to.

7          THE COURT:  So what you're saying is, if you felt she

8   needed, like, antidepressants, or some medication, you'd have

9   to refer her to a psychiatrist.

10          THE WITNESS:  Absolutely.

11          THE COURT:  Or if you felt she needed more, possible

12   hospitalization, or anything like that.

13          THE WITNESS:  Exactly.

14          THE COURT:  But high functioning to you means we're

15   in the realm where a social worker, a counselor, somebody could

16   work with her.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.

19   BY MS. DAO

20   Q    Did Ms. Lucero relate to you how the stress affected the

21   relationships that she has with others, for example, starting

22   out with her family, her two boys?

23          MR. WOZNIAK:  Your Honor, I'm going to object on the

24   grounds of privilege.

25          THE COURT:  Yeah.  I mean, without imparting, you

BELL – Direct (by Ms. Dao)

1    know, verbatim what she said, how did that topic go?

2              THE WITNESS:  So I would get -- I do something called

3    mini-sessions with clients.  So when they get really overly

4    emotional in times that's not appropriate, for instance, around

5    children, I encourage them to step outside, go into the

6    bathroom, give me a call, and discharge some of their feelings,

7    so they're not doing it with their families.  And frequently, I

8    would receive a call from Leticia.  Because she was crying, she

9    didn't want to cry in front of her sons.  And then, you know,

10   we'd process, she'd feel better, and she'd go back and be a

11   mom.

12             THE COURT:  A lot of your clients who are

13   high-functioning women also have the work/family balance to

14   deal with --

15             THE WITNESS:  Absolutely.

16             THE COURT:  -- while they're going through other

17   stresses.

18             THE WITNESS:  Exactly.

19             THE COURT:  And that was something you've encountered

20   in a number of your clients.

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.

23             THE WITNESS:  I encourage them -- they get an A-plus

24   if they pick up the phone and call.  It's hard for them.  Most

25   people -- and Leticia is one of these people -- they don't

BELL – Direct (by Ms. Dao)

1    reach out for help in these realms very often, unless it's

2    reached a critical point.

3            THE COURT:  Do you have receiving-phone-call hours?

4            THE WITNESS:  I do.  I don't pick up when I'm not

5    available.  And I let them know, leave a message.  I will

6    listen to it.

7            THE COURT:  All right.

8    BY MS. DAO

9    Q    Did you, during the course of your work with Ms. Lucero,

10   did you see any progress or regress or plateau during the

11   months that I just mentioned to you?

12   A    I saw quite a bit of progress.  There was a regress -- or

13   you know, there was a very intense session that we had in April

14   of this year, actually.  So there were two sessions, as I was

15   going through my notes, that were very, very emotional.  And

16   one of them was in August of 2014, that you were talking about.

17   So I didn't remember the birthday party, but I do have lots of

18   notes about what was happening then.

19           THE COURT:  Could you relate that session for us?

20           MR. WOZNIAK:  No, Your Honor.  Objection on the

21   grounds of privilege, again.

22           THE COURT:  Well, just in general, not verbatim

23   things, but just in general what the topics were.

24           THE WITNESS:  Things like really losing sleep, the

25   insomnia and the loss of appetite and digestive issues were

BELL – Direct (by Ms. Dao)

1   very strong.  And there was, like, that was also a very

2   positive session, because she was learning how to use the

3   tools.  So she was getting more comfortable with crying, and

4   not feeling like there was something the matter with her

5   because she was feeling emotional.  She was doing more prayer

6   work.  There were things where she was feeling more confident,

7   even though there was a lot more emotions happening at that

8   time.

9        The other time that happened was in April of this year,

10  when she was really shocked by the new deposition, that she

11  said that she was blind-sided.  And --

12          THE COURT:  This was before the deposition or after

13  the deposition?  Or you don't recall?

14          THE WITNESS:  It was April 24, so I'm not sure at

15  what time.  I just -- again, because this isn't my bailiwick,

16  it was, like, I'm just helping her deal with the emotions of

17  whatever, her conditions.

18          THE COURT:  Sure.

19          THE WITNESS:  She was definitely showing higher signs

20  of post-trauma stress symptoms.  She had huge wave emotions.

21  She actually vomited in session.  It was a very intense -- it

22  was a very intense session.  So I did a lot more coaching and

23  training on how to ameliorate the physiological symptoms that

24  were coming up with the stress.

25  ////

BELL – Direct (by Ms. Dao)

1  BY MS. DAO

2  Q    You mentioned deposition.  I don't believe that we were

3  having any activities as far as deposition in April of 2015,

4  you said?

5  A    Right.

6  Q    And that is your note, as far as referring to --

7  A    Right.  That it was scheduled.  It hadn't happened yet,

8  I'm sure, if that's why it's not in there.  This was just news

9  that there was more coming.

10       And so that's frequently what happens.  When someone has

11  been dealing with a lot of stress, and then there's the thought

12  of having that stress come again, there could be a spike of

13  symptoms, reaction.

14  Q    And that was in April of this year, so that was just a few

15  months ago; is that correct?

16  A    Uh-huh.

17  Q    And so in sum, you said that there was some progress, but

18  there also seemed to be some regress, as well?

19  A    Correct.

20  Q    Is that normal?  Is that to be expected for somebody who's

21  going through life events like herself?

22  A    Well, and also especially ongoing.  If there's an ongoing

23  stressor.  So one of the things that came out in the notes

24  too -- one of the phrases was that I've -- "It's been four

25  years of not knowing."  And so when you're living in that kind

BELL – Direct (by Ms. Dao)

1    of an ongoing –– it's like ongoing static, can take –– and the

2    physiology of it is very strong.  And it's one of the things

3    that causes disease, when we're living with that level of

4    stress all the time, no matter –– it's kind of like you're

5    functioning on top of it, and then little things will ––

6    Q    Set you off?

7    A    –– set you off.

8    Q    So you observed and you worked with her not only towards

9    the feelings, the intangibles, but also, as you noted, that she

10   vomited in the session, and that led you to believe that it

11   affected her physically, as well as ––

12   A    Well, it's constant.  I mean, and that's what the

13   scientific data is.  It's, like, you're living with stress.  I

14   mean, 86 percent of disease is caused by heightened levels of

15   the sympathetic nervous system never being able to shut off.

16   So that's the fight-or-flight.  And when you're in a

17   fight-or-flight sympathetic nervous system, you're

18   constantly –– your adrenals are going, you're not digesting

19   well, your body can't get back down to what I refer to as

20   baseline, which is the parasympathetic.

21        And so a lot of what I do with clients is, I'll teach them

22   breathing techniques, I'll teach them how to exercise, how to

23   put their mind on other things so you can help ameliorate the

24   sympathetic nervous system's responses.  And all of us in our

25   culture have a certain level of that.  But what Leticia has

BELL – Direct (by Ms. Dao)

1   been dealing with is a lot more than what most of us are

2   functioning with during the day.

3   Q    Given the circumstances that she related to you, and you

4   talked about chronic stress, what would help to end the

5   symptoms or the feelings that she has experienced?

6            MR. WOZNIAK:  I'm going to object on the expert

7   testimony.

8            THE COURT:  That does sound like an opinion, rather

9   than -- yeah.  I'm going to sustain the objection.

10  BY MS. DAO

11  Q    All right.  So between April and today, has Ms. Lucero

12  been seeing you every month?

13  A    The only month she missed was August.

14           THE COURT:  Of this year?

15           THE WITNESS:  Of this year.

16  BY MS. DAO

17  Q    Do you foresee that she's -- I'm sorry.  Before asking

18  that, let me ask you this.

19       To the best of your knowledge, has she been exercising the

20  tools that you've been giving her?

21  A    Absolutely, yeah.

22  Q    And that would be breathing, and what else?

23  A    Breathing, exercise, attention off the stress, doing

24  social things, looking at what it is that gives her pleasure.

25  The one thing that I would have -- that I do recommend is that

BELL – Direct (by Ms. Dao)

1   she see me more frequently, because the sessions tend to have

2   longer-lasting positive effect.

3   Q    How long of a session that you usually spend?

4   A    Between 60 and 90 minutes, unless we're doing

5   mini-sessions, and then that can be anywhere from five to 15

6   minutes.

7   Q    And that interspersed with phone calls; if she needed to

8   call you, she would?

9   A    Exactly.

10  Q    Do you have any recommendation as to, going forward, will

11  she need you, given how you have seen her in the last year or

12  so?

13  A    I think people should receive counseling.  So, I mean, I

14  don't know how else to say that.  It's, like, when you're

15  raising a family, and you're in a leadership position, and

16  you're managing everything that's happening in our culture

17  right now, I absolutely recommend that people receive

18  counseling.

19  Q    Have you heard of any other stressors besides the mortgage

20  situation?

21  A    Of course, yeah.

22  Q    What other stressors that Ms. Lucero related to you?

23  A    Losing her job --

24           MR. WOZNIAK:  I'm going to object on the grounds --

25           THE COURT:  This is for your benefit, Counsel.  Don't

BELL – Direct (by Ms. Dao)

1   object automatically.

2        Go ahead.  You can answer.

3             THE WITNESS:  Thank you.

4        Yeah.  There were -- losing her job, needed to get a new

5   job, and also working -- she's working in a start-up company,

6   and that has its own challenges, one of them being that she

7   doesn't get compensated fully until the company hits a certain

8   place.  So that has its stresses.

9   BY MS. DAO

10  Q    Did she relate to you that she was -- that her loan was

11  declared delinquent?

12  A    Yes.  And she has shared frequently that the stress of

13  having her credit be affected -- she worked very, very hard to

14  get to the position where she was at financially.  And to have

15  her credit be ruined, is what she has said many times, that --

16  and to be able -- to have to pay higher interest on everything

17  she does, and also having the debt, those things have been

18  very, very ongoingly stressful for her.

19            MS. DAO:  That's all I have, Your Honor.

20            THE COURT:  Tell me your -- Ms. Bell, your academic

21  background?

22            THE WITNESS:  I was just thinking about this.  I have

23  5,000 hours of certifications, post-graduate work.  I did -- I

24  have 50 credits in graduate school and did not complete my

25  internship.  So I'm just shy of getting my master's.

BELL – Direct (by Ms. Dao)

```
 1              THE COURT:  In counseling?

 2              THE WITNESS:  In counseling, mental health

 3    counseling.

 4              THE COURT:  And your undergraduate?

 5              THE WITNESS:  Was in English.

 6              THE COURT:  At?

 7              THE WITNESS:  San Francisco State.

 8              THE COURT:  Thanks.

 9         And you -- Ms. Lucero referred to you as a coach.

10              THE WITNESS:  So if I may?

11              THE COURT:  Yes.

12              THE WITNESS:  If you go to a counselor, there's

13    something wrong with you, you're embarrassed about it, and

14    you're expected not to pay much money.  If you go to a coach,

15    you're being proactive, you can brag about it, and you spend

16    more.  So I actually do the same work.

17              THE COURT:  Right.

18              THE WITNESS:  But I find that my high-end clients

19    never refer to me as a counselor.

20              THE COURT:  Great.  Let me just ask you, sometimes

21    when you're dealing with people who are under multiple

22    stressors, family, maybe a separation or divorce, financial

23    problems on the job, financial problems after 2008, on the home

24    front, do you sometimes see that one thing becomes the focal

25    point for all the stress, but there's really multiple stressors
```

BELL – Direct (by Ms. Dao)

```
1    that are causing it?
2              THE WITNESS:  Sometimes.  You know, one of the
3    things, because that's my skill set, is, I help look at the
4    whole thing.  It's, like, what's happening in these domains?
5    And I help my clients track.  So one of the things that -- and
6    absolutely that, at times, can happen, where people just get
7    stuck on one thing.  Leticia came with other things also.  So
8    it wasn't just like she was hyper-focused on this case.
9              THE COURT:  And have you also worked with clients who
10   were in litigation?
11             THE WITNESS:  I have not.
12             THE COURT:  Okay.  Believe me, that's one of the
13   major stressors in everyone's life, when they're going through
14   a litigation, because they lose control.
15             THE WITNESS:  Yeah.
16             THE COURT:  But -- and I want you to know that in
17   addition to my juris doctor degree, I have a master's in
18   counseling from Northwestern.
19             THE WITNESS:  Got it.
20             THE COURT:  So I speak your language.
21             THE WITNESS:  Great.
22             THE COURT:  All right.  Mr. Wozniak, questions for
23   Ms. Bell?
24             MR. WOZNIAK:  Your Honor, could I just have a
25   two-minute recess?  I just need to --
```

BELL – Cross (by Mr. Wozniak)

```
1              THE COURT:  Hit the restroom?

2              MR. WOZNIAK:  Yeah.

3              THE COURT:  Yeah.  Sure.  What do you need, just,

4    like, five minutes?

5              MR. WOZNIAK:  Yeah.

6              THE COURT:  We'll just keep it right here, how about

7    that?  We won't talk about you while you're gone.

8                      (Off the record)

9              THE COURT:  We're back on the record.

10        And you will now get some questions from the counsel for

11   Cenlar, Mr. Wozniak.

12                    CROSS EXAMINATION

13   BY MR. WOZNIAK:

14   Q    Good afternoon, Ms. Bell.

15   A    Hi.

16   Q    How are you doing?

17   A    I'm well.  How are you?

18   Q    Good, thank you.

19   A    Good.

20   Q    I hope you recall me from the deposition.

21   A    Of course.

22   Q    So I have a few questions regarding your testimony that

23   you've just given a few moments ago.

24        Now, Ms. Bell, just for the record, I want to just go

25   through your certifications real quick.  You are a certified
```

BELL – Cross (by Mr. Wozniak)

1   counselor; correct?

2   A   Correct.

3   Q   And you've been a certified counselor since 2010; right?

4   A   2008.

5   Q   2008, okay.

6       And you own your private practice; correct?

7   A   Correct.  Actually, I want to –– I've been a certified

8   counselor since 2007.

9   Q   But it's –– if I understood your testimony before, there

10  were different stages of certification?

11  A   Actually, no.  2008 was when I set up my LLC, for my

12  private practice.  But I was actually certified prior to that,

13  so that's the date that sticks in my head.

14  Q   Oh, okay.  No problem.

15      Now, your company is called Simply a Moment; correct?

16  A   Correct.

17  Q   And the purpose of Simply a Moment is counseling and

18  coaching; correct?

19  A   Correct.

20  Q   And then you were a registered counselor first?

21  A   Uh-huh.

22  Q   Since 2001; right?

23  A   Correct.

24  Q   All right.  Now, you are not a licensed psychiatrist or

25  psychologist; correct?

BELL – Cross (by Mr. Wozniak)

1    A    Correct.

2    Q    And you are not a licensed psychotherapist; correct?

3    A    Correct.

4    Q    Now, as a certified counselor, you work with people for

5    the purpose of stress reduction; correct?

6    A    Yeah, that's one of the things.  There's many others, but

7    that is -- part of my background that I bring to the profession

8    is that I have a 25-year history of training in somatic

9    psychology, which is body-based psychotherapy.

10   Q    Yeah.  And to do this job, you're allowed to assess stress

11   or depression levels; correct?

12   A    Correct.

13   Q    Now, you can't diagnose or prescribe medication; correct?

14   A    Correct.

15   Q    Now -- because you are not permitted to practice medicine;

16   correct?

17   A    Correct.

18   Q    Correct.  So, now, if you believed that your client has

19   extreme stress levels that don't allow them to function

20   properly in society, you would refer them out to a medical

21   professional; correct?

22   A    Absolutely, yes.

23   Q    Because at that point in time, that person would need

24   medical help.

25   A    Correct.

BELL – Cross (by Mr. Wozniak)

1   Q    And would need medication; correct?

2   A    Absolutely.

3   Q    More than coaching?

4   A    Correct.

5   Q    All right.  Now, you testified that you worked with a lot

6   of people, because your practice is built to help successful

7   women entrepreneurs who are in high-level positions with

8   companies; correct?

9   A    Uh-huh.

10  Q    And that being successful itself brings in a lot of stress

11  for women; correct?

12  A    Being in leadership positions is stressful for -- it's not

13  just women.  And I work with men also.

14  Q    Okay.  But 85 percent is women; correct?

15  A    Correct.

16  Q    Now, is the stress for women a little different than for

17  men because the women in these positions have to maintain a

18  relationship -- work/life relationship?  And I mean by

19  work/life relationship, I mean they have to juggle personal

20  life, like kids, school, and work?

21  A    Men have to do the same, so I'm not quite sure what you're

22  asking.

23  Q    Okay.  Now, that -- the need for juggling these issues,

24  the life and work issues, creates a lot of stress for

25  successful people; correct?

BELL – Cross (by Mr. Wozniak)

1   A    Correct.

2   Q    And Ms. Lucero, you testified a few minutes ago that she

3   was a successful person; correct?

4   A    Correct.

5   Q    All right.  So, now, her work created a lot of stress for

6   her; didn't it?

7   A    Actually, when I was going through my notes, she really

8   loved that position, and she loved her team.  So she was very

9   surprised when they let her go.

10  Q    Okay.  And but wouldn't you agree that the work brought

11  her some stress?

12           MS. DAO:  Objection.  Asked and answered, Your Honor.

13           THE COURT:  Overruled.  You can answer.

14           THE WITNESS:  Yes, of course.

15  BY MR. WOZNIAK

16  Q    Okay.  Now, you testified that Ms. Lucero had very high

17  stress, correct --

18  A    Uh-huh.

19  Q    -- when she came to see you?

20       And she scored 16 out of 18; correct?

21  A    Uh-huh.

22  Q    Now, you did not refer her to a medical professional;

23  correct?

24  A    Correct.  There wasn't any need, at that point.

25  Q    Okay.  And you did not prescribe her any medication for

BELL - Cross (by Mr. Wozniak)

1    that stress; correct?

2    A    Correct.

3    Q    All you went through is your regular coaching sessions,

4    whereas you would try to use your body-type-level treatment to

5    help her manage the stress; correct?

6    A    Yes.

7    Q    Okay.  I got it.  I understood it.

8         Now, basically, if I understood you, you would refer

9    them -- you would refer your clients to medical professionals

10   if they are unable to handle their life properly, or they're

11   out of reality; correct?

12   A    Correct, or if they're suicidal.

13   Q    Okay.  Now, your treatment, the body-based psychotherapy

14   and mind clearing, and psychology, behavioral psychology, is

15   the treatment that you do with Ms. Lucero; correct?

16   A    I do cognitive behavioral work with people and, yes, the

17   somatic work also, which is teaching them literally how to

18   manage their sympathetic nervous system with the breath.

19   Q    Now, mind clearing is not a technique recognized by the

20   medical community; correct?

21   A    It's not at this time.

22   Q    All right.  Neither is body-based psychotherapy; correct?

23   A    Somatic psychology is absolutely recognized, yes.

24   Q    But I thought that you testified that -- at your

25   deposition that body-based psychotherapy itself, part of your

BELL - Cross (by Mr. Wozniak)

1   practice, is not recognized.

2   A     I don't recall saying that, but it is definitely

3   recognized.

4   Q     Okay.

5   A     It's in the textbooks.

6   Q     All right.  Now, Ms. Lucero comes to you as needed;

7   correct?

8   A     Correct.

9   Q     And at the time when we were taking your deposition, in

10  April of this year, she visited you approximately once a month

11  since May; correct?

12  A     Uh-huh.

13  Q     And the purpose of your treatment of Ms. Lucero is not

14  psychotherapy, but counseling and coaching?

15  A     Correct.

16  Q     And it is to coach her into a calmer state?

17  A     Correct.

18  Q     To help her handle her emotions?

19  A     And it's not just to handle the emotions.  How I work with

20  people is that I take them into a higher resource place.  And

21  so what we do with discharging the emotions, it allows people

22  to think strategically and make different decisions.  So it's

23  not just about clearing the emotions.  It's about helping them

24  think and act strategically, in whatever domain they're

25  choosing.

BELL - Cross (by Mr. Wozniak)

1   Q    Now, the purpose of your treatment of Ms. Lucero is to

2   help her reduce the stress, to get her into a calmer state;

3   correct?

4   A    Uh-huh.

5   Q    So that she can move on with her -- whatever she has to do

6   that day.

7   A    Correct, and so that she's not making herself ill with the

8   level of stress in her body.

9   Q    Okay.  But at no point during your treatment or during

10  your coaching of Ms. Lucero you felt a need to refer her out?

11  A    No.

12  Q    All right.  Now, when she came to you, when there was this

13  initial session, you testified that she came to you, and the

14  reason for her stress was the loan modification issue; correct?

15  A    Correct.

16  Q    And she was also concerned about losing her home; correct?

17  A    Correct.  And that she was in a lawsuit, and that the

18  stress had just gotten to the point where she wasn't -- she was

19  just very emotional all the time and needed some help managing

20  that.

21  Q    Okay.  Now, you testified at your deposition that in your

22  opinion, which you attained from treating Ms. Lucero --

23          THE COURT:  Let him finish the question.  I

24  understand your objection.

25  ////

BELL – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    Based on the treatment of Ms. Lucero, is that the reason

3   for her stress is the litigation; correct?

4   A    That was.

5        MS. DAO:  I'm going to object, Your Honor.

6        THE COURT:  Okay.  And your objection is?

7        MS. DAO:  It's improper impeachment.  He's testifying

8   as to what was supposedly her deposition testimony.

9        THE COURT:  Right.  The form of the question is

10  objectionable, Counsel.  Just ask her directly, not what she

11  said at the deposition.  Ask her what she thinks.  And if she

12  says something different, you can impeach her with the

13  deposition.

14       MR. WOZNIAK:  No problem.  Thank you.  I understand,

15  Your Honor.

16  BY MR. WOZNIAK

17  Q    Now, your opinion, based on your treatment of Ms. Lucero,

18  is that the stress levels have been –– that Ms. Lucero's

19  experiencing is this litigation; correct?

20  A    Correct.

21  Q    And you've been helping her to cope with the stress

22  involved in the litigation; correct?

23  A    The litigation is a piece of it, but it was also what was

24  happening with her credit and her house.  So it's the whole

25  package that I've been helping her with.  It wasn't just this

BELL – Cross (by Mr. Wozniak)

1   case.  It was the whole situation that she's in.

2   Q    Okay.  Now –– and you understood that she brought this

3   litigation to save her house; correct?

4   A    Yes, that was my understanding.

5   Q    And that understanding came from what Ms. Lucero told you?

6   A    As again, this is not my domain, so it's –– it gets

7   confusing here.  I'm not quite sure how to answer that.

8   Q    Your assessment was based on your treatment of Ms. Lucero.

9   A    Uh-huh.

10   Q    Now, your understanding, since Ms. Lucero came to you back

11   in May of 2014, up until now, has not changed; correct?

12   A    My understanding of?

13   Q    Your understanding of the reasons for the stress ––

14   A    Yes.

15   Q    –– that Ms. Lucero is experiencing.

16   A    Yeah.  That –– again, I think we were talking about it ––

17   it was off the record.  Being in litigation is stressful, no

18   matter what side you're on.  And it's the tipping point.  So if

19   you're already living in a stressful life, which most of us

20   are, you add a condition like that, it makes –– it's the

21   tipping point.

22   Q    And the reason for Ms. Lucero's fear of losing her home is

23   because she's in this court case; correct?

24   A    That's not –– no, that's not my understanding.

25   Q    Okay.  Now, I would like to read into the record part of

BELL – Cross (by Mr. Wozniak)

1   your testimony taken at the deposition.

2             THE COURT:  Okay.  Why don't you, first of all, tell

3   us what page and line.

4             MR. WOZNIAK:  Sure.

5             THE COURT:  And we have to file the deposition with

6   the Court.

7        Do you have the original?

8             MR. WOZNIAK:  I have the original, Your Honor.

9             THE COURT:  Okay.  Give that to Kerry.

10            MR. WOZNIAK:  No problem.  I am going to read on

11  Page 42, and I'm going to read from Lines 3 to 11.

12            THE COURT:  Do you have a copy?

13            MS. DAO:  I do not, Your Honor.  I don't have any --

14            THE COURT:  Show it to Ms. Dao first, so we know

15  whether it's truly impeachment.

16       It's Mr. Wozniak's contention that you're giving a

17  different answer here in court than you gave in the deposition,

18  so he wants to read your prior answer.

19       Can you imagine if you did that with clients?  Wait a

20  minute.  You told me two months ago -- yeah, Ms. Dao?

21            MS. DAO:  I object, Your Honor.  The deposition

22  testimony is not what Mr. Wozniak is trying to advance.

23            THE COURT:  Bring it on up.  Let me read it.  Thanks.

24       Okay.  Here's -- I'll just read it into the record.  And

25  his question to you is:  "No problem.  I'm not asking you to

BELL – Cross (by Mr. Wozniak)

1   tell me.  I'm not asking you to tell me exactly what happened

2   in the session.  What I want to hone in on —— what is —— if you

3   know what the purpose —— what the reason is, why she believes

4   that she's about to lose her home."

5          ANSWER:  "Being in the court case itself.  It was my

6   understanding that one of the reasons why this was happening

7   was that in order to protect her home, and not lose her home."

8          All right?

9                  MR. WOZNIAK:  Yes.

10                  THE COURT:  Do you want it back?

11                  MR. WOZNIAK:  Well, we want to —— we would like to

12   lodge it, lodge this deposition transcript.

13                  THE COURT:  Okay.  You want to file the original?

14                  MR. WOZNIAK:  Yes.  Thank you.

15                  THE COURT:  Okay.  All right.  We've opened it and

16   stamped it, and it's in.

17          Okay.  It's not an exhibit.  But normally, you would give

18   it in the sealed envelope to Kerry, she would cut it open, and

19   file it, and that's how we publish the deposition.

20                  MR. WOZNIAK:  Thank you, Your Honor.  I apologize.

21                  THE COURT:  That's fine.

22                  MR. WOZNIAK:  The original was not delivered to my

23   office.  It was delivered to co-defendants, so I obtained it

24   from them.

25                  THE COURT:  All right.  Okay.

BELL – Cross (by Mr. Wozniak)

```
1    BY MR. WOZNIAK
2    Q    Now, in addition, Ms. Lucero's financial situation
3    contributed to her stress; correct?
4    A    Uh-huh.
5    Q    Is that a yes?  I'm sorry.
6    A    That's a yes.
7    Q    Thank you.
8         Now, your job is not to treat Ms. Lucero, but to help her
9    manage the stress caused by her decision to pursue this
10   litigation; correct?
11   A    Say that again, please?
12   Q    Sure.  Your job is not to treat Ms. Lucero, but to help
13   manage her stress; correct?
14   A    Correct.
15        MS. DAO:  Your Honor, this question has been asked
16   and answered several times.
17        THE COURT:  True.
18   BY MR. WOZNIAK
19   Q    Now, your job is to help her manage the stress caused by
20   her decision to pursue this litigation; correct?
21   A    My job is to help her manage the stress of her life,
22   whatever decisions she's making.
23   Q    And one of the decisions that she made is that she chose
24   to pursue this litigation; correct?
25   A    Uh-huh.
```

BELL – Cross (by Mr. Wozniak)

```
 1              THE COURT:  Yes?
 2              THE WITNESS:  Yes.  Thank you.
 3              THE COURT:  In the court reporter's notes,
 4   "uh-huh" --
 5              THE WITNESS:  Yeah, thank you.
 6              THE COURT:  Is it "uh-huh" or "huh-uh"?  So "yes" or
 7   "no" is much better for us.
 8         Right, Andrea?
 9              THE COURT REPORTER:  Yes, Your Honor.
10              THE WITNESS:  Thank you.
11   BY MR. WOZNIAK
12   Q    Now, the levels of stress -- you testified that
13   Ms. Lucero's levels of stress have not changed since she first
14   came to you -- to see you in May of 2014 until now; correct?
15   A    They actually change.  They come and go.  So it's never
16   just like one place for any of us.  So there were times when
17   her stress levels were well within normal range, and lower.
18   Q    And, now -- but they would come back, and you would have
19   to coach her again; correct?
20   A    Absolutely, yes.
21   Q    Now, you testified that one of the sessions that was very
22   emotional was the session in April this year; correct?
23   A    Correct.
24   Q    And the reason for that -- the reason for the emotions
25   were associated with Ms. Lucero's deposition; correct?
```

BELL – Cross (by Mr. Wozniak)

1  A    That she was being deposed again, correct.

2  Q    Okay.  And that's the stress associated with the

3  litigation of this case; correct?

4  A    Correct.

5  Q    Now, you'd also testified that at one of the sessions

6  Ms. Lucero told you "four years of not knowing."

7       Do you recall that?

8  A    Uh-huh, yes.

9  Q    Sorry.

10      Now, did it happen in this year or last year, that she

11 said that?

12 A    I'll have to find the note.  So in February of 2015, one

13 of the quotes was, "I haven't felt safe for four years about

14 our home."

15 Q    Okay.  So in February of 2015, you said; correct?

16 A    Correct.

17 Q    So that would mean that Ms. Lucero, then, told you that

18 she hasn't felt safe in her home since 2011; correct?

19         THE COURT:  Well, she said four years.

20 BY MR. WOZNIAK

21 Q    So that would mean since 2011; correct?

22         THE COURT:  Well, again, people say things all the

23 time.  I mean, I might say, "That's the best dinner I've had in

24 20 years," but I don't really mean since –– I mean, 1995, you

25 know what I mean?  All she can do is say what she said, not

BELL - Cross (by Mr. Wozniak)

```
 1   what she meant.
 2              THE WITNESS:  Right.
 3              MR. WOZNIAK:  No problem.
 4   BY MR. WOZNIAK
 5   Q    And do you know why Ms. Lucero said that?
 6              MS. DAO:  Objection, Your Honor.  Speculation.
 7              THE COURT:  Objection is sustained.
 8   BY MR. WOZNIAK
 9   Q    Now, you also testified that Ms. Lucero is -- one of the
10   issues in connection with Ms. Lucero being stressed is that
11   she's working a start-up; correct?
12   A    Correct.
13   Q    And that her job brings stress levels in and of itself;
14   correct?
15   A    Actually, the job itself is not stressful.  There's a lot
16   of joy there.  So it's not an ongoing stressor.  The ongoing
17   stressor has to do with finances and delayed -- it's deferred
18   payment.  So it's just like any entrepreneur, there's always a
19   gap.  And so there's stress in the gap.
20              THE COURT:  And then a lot of start-ups don't make
21   it.
22              THE WITNESS:  Right.
23              MR. WOZNIAK:  I don't have any further questions,
24   Your Honor.
25              THE COURT:  Okay.  Thanks, Mr. Wozniak.
```

BELL – Redirect (by Ms. Dao)

```
 1        Ms. Dao, anything else?
 2              MS. DAO:  Very quickly, Your Honor.
 3              THE COURT:  Sure.
 4                      REDIRECT EXAMINATION
 5   BY MS. DAO
 6   Q    We get it that Counsel is trying to get you to say that,
 7   you know, people file a lawsuit, and then they get very
 8   stressful.
 9        Is that your perception?
10              THE COURT:  Ms. Dao, are you testifying now?
11              MS. DAO:  Not at all, Your Honor.
12              THE COURT:  All right.  Ask a question.
13   BY MS. DAO
14   Q    The question is, is it your perception that when
15   Ms. Lucero came to see you, it was to advance her lawsuit in
16   any way?
17   A    No.
18   Q    Was she truly breaking down, and had to seek help from
19   you --
20   A    Yes.
21   Q    -- is your perception?
22        In her testimony, she related the inability to recall
23   dates and times and events.  Do you have that in your work with
24   her?
25   A    Yes.
```

BELL – Redirect (by Ms. Dao)

1  Q    Is that a typical symptom of posttraumatic stress

2  disorder?

3  A    I wouldn't call it disorder.  I prefer PTSS, which is

4  posttraumatic stress symptoms.  She does not have the disorder.

5  Q    Thank you very much for that clarification.

6       When Ms. Lucero made the statement that she hasn't felt

7  safe in her home in four years, is she relating to the fear of

8  foreclosure?

9  A    There was a whole list.

10  Q    Can you go through that list for us?

11  A    Fear of losing the home, having to pay much higher

12  interest rate, having to pay me for stress management, that her

13  credit was ruined, she really felt that it contributed to

14  losing her job, and her high debt.

15          MS. DAO:  Thank you, Your Honor.

16          THE COURT:  What was the last one?

17          THE WITNESS:  High debt, the high debt.

18          THE COURT:  Debt?

19          THE WITNESS:  Yeah, debt.  Lawyer's fees, she owes

20  me.  It's just building.

21          THE COURT:  Sure.

22  BY MS. DAO

23  Q    And by the way, did she ever relate to you any specific

24  amount of money that she owes to the bank or the creditor or

25  the people who own her home?

BELL – Redirect (by Ms. Dao)

```
 1   A    The only number that I've heard is that there's a $27,000
 2   bill that's unclear about what it's attached to.  I'm not clear
 3   about what that is; but that, in addition to the accruing debt
 4   that she has to me, and other things.
 5          MS. DAO:  Thank you so much.
 6          THE COURT:  Okay.  Thank you very much for coming in,
 7   Ms. Bell.
 8      It's a beautiful courtroom; isn't it?
 9          THE WITNESS:  It's gorgeous.  Oh, god, I walked out
10   the elevators, and -- it's fabulous.
11          THE COURT:  It's really nice on a beautiful day like
12   today.  We're very lucky.
13      Okay.  Thanks.  So why don't we start up at ten of 3:00.
14   We'll take about a 12-minute break here, and we'll do cross
15   examination of Ms. Lucero.
16      Mr. Wozniak, do you have kind of a range in -- of how long
17   you're going to be?  Do you think you'll get it done by 4:00?
18          MR. WOZNIAK:  I doubt it, Your Honor.
19          THE COURT:  Okay.  That's fine.  So we'll be back
20   tomorrow.  Great.
21      But we'll be done in the morning; right?
22          MR. WOZNIAK:  I think so.
23          THE COURT:  I think so too.
24      All right.  Thanks.  We'll be back at ten of.
25                         (Recess)
```

LUCERO – Cross (by Mr. Wozniak)

```
 1                THE COURT:  All right.  Mr. Wozniak?

 2                MR. WOZNIAK:  Thank you, Your Honor.

 3                THE COURT:  Now, Ms. Lucero, obviously, Mr. Wozniak's

 4    on the other team.  Don't let him get to you.  Just remember

 5    that we're in the truth-finding thing here.  And if you're

 6    offended by a question, Ms. Dao might object.  Let me have time

 7    to make the ruling.

 8                THE WITNESS:  Okay.

 9                THE COURT:  And then, you know, just answer the

10    questions the best you can; okay?

11                THE WITNESS:  Okay.  Thank you.

12                THE COURT:  Go ahead, Counsel.

13                MR. WOZNIAK:  Thank you, Your Honor.

14        LETICIA LUCERO, having been previously sworn, was examined

15    and testified as follows:

16                          CROSS EXAMINATION

17    BY MR. WOZNIAK

18    Q    Good afternoon, Ms. Lucero.  My name is Lucasz Wozniak,

19    and I represent the defendant, Cenlar FSB.

20                MR. WOZNIAK:  Now, if Your Honor can bear with me a

21    little bit, because of the different exhibit list I'm a little

22    confused.

23                THE COURT:  Not a problem.  Take your time.

24    BY MR. WOZNIAK

25    Q    Now, you and your ex-husband are borrowers on a mortgage
```

LUCERO – Cross (by Mr. Wozniak)

1   loan which you obtained in 2006; correct?

2   A    That's correct.

3   Q    Now, this loan is evidenced by a promissory note and a

4   deed of trust; correct?

5   A    Can you repeat your question?

6   Q    Sure.  This loan is evidenced by a promissory note and a

7   deed of trust; correct?

8   A    Correct.

9   Q    All right.  And if you look at Plaintiff's

10  Exhibit Number 1 --

11           THE COURT:  Plaintiff's 1?

12           MR. WOZNIAK:  Plaintiff's.

13           THE COURT:  Okay.

14           THE WITNESS:  The note?

15           MR. WOZNIAK:  Yes.

16           THE WITNESS:  Yes.

17  BY MR. WOZNIAK

18  Q    That's the note -- that's the note that you signed in

19  connection with the loan; correct?

20  A    Correct, with my ex-husband.

21  Q    Yes.  And that's your signature at the end; correct?

22  A    Yes, it is.

23           MR. WOZNIAK:  Okay.  At this point in time I'd like

24  to move the note into evidence, Your Honor.

25           THE COURT:  Exhibit 1 is admitted into evidence.

LUCERO – Cross (by Mr. Wozniak)

1                     (Exhibit 1 was admitted)

2    BY MR. WOZNIAK

3    Q    And you also signed a deed of trust, which is Plaintiff's

4    Exhibit 2; correct?

5    A    Yes, I did.

6    Q    Okay.

7    A    With my ex-husband.

8    Q    And that's your and your ex-husband's signatures at the

9    end; correct?

10   A    That is correct.

11           MR. WOZNIAK:  I'd like to move the deed of trust into

12   evidence, Your Honor.

13           THE COURT:  Exhibit 2 is admitted into evidence.

14                    (Exhibit 2 was admitted)

15   BY MR. WOZNIAK

16   Q    Now, the purpose of these documents were to provide you

17   funds necessary to purchase your home; correct?

18   A    Yes, in 2006.

19   Q    Yes?

20   A    Correct.

21   Q    Okay.  And provide you with guidelines as to how to repay

22   your loan; correct?

23   A    That's correct.

24   Q    And you received the funds in 2006; correct?

25   A    That's correct.

LUCERO - Cross (by Mr. Wozniak)

1          MS. DAO:  I would object to this being outside the

2    scope of direct examination, Your Honor.

3          THE COURT:  Overruled.  Go ahead.

4    BY MR. WOZNIAK

5    Q    And you obtained your house in 2006; correct?

6    A    Yes, in August of 2006.

7    Q    All right.  And when you signed the deed of trust and the

8    note, you understood that it was a contract; correct?

9    A    It is a contract.

10   Q    Yes.  And you understood that this contract was binding on

11   you; correct?

12   A    That is correct.

13   Q    Now, can you please read the topic sentence of Section 20

14   of the deed of trust, which is Exhibit 2?

15         MS. DAO:  Objection, Your Honor.

16         THE COURT:  Yeah.  The exhibit speaks for itself,

17   Counsel.  We don't need to have her read it.

18         MR. WOZNIAK:  Okay.

19   BY MR. WOZNIAK

20   Q    You understood that Section 20 provides a requirement to

21   provide the lender with a notice if you're going to bring a

22   lawsuit against them, with respect to the deed of trust;

23   correct?

24         MS. DAO:  Objection, Your Honor.

25         THE COURT:  Did you ever read this?  Nobody reads

LUCERO – Cross (by Mr. Wozniak)

1   that.

2          THE WITNESS:  (Indicating).

3   BY MR. WOZNIAK

4   Q    You understood, though, that by signing it, the terms of

5   the note and the deed of trust became binding on you; correct?

6          THE COURT:  That's true.

7          THE WITNESS:  That's true.

8   BY MR. WOZNIAK

9   Q    Now, you never provided a written notice to the lender

10  prior to bringing your lawsuit; correct?

11         THE COURT:  That's correct.  She did not.

12  BY MR. WOZNIAK

13  Q    All right.  And you understood that under the loan and

14  that under the note and the deed of trust your payment amount

15  was approximately $2,400, for principal and interest every

16  month; correct?

17  A    No.  It was more like $2,750, $2,747.

18  Q    I'm just asking about principal and interest.

19  A    Oh, the principal and interest.  Yes.  Approximately, yes.

20  Q    The other ones was for escrow; correct?

21  A    That's correct.

22  Q    Now, you understood that the loan provided you with an

23  interest rate of approximately 6.25 percent; correct?

24  A    That's correct.

25  Q    All right.  And you understood that your payments you

LUCERO – Cross (by Mr. Wozniak)

1   were –– under the note, you were required to make them for 30

2   years; correct?

3   A     Yeah ––

4          THE COURT:  For 30 years, did you say?

5          MR. WOZNIAK:  Yes.

6          THE WITNESS:  And that is correct.  It's a 30-year

7   term that we agreed to.

8   BY MR. WOZNIAK:

9   Q     And you also understood that if you defaulted, the lender

10   could foreclose; correct?

11   A     Yeah.  That's what it says.

12   Q     And you, in fact –– you understood that under the terms of

13   the note and the deed of trust, if you do not make payment, the

14   periodic payments, you would be in default; correct?

15   A     Yeah, that would be correct.

16   Q     Okay.  Now, on April 3, 2013, you filed this lawsuit;

17   correct?

18   A     In April of 2013, seven years later, with a different

19   lender.

20          MR. WOZNIAK:  And, Your Honor, if I may turn your

21   attention to the pretrial order.  There's some stipulated facts

22   in there.  So I'd like the Court to take notice of the

23   Stipulated Fact Number 1 and 5.

24          THE COURT:  Okay.  I will.

25   ////

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    Now, prior to the filing of the complaint in this case,

3   have you had a chance to look at it?

4            MS. DAO:  Look at what?  I'm sorry.

5            THE WITNESS:  I'm not sure -- what exhibit are we at?

6   BY MR. WOZNIAK

7   Q    I'm asking you, prior to the filing of your lawsuit in

8   this case, did you have a chance to look at the complaint?

9            THE COURT:  Before you actually filed your formal

10  complaint, did you read it over?

11           THE WITNESS:  Yes.  We went over it.

12           THE COURT:  Okay.

13  BY MR. WOZNIAK

14  Q    And you agreed with everything that was said in it;

15  correct?

16  A    Well, I -- what happened was that -- just to be clear, is

17  that I instructed my attorneys to help me get my credit back on

18  track, get that off my credit, and also that I had a $52,000

19  debt that I had no idea how it appeared on my credit.  So I --

20           MR. WOZNIAK:  I'm going to move to strike as

21  nonresponsive.

22           THE COURT:  Let her finish, and then you can --

23           THE WITNESS:  So for me, I had instructed my

24  attorneys to help me figure out how to get it off my credit and

25  how to get right with Cenlar.  So there were -- there were

LUCERO – Cross (by Mr. Wozniak)

1   other things in there that are attorney legalese.  I don't know

2   how to speak it very well.  But I just know that I was charging

3   them to please help me get this off my record.

4           THE COURT:  Sure.  But you did do this declaration at

5   the end that says --

6           THE WITNESS:  Yes.

7           THE COURT:  -- I am the plaintiff.

8           THE WITNESS:  Yes.

9           THE COURT:  I have reviewed this complaint, and

10  believe it true and accurate to the best of my knowledge.

11          THE WITNESS:  That is correct.  That is true.

12          THE COURT:  Okay.

13          MR. WOZNIAK:  Now -- I apologize, Your Honor.  I knew

14  that their -- Plaintiff's exhibit list contained the complaint

15  the first time.  I just can't find the number.  I think it's

16  70.  Yep.

17  BY MR. WOZNIAK

18  Q   Now, could you please look at the Exhibit 70?

19          THE COURT:  Seventy.  Okay.  Give her a minute.

20      And this is the original complaint?

21          MR. WOZNIAK:  That's the original complaint, Your

22  Honor.

23          THE WITNESS:  Yes, 70.

24          THE COURT:  She has it.

25  ////

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    Now, if you look through the complaint, it contains

3   various claims against my client; correct?

4   A    Correct.

5   Q    Now, the claims -- it contains the claim for wrongful

6   foreclosure; do you see that?

7            THE COURT:  Could you refer to a page?

8            THE WITNESS:  What page, by chance --

9            MR. WOZNIAK:  I think it's 5 of 40, Your Honor.

10           THE WITNESS:  I don't have a Page 40.

11           THE COURT:  Just wait a second.

12           MR. WOZNIAK:  Five of Paragraph 40.

13           THE COURT:  Paragraph 40, on Page 8.

14           MR. WOZNIAK:  Let's go -- I've got it.  I'm going to

15   walk through it, Your Honor.

16           THE COURT:  Okay.

17   BY MR. WOZNIAK

18   Q    Please turn to Page Number 8.

19           THE COURT:  All right.  She has it.

20   BY MR. WOZNIAK

21   Q    And there is a statement, Count 1, wrongful foreclosure;

22   do you see that?

23   A    I do.

24   Q    Okay.  Now, if you look at the next page --

25           THE COURT:  All right.  She has it.

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    It contains Count 2, federal debt collection practices and

3   violations; do you see that?

4   A    Paragraph 11?

5   Q    No, no, the next page.  If you look at Count 2 --

6        THE COURT:  Page 9.

7        THE WITNESS:  Yes, I see it right here.

8   BY MR. WOZNIAK

9   Q    Now, Page 10, it contains Count 3, Fair Credit Reporting

10  Act violations; is that correct?

11  A    That is correct.

12  Q    Now, on Page 12, it contains Count 4, Washington Consumer

13  Protection Act violations?

14  A    Correct.

15  Q    Then on the next page, Page 13, it contains two counts,

16  Count 5, negligent training and supervision?

17       MS. DAO:  Your Honor, we would stipulate to the

18  complaint being what it is.

19       THE COURT:  Well, that's not going to help us move

20  things along.  So, I mean -- the Court can take judicial notice

21  of all the documents here, but I think Counsel is building

22  towards a question so --

23       THE WITNESS:  Okay.

24       THE COURT:  -- let him do it.

25       Yes.  It says five is negligent training.  Six is

LUCERO – Cross (by Mr. Wozniak)

1    negligence.  Go ahead.

2              THE WITNESS:  Correct.

3    BY MR. WOZNIAK

4    Q    Now, if you go back to Page Number 40 –- I mean, Number 8,

5    Paragraph Number 40.

6              THE COURT:  Back to Page 8, Paragraph 40.

7    BY MR. WOZNIAK

8    Q    In Paragraph 40 and Paragraph 41, you allege that Cenlar

9    was not the beneficiary and the noteholder until November 21,

10   2012; correct?

11   A    Correct.

12   Q    All right.  Now, on the next page, if you look at

13   Paragraph 44 –- and I'm going to turn to Page Number 10, 44(e)

14   and (g) –- you claim that Cenlar was not the beneficiary of

15   your deed of trust and could not legally foreclose on your

16   property; do you see that?

17   A    Page 10?

18   Q    Page 10, Paragraph 44(e) and (g).

19   A    Yes, I do.  I see that.  That is correct.

20   Q    Now, under Count 4, which is Paragraph 12 –- I mean,

21   sorry –- Page 12, in Paragraph 51, you state that Cenlar

22   mischaracterizes its position as the note holder; do you see

23   that?

24   A    I do.

25   Q    Now, on Paragraph 52, you allege that the issuance of the

LUCERO – Cross (by Mr. Wozniak)

1   notice of default constitutes a deceptive business practice; do

2   you see that?

3   A    I do.

4   Q    Now, if you look at Page 14, Paragraph 62.

5        Now, in Paragraph 62, do you see that?

6   A    Where it says "defendant owed a duty"?

7             THE COURT:  Yes.

8             THE WITNESS:  Yes, I do see that.

9   BY MR. WOZNIAK

10  Q    You allege, among other things, that Cenlar failed to

11  follow reasonable case in following procedural protections

12  enacted to prevent wrongful foreclosure; do you see that?

13            THE COURT:  Reasonable care.

14            MR. WOZNIAK:  I apologize.

15            THE WITNESS:  Thank you.  And, yes, I see it.

16  BY MR. WOZNIAK

17  Q    And then in Paragraph 67, on the same page, you allege

18  that my client threatened to wrongfully foreclose on your

19  property; do you see that?

20  A    I do.

21  Q    So, now, your complaint is more than just about the issues

22  with the credit reporting; correct?

23  A    That is correct.  It's with the debt and the foreclosure.

24  Q    Okay.  So you understood when you filed it that the

25  complaint deals with the foreclosure and my client's status as

LUCERO – Cross (by Mr. Wozniak)

1  a note holder; correct?

2  A    Can you rephrase that, please?

3  Q    Sure.  You understood when you filed the complaint that

4  the complaint deals with the foreclosure; correct?

5  A    Yes.

6  Q    And with a challenge to my client being the note holder;

7  correct?

8  A    There were several entities on that original lawsuit, and

9  Cenlar was one of them.  There was Northwest Trustees.  There

10 was RCO, and some individuals, as well.

11 Q    I understood, but you didn't answer my question.

12      You understood that the complaint deals with a challenge

13 to my client's status as the note holder; correct?

14 A    I was questioning their actions and their authority, to

15 try to figure it out.

16 Q    Now, in September of 2012, Cenlar offered you a loan

17 modification; correct?

18 A    Yes.  Yes, they did.  That's correct.

19 Q    And first they offered you a trial plan?

20 A    Correct.

21 Q    Pursuant to that trial plan, you were required to make

22 payments of approximately $1,500 a month for three months;

23 correct?

24 A    $1,553 for three months straight, correct.

25 Q    $1,523; correct?

LUCERO – Cross (by Mr. Wozniak)

1    A      $1,553.

2    Q      Fifty-three?  Okay.

3           So you were required to make these trial payments in

4    October, November, and December of 2012; correct?

5    A      That's correct.

6    Q      And you made these payments; correct?

7    A      Yes.

8    Q      And then Cenlar offered you a loan modification under the

9    Home Affordable Modification Plan; correct?

10   A      That is correct, in January.

11   Q      Yeah.  And you accepted this?

12   A      Yes, I did.  Oh, absolutely.

13   Q      And at that time, you understood that you received that

14   modification from Cenlar; correct?

15   A      Yes, the servicer.

16   Q      Yes.  And you didn't question Cenlar's authority to give

17   you that modification, modify the loan; correct?

18   A      No.  No, not at all.

19   Q      Now, you signed that agreement on January 25, 2013;

20   correct?

21   A      That is correct.

22   Q      And then Cenlar signed it in April of that year; correct?

23   A      Yes, April of 2013.  And the effective date was March 1,

24   2013.

25   Q      Now, I'd like to -- I'd like you to take a look at the

LUCERO – Cross (by Mr. Wozniak)

1    loan modification.  And it was admitted into evidence at --

2              MS. DAO:  Twelve.

3              MR. WOZNIAK:  Exhibit 12.  Thank you, Counsel.

4    BY MR. WOZNIAK

5    Q    Can you please take a look at Exhibit 12, loan

6    modification?

7    A    Exhibit 12?

8    Q    Yes.

9    A    And my Exhibit 12 is a -- yes, it's the --

10   Q    Loan modification.

11   A    Well, it's the cover letter, yes.  Oh, there it is.  Yes.

12   Q    No problem.

13   A    Yes, I see it's right here.

14   Q    Now, on the very first page it defines you and your

15   ex-husband as the borrower; correct?

16   A    That's correct, still on the note.

17   Q    And then the lender or servicer is Cenlar; correct?

18   A    Say that again?

19   Q    And then underneath your -- you being identified as the

20   borrower, it's identified the lender or servicer, and then

21   defines it as the lender, Cenlar FSB; do you see that?

22   A    It says -- yeah, lender of servicer.  It says lender or

23   servicer.

24   Q    Okay.  And after that it says in quotation "lender";

25   correct?

LUCERO – Cross (by Mr. Wozniak)

1   A    Yes, it does.

2   Q    And at the time you were offered the modification, you

3   were represented by your counsel; correct?

4   A    Yes, absolutely.

5   Q    It was Mr. Barraza; correct?

6   A    That is correct.

7   Q    In fact, you retained your counsel initially to assist you

8   with obtaining a modification of your loan; correct?

9   A    Yes.  Because when I first started this mortgage

10  modification, in June of 2011, I had called Cenlar, because the

11  market had crashed, I had lost my job, and I was really needing

12  to do a mortgage mod.  And I kept -- and they asked me to

13  contact Bayview.  So Bayview took me through this long, lengthy

14  process of constantly losing my paperwork, you know, things

15  expired --

16          THE COURT:  Ms. Lucero, this is not helpful.

17          THE WITNESS:  Okay.

18  BY MR. WOZNIAK:

19  Q    Ms. Lucero, we know that the thing --

20  A    So I did hire an attorney soon after I got a notice of

21  default on my door.

22  Q    To assist you?

23  A    To assist me with the mortgage mod, correct.

24  Q    Now, when you signed that modification, you understood it

25  was a contract; correct?

LUCERO – Cross (by Mr. Wozniak)

1    A    Yes.

2    Q    And you understood that you were responsible for the costs

3    and -- I'm sorry.  You were responsible for the terms in the

4    modification agreement; correct?

5              THE COURT:  Did you say "terms"?

6              MR. WOZNIAK:  Terms.

7              THE COURT:  The terms of the modification.

8              THE WITNESS:  Yes, absolutely.

9    BY MR. WOZNIAK

10   Q    And prior to signing it, you read the modification

11   agreement; correct?

12   A    I sure did.

13   Q    Yes.  And you understood that this modification agreement

14   imposed certain obligations on you, much like the note and the

15   deed of trust did; correct?

16   A    Yes.

17   Q    And you understood that it modified certain terms of the

18   note and the deed of trust; correct?

19   A    Yes.

20   Q    But not others; correct?

21   A    But what?

22   Q    Not other terms.

23             THE COURT:  The deed of trust was still an operative

24   contract too.

25             THE WITNESS:  Correct.

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    Okay.  Now, you understood that you were required to

3   perform these obligations under the note, the deed of trust,

4   and the modification agreement; correct?

5   A    Correct.

6   Q    Now, you understood that the modification provided you

7   with a new loan balance; correct?

8   A    That is correct.

9   Q    And new interest rate; correct?

10  A    That is correct.

11  Q    And the loan -- a new loan term of 40 years; correct?

12  A    The new loan term is 40 years, correct.

13  Q    And a new payment amount; correct?

14  A    Correct.

15  Q    Correct.  Now, you understood, for instance, that the

16  terms, the other terms that we just talked about, remained

17  unchanged; correct?

18  A    Correct.

19  Q    All right.  And, in fact, the modification agreement

20  contains provision reaffirming the note and the deed of trust;

21  correct?

22  A    Yes.

23  Q    All right.  So, for instance, you understood that if you

24  do not make your payments before the expiration of the grace

25  period, which you had a 15-day grace period to make your

LUCERO - Cross (by Mr. Wozniak)

1    payment, you would be assessed late fees; correct?

2    A    Yes, that's correct.

3    Q    But the modification agreement itself does not contain any

4    provisions for the late fees; correct?

5    A    I don't know.  I mean, I'd have to -- I made my payments

6    on the first of every month until probably towards the end of

7    the year of 2013, when -- and this was, of course, we had

8    already filed our lawsuit so --

9    Q    I'm not disputing that, ma'am.  I'm not disputing that.

10            THE COURT:  What are you asking?

11            THE WITNESS:  Right.

12            MR. WOZNIAK:  My question is --

13            THE WITNESS:  I made my payment --

14            THE COURT:  Wait a second.  Wait a second.

15        You're asking about documents that are not in dispute,

16    that she's bound by.  And, you know, you're asking her --

17            MR. WOZNIAK:  I'm asking her about her understanding,

18    Your Honor.  That's about her -- what her understanding of

19    these documents.

20            THE COURT:  All right.  But, you know, you're asking

21    about whether she's read a document and what her understanding

22    is.

23        Where is this going?

24            MR. WOZNIAK:  Your Honor, it's going to the fact

25    that -- to the breach of implied covenant, to the breach of

LUCERO – Cross (by Mr. Wozniak)

1   contract cause of action, by the assessment of the fees.  She

2   testified, in my opinion, that she isn't agreed to pay the

3   attorney's fees.

4           THE COURT:  Right.

5           MR. WOZNIAK:  And we're going through her testimony.

6           THE COURT:  Well, you have a legal argument about why

7   she's responsible to make the attorney's fees.  You're not

8   going to get her to admit she has an obligation to pay the

9   attorney's fees.

10          MR. WOZNIAK:  I'm not saying that, Your Honor.

11          THE COURT:  So let's get to the heart of things.

12          MR. WOZNIAK:  Okay.

13  BY MR. WOZNIAK

14  Q    Now, so going back to your testimony, you understood, for

15  instance, that you're responsible for payment of legal -- I

16  mean, late fees; correct?

17  A    That is correct.  And in my -- every statement you will

18  see that if it is received after the 15th of that month, a late

19  fee is incurred, and I would always pay that.

20  Q    Yes.  And the late fee --

21  A    When -- if I paid after the 15th.

22  Q    And the late fee provision is contained in the note,

23  correct, if you look at Exhibit Number 1, Section 6A?

24          THE COURT:  This is what I'm asking you.  Why do you

25  need to -- she's already said she has to pay it.  The document

LUCERO - Cross (by Mr. Wozniak)

1   is in evidence.  It speaks for itself.

2       So what do you need to point her to that and say, "Yeah,

3   it says that there"?  What do you gain by that?

4           MR. WOZNIAK:  Your Honor, the issue is of her saying

5   that attorney's fees, she was responsible for paying them, and

6   they were added to the loan balance.

7           THE COURT:  Yeah.  So get to the attorney's fees.

8   Don't ask about the late fees.

9           MR. WOZNIAK:  The issue is that, Your Honor, the late

10  fees assessed in the statement were charged based on principal

11  and interest payments, and not the attorney fee provisions.  So

12  I want her --

13          THE COURT:  All right.  We agree with that, that the

14  late fees are based on late fees, not attorney's fees.

15          THE WITNESS:  Correct.

16          MR. WOZNIAK:  Okay.  I understand that.

17      All right.  I'm going to move forward.

18  BY MR. WOZNIAK

19  Q   You understood that although the modifications contained

20  terms concerning the principal interest of your loan payment,

21  you understood that you might be responsible for other fees in

22  the future; correct?

23          THE COURT:  Other fees meaning what?

24  BY MR. WOZNIAK

25  Q   Other fees that come along with the loan in the future;

LUCERO – Cross (by Mr. Wozniak)

1   correct?

2   A    The only thing I can think of is escrow.

3   Q    Okay.  You understood that the total loan balance of your

4   loan modification contained all the fees included --

5   A    That is correct, Mr. Wozniak.

6   Q    -- that occurred prior to modification; correct?

7   A    Correct.  That is correct.  That was our agreement.

8   Q    You understood, though, that these documents provided that

9   you might be responsible for other fees in the future; correct?

10  A    No.

11  Q    You didn't understand that?

12  A    That's not what it says.

13  Q    Okay.  Now, at the time of execution of the modification,

14  you had access to the note and deed of trust; correct?

15  A    Yes.

16  Q    And you could have read them; correct?

17  A    Yes.

18  Q    And Cenlar did not preclude you from reviewing the note

19  and deed of trust prior to you signing the modification;

20  correct?

21  A    That is correct.

22  Q    You understood that prior to your loan being permanently

23  modified, you did not make all of your payments that had

24  otherwise been due; correct?

25       THE COURT:  Could you start that question again?

LUCERO – Cross (by Mr. Wozniak)

1    Prior to the loan being --

2            MR. WOZNIAK:  Permanently modified.

3            THE COURT:  Prior to the HAMP?

4            MR. WOZNIAK:  Prior to the loan being permanently

5    modified by the HAMP modification.

6            THE COURT:  Yeah.

7            MR. WOZNIAK:  In March of --

8            THE COURT:  You missed some payments.

9            THE WITNESS:  Oh, yeah.  Absolutely.  And they were

10   rolled into the final mortgage modification.

11   BY MR. WOZNIAK

12   Q    And you understood that prior to the loan being modified

13   on March 1, 2013, you were in default; correct?

14   A    Well, no, I actually didn't think I was in default because

15   it -- I wasn't.

16   Q    But you understood that you didn't make all the payments

17   that were required, prior to the --

18   A    I did make all my payments required.

19   Q    You made your trial payments; correct?

20   A    I made my trial payments, and I kept making my payments

21   every month.  So I never missed one.

22   Q    Now, you did not make payments between -- since 2011,

23   until you made the trial payments in --

24   A    October 1, 2012.  But all that was lump summed into my

25   mortgage modification.  So, yes, I started to pay them back.

LUCERO – Cross (by Mr. Wozniak)

1    Q     Okay.  And you understood that the loan was being modified

2    effective March 1, 2013; correct?

3    A     It became effective because they saw that I was making my

4    trials.  It was something I could make and keep my home, and I

5    started making my payments.  So I was making my payments.  And

6    they did say it would vary a little bit, and it did a little

7    bit, like, $10.  But I was still making my payments.

8    Q     You understood that prior to modification being effective,

9    you were in foreclosure; correct?

10            MS. DAO:  Your Honor, you have exercised great

11   patience.  And we're sitting here, and these are points of

12   concessions --

13            THE COURT:  Yeah.  I don't understand where you're

14   going, Mr. Wozniak.  Please explain it to me, if I'm missing

15   something.

16            MR. WOZNIAK:  Your Honor, the issue is, Ms. Lucero's

17   contention is that the lawsuit was brought for the purposes of

18   credit -- remedying a credit reporting error.  Her contention

19   is -- one of the contentions is that she was not in

20   foreclosure.

21            THE COURT:  At the time she's getting these things

22   after the HAMP, yes.

23            MR. WOZNIAK:  Yes.  My contention is that the HAMP

24   modification was effective March 1, 2013.  She did not make her

25   payments.  She was not current until the loan was modified on

LUCERO – Cross (by Mr. Wozniak)

1   March 1, 2013.  And she was, in fact, in foreclosure at the

2   time.

3              THE COURT:  Okay.  All right.  But you don't need to

4   get her to admit it.  You've -- you have the concession that

5   she missed payments, and that's why she needed to do this

6   modification.  And then when she did the modification, she

7   stayed on track to make the payments.

8              MR. WOZNIAK:  Yes.

9              THE COURT:  Okay.  That's not in dispute.

10             MR. WOZNIAK:  All right.

11  BY MR. WOZNIAK

12  Q    Now, you understood that when modification was effective,

13  it would terminate all the foreclosure proceedings against you;

14  correct?

15  A    Say that again?

16  Q    At the time the loan was modified, you understood that

17  that modification would terminate the foreclosure proceedings

18  against you; correct?

19  A    Yes.

20  Q    And after these foreclosure proceedings had been

21  terminated, between March 1, 2013, and March of 2015, you did

22  not receive another notice of default from Cenlar; correct?

23             THE COURT:  Did not receive another notice of

24  default.

25             THE WITNESS:  No.

LUCERO – Cross (by Mr. Wozniak)

1    BY MR. WOZNIAK

2    Q    You did not receive another notice of default.

3    A    On my door, like I was going into foreclosure?

4    Q    Yes.

5    A    Like I did the year before, in 2012?

6    Q    Yes.

7    A    That is correct.

8    Q    Now, between March 1, 2013, and November 2013, Cenlar did

9    not refer you to foreclosure; correct?

10   A    Well, they shouldn't have, because I was making my

11   payments since October 1, 2012.  I was making payments.

12           MR. WOZNIAK:  And now I -- I want the Court to take

13   notice of the parties' Stipulated Fact Number 18 and 19.

14           THE COURT:  Okay.

15   BY MR. WOZNIAK

16   Q    And between November 2014, Ms. Lucero, and March 2015,

17   Cenlar did not declare you to be in default; correct?

18   A    Can you repeat those dates, please?

19   Q    Between November 2014 and March 2015.

20   A    And Cenlar what?

21   Q    Cenlar did not declare you to be in default; correct?

22   A    I'd have to go back and see those notifications of

23   default -- no, no.  Default, no.  Correct.  That is correct.

24   Q    And between March -- I'm sorry -- between November 2014

25   and March 2015, Cenlar did not refer you to foreclosure;

LUCERO – Cross (by Mr. Wozniak)

1  correct?

2  A    No, because I was paying my mortgage every month.

3  Q    And between March 1, 2013, and March 2015, Cenlar accepted

4  your monthly payments; correct?

5  A    Until March 2015, that is correct.

6  Q    Now, you believe that Cenlar acted wrongfully because it

7  assessed attorney fees against your account; correct?

8  A    Can you repeat that?

9  Q    You believe that Cenlar acted wrongly because it assessed

10  attorney fees against your account; correct?

11  A    Correct.

12  Q    And included them in the monthly statements; correct?

13  A    An amount due, yes.

14  Q    And it included these fees in the monthly statements

15  between January and October 2014; correct?

16  A    Well, no.  They started to appear in February, in the

17  statements.  But I got a December letter saying that I would

18  incur attorney fees to my loan.

19  Q    And -- but so they appeared between February and October

20  of 2014; correct?

21  A    Until November 2015.

22  Q    Until November?

23  A    Uh-huh.

24  Q    And then stopped; correct?

25  A    They continued until -- I think the last one was December.

LUCERO – Cross (by Mr. Wozniak)

1    We'd have to look again.  But they continued.  But they just

2    weren't on the owed amount, like amount due that month.  They

3    were no longer present there.

4    Q    So after November, they stopped being under the amount

5    due; correct?

6    A    Correct.

7    Q    They appeared somewhere else in the statement?

8    A    They still appeared, attorney fees, correct, and costs.

9    Q    And it's your contention that Cenlar acted wrongly,

10   because you did not agree to pay for these fees, correct, when

11   you signed the modification?

12              MS. DAO:  Objection, Your Honor.  It's

13   incomprehensible what the question is.

14              THE COURT:  Well, I don't think it's

15   incomprehensible.

16        But why do you think you shouldn't have to pay the

17   attorney's fees?

18              THE WITNESS:  Why I shouldn't pay?

19              THE COURT:  Why you shouldn't have to pay.

20              THE WITNESS:  Because we're in litigation.  You know,

21   I don't -- why should I pay for those fees?  I wasn't -- I

22   don't understand.

23        Your client put tremendous amount of pressure for me to

24   pay outrageous amounts of money on a month to month, and they

25   varied month to month.  And I didn't understand what these fees

LUCERO - Cross (by Mr. Wozniak)

1   were.  No one told me what they were.  And I kept asking, and

2   your client never responded in a timely manner, and never

3   explained what those fees were about.

4   Q    Okay.  You believed that when you signed the modification,

5   you did not agree to pay these attorney's fees; correct?

6   A    Could you not use the not-not stuff?  Just ask me a

7   question, please.

8   Q    Sure.

9         THE COURT:  Well, this one -- he's not trying to

10  trick you.

11        THE WITNESS:  I know.  But sometimes -- believe it or

12  not, English is still my second -- like, I speak Spanish

13  fluently too.  And sometimes, specifically when people use the

14  not-not stuff --

15        THE COURT:  Okay.

16  BY MR. WOZNIAK

17  Q    Ms. Lucero, you believe that you don't have to pay the

18  attorney's fees, because the modification did not provide for

19  the payment of attorney's fees; correct?

20  A    I don't have to pay those fees.  I shouldn't pay those

21  fees.  That is correct.  I should not be paying those fees.

22  Those are not my fees.

23  Q    Now, you understand that it is my client's position, and

24  that position has been explained to you in various letters,

25  that my client believes that the attorney's fees -- there are

LUCERO – Cross (by Mr. Wozniak)

1    provisions for attorney's fees in your loan documents, such as

2    deed of trust and the note; correct?

3           MS. DAO:  I'm going to object, Your Honor.  Counsel

4    is testifying now.  He's saying things about his client thinks,

5    or his client's position.  We don't have anything in evidence.

6           THE COURT:  Well, do you understand what their

7    position is?

8           THE WITNESS:  Yeah.  I think that they're trying

9    to -- if we are in a position where I'm in bankruptcy, or

10   something of a matter that I am -- they, as the lender, can put

11   those on the bar.  And, yes, I did sign that provision, because

12   knowing that if I was in some sort of situation with the

13   lender's property was probably in jeopardy --

14          THE COURT:  And you know that these lawyers, on

15   behalf of their client, are saying that same provision covers

16   their having -- that that's their position.  You understand

17   that?

18          THE WITNESS:  I understand that that's their

19   position, but that's not the way I understand it.  That is

20   correct.

21          THE COURT:  Okay.

22   BY MR. WOZNIAK

23   Q    And at the time you filed this lawsuit, you had access to

24   information that -- stating that you could potentially be

25   responsible for payment of attorney's fees in this matter;

LUCERO – Cross (by Mr. Wozniak)

```
 1   correct?
 2          THE COURT:  What do you mean by "access to
 3   information"?
 4   BY MR. WOZNIAK
 5   Q    You had the access to the note and the deed of trust when
 6   you filed this lawsuit.
 7          THE COURT:  She's testified many times to that.  Now,
 8   your characterization of it as access to the information that
 9   would have conveyed that is an argumentative point that is not
10   for her to answer.  But she certainly knew what -- that she had
11   the deed of trust.  She understood that there was a provision
12   for attorney's fees in it.  She doesn't read it the way you do.
13   BY MR. WOZNIAK
14   Q    Now, Ms. Lucero, this lawsuit has been continuing since
15   when you filed your complaint --
16   A    That's correct.
17   Q    -- in April of 2013.
18        And you filed multiple amended complaints in this lawsuit;
19   correct?
20   A    Correct.
21   Q    All right.  And you understood that --
22          MR. WOZNIAK:  For the purpose of brevity, Your Honor,
23   I just want to go through and introduce into evidence the first
24   amended complaint.
25          THE COURT:  Well, the first amended complaint, second
```

LUCERO – Cross (by Mr. Wozniak)

1    amended complaint, and third amended complaint I can take

2    judicial notice of.

3    BY MR. WOZNIAK

4    Q    All right.  So you understood that in this first amended

5    complaint, second amended complaint, and third amended

6    complaint you still alleged claims that challenge my rights

7    to -- my client's rights to act under -- as the beneficiary

8    under the deed of trust, or as the note holder.  You understood

9    that; correct?

10   A    Correct.

11   Q    Is that a yes?

12            THE COURT:  It was, yes.

13            THE WITNESS:  Yes.  I said correct.

14   BY MR. WOZNIAK

15   Q    Sorry.  I didn't hear you.

16        And with respect to the attorney's fees that appeared on

17   your statements, you didn't pay any of the amounts of the

18   attorney's fees; correct?

19   A    That is correct.

20   Q    All right.  And you have no personal knowledge as to

21   whether Cenlar applied any part of your monthly payment to

22   those fees; correct?

23   A    Do I have personal knowledge -- the statements show that

24   it goes towards my principal.

25   Q    Okay.  You have no personal knowledge as to whether or not

LUCERO – Cross (by Mr. Wozniak)

1   you are assessed interest on these attorney's fees; correct?

2          THE COURT:  You don't think you were.

3          THE WITNESS:  I hope not.

4          THE COURT:  That's not one of the claims.

5          THE WITNESS:  Yeah.

6   BY MR. WOZNIAK

7   Q    You were not precluded from making your regular monthly

8   statements to Cenlar, you testified to it; correct?

9          THE COURT:  She made her payments, yeah.

10         THE WITNESS:  Yeah.

11  BY MR. WOZNIAK

12  Q    And between January and November 2014, you occasionally

13  made your payments late; correct?

14         THE COURT:  Right.  She admitted that.

15         THE WITNESS:  That's correct.  And like I said, when

16  I noticed there was a late fee, I would pay my check with the

17  late fee included, to acknowledge that it was coming in after

18  the 15th.  And I would pay a FedEx fee to get it there

19  immediately, as soon as possible.  So sometimes it ranged

20  between $32 to $28, depending if it were a Friday or a weekday.

21  So again, I was conscious of that.

22  BY MR. WOZNIAK

23  Q    Okay.  So, now, you testified earlier today that when you

24  first got your statement, back in February of 2014, and shows

25  amount Due, which included attorney's fees --

LUCERO – Cross (by Mr. Wozniak)

1    A    Correct.

2    Q    -- you believed that you were responsible for making that

3    payment by the date due; correct?

4    A    Yes.  Because I had received a letter from Cenlar saying

5    that according to the Washington law, your loan incurred

6    attorney fees.  And I wasn't sure what law, and I was trying to

7    figure it out.  So it was the first time I've ever heard of

8    such a law, and then also, finally seeing them on my

9    statements.  So from December 4 of 2013 to February of 2014,

10   they finally showed up.  But it wasn't the $1,200 that was

11   listed on that statement.  It was actually more like $10,000.

12   Q    That's later on; correct?

13   A    Or $5,000.

14   Q    But it was later on?

15   A    Yes.  But it's still showing up on my statements.

16   Q    Yes.  Now, you -- you testified earlier about the late

17   fees.  And you understood that the late fees that you were

18   being assessed are based on your principal and interest

19   payment; correct?

20   A    Correct.

21   Q    All right.  Now, the late fees that you were -- that you

22   incurred were about $57 each month; correct?

23             THE COURT:  Give or take a little bit.

24             THE WITNESS:  Yeah.

25   ////

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    Now, if you look at the note, in Paragraph 6(a) of the

3   note -- so you have Exhibit 1, Section 6(a) -- it specifies

4   that the late fee amount is five percent; do you see that?

5           THE COURT:  Page 2.

6   BY MR. WOZNIAK

7   Q    Page 2, Section 6(a).

8   A    6(a), five percent, uh-huh.

9   Q    The amount of the charge -- I'm sorry.  "The amount of the

10  charge of will be five percent of my overdue payment of

11  principal and interest."

12  A    That's correct.  That's what it says.

13  Q    Now, every time the late fee was $57, that's approximately

14  five percent of your payment for $1,100; correct?

15  A    $1,100?

16  Q    Your principal and interest payment under the modification

17  was approximately $1,100; correct?

18  A    $1,100?  No.  If I understand correctly, are you asking,

19  like, my total --

20          THE COURT:  Not the total you paid, but just

21  principal and interest part of it, on the HAMP.

22          THE WITNESS:  On the HAMP, uh-huh.

23          THE COURT:  Do you want to look at it?

24          THE WITNESS:  Yes, please.

25          MR. WOZNIAK:  It's Exhibit Number 12, Page 2 of 5.

LUCERO - Cross (by Mr. Wozniak)

1              THE WITNESS:  Page 2?

2              THE COURT:  So, you see on Page 2 it says your total

3     monthly payment is $1,523, but $1,156 of that is principal and

4     interest, and then the rest is an estimated monthly escrow

5     payment?  Do you see that chart there?

6              THE WITNESS:  Yeah, I do.

7              THE COURT:  Okay.  So that's all he's asking you.

8              THE WITNESS:  Oh, I see it.  Right there.  Of course.

9     BY MR. WOZNIAK

10    Q    So that $57 was calculated on approximately $1,100?

11             THE COURT:  Seems to be, yes.

12    BY MR. WOZNIAK

13    Q    Yes.  So you agree with me that the late fees were not

14    charged on the attorney's fees?

15             THE COURT:  Right.

16             THE WITNESS:  Yeah.  We agreed to that earlier,

17    correct.

18    BY MR. WOZNIAK

19    Q    Now, Ms. Lucero, just to clarify, you're not an employee

20    of Cenlar; correct?

21    A    No.

22    Q    You don't have --

23             THE COURT:  Neither am I.  Have we clarified that?

24    BY MR. WOZNIAK

25    Q    Yes.  You're not an employer/employee relationship with

LUCERO – Cross (by Mr. Wozniak)

1   Cenlar; correct?

2   A     No.   Correct.   I'm not an employer/employee.

3   Q     Your outrage claim is based on the fact that Cenlar sent

4   you letters informing that your account has been -- was

5   assessed attorney's fees, and then the fact that the fees

6   appeared in your monthly statement; correct?

7   A     That's correct.

8   Q     All right.   Now, and you believe that these fees are

9   errors; correct?

10  A     That is correct.

11  Q     All right.

12  A     Is it the right time to say we amended our complaint,

13  because they did show up later?   Because that's what happened;

14  right?   That's the right term?

15          THE COURT:   You amended the complaint?

16          THE WITNESS:   That's correct.

17  BY MR. WOZNIAK

18  Q     Now, a part of the reason is that you can't afford to pay

19  these fees; correct?

20          THE COURT:   What?   I'm sorry?

21  BY MR. WOZNIAK

22  Q     Part of the reason for that is because you can't afford to

23  pay these fees; correct?

24          THE COURT:   By that, part of the reason for that --

25  ////

LUCERO – Cross (by Mr. Wozniak)

| | |
|---|---|
| 1 | BY MR. WOZNIAK |
| 2 | Q    For your outrage claim. |
| 3 | A    That's correct. |
| 4 | Q    And that's why you believe that Cenlar's conduct was |
| 5 | outrageous? |
| 6 | A    Yes. |
| 7 | Q    And Cenlar never notified you -- other than sending the |
| 8 | statements, the monthly statements, Cenlar never sent you a |
| 9 | letter telling you that these fees are due now, pay and -- now |
| 10 | due and payable; correct? |
| 11 | A    They did, in my statement.  They said amount due.  And |
| 12 | they also sent me a delinquent notice, saying that they |
| 13 | acknowledged that I haven't been paying those attorney fees on |
| 14 | the amount due.  And they also sent me a letter saying that I |
| 15 | would be accruing more attorney fees, based on a Washington |
| 16 | law. |
| 17 | Q    Okay.  Now -- |
| 18 | A    So there was three times they notified me that there was |
| 19 | things coming -- |
| 20 | Q    But nobody said -- |
| 21 | A    -- and they were due. |
| 22 | Q    But nobody said that -- |
| 23 | A    Well, nobody gets a personal statement, a monthly |
| 24 | statement, somebody coming to you at your door and saying, "By |
| 25 | the way, Ms. Lucero" -- |

LUCERO - Cross (by Mr. Wozniak)

1    Q    Did you receive a letter from Cenlar saying you must pay
2    $26,000 of attorney's fees by the end of next week?
3    A    That is correct.  No --
4              THE COURT:  You did not receive?
5              THE WITNESS:  I did not receive a letter saying,
6    specifically, that Ms. Lucero needs to pay $26,000.
7              THE COURT:  And nobody ever called you and said you
8    had to pay this?
9              THE WITNESS:  Nobody ever called me, correct.
10             THE COURT:  Nobody threatened you with foreclosure if
11   you didn't pay the attorney's fees?
12             THE WITNESS:  No.  That's true.
13   BY MR. WOZNIAK
14   Q    And no one was trying to foreclose on your house between
15   March 2013 and March 2015 because you did not pay these
16   attorney's fees; correct?
17   A    That is correct.
18   Q    You never received any notice of sale from Cenlar during
19   that time frame; correct?
20   A    But that was always the fear, that there would be.
21             THE COURT:  Right.  But you didn't receive any?
22             THE WITNESS:  No, absolutely not.  But I did --
23             THE COURT:  Worry about it.
24             THE WITNESS:  Worry about it, all the time.  I still
25   worry about it.

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    So all that Cenlar did was send you the monthly statement.

3   That's the one thing that they did.  And they sent you

4   delinquent notices, after you failed -- after you made your

5   payments late; correct?

6   A    Correct.

7   Q    And then the third was the letters, in which they said

8   that your account was assessed -- being assessed attorney's

9   fees; correct?

10          THE COURT:  When you said "the letters," you mean the

11   letters from your firm?

12          MR. WOZNIAK:  No.  I'm reflecting to the letters that

13   plaintiff's counsel referred to as, "In keeping with Washington

14   law, your account has been assessed attorney's fees."

15          THE COURT:  Okay.

16          THE WITNESS:  By your client, Cenlar.

17          MR. WOZNIAK:  By my client, Cenlar, yes.

18   BY MR. WOZNIAK

19   Q    So these are the only three things; correct?

20   A    Correct.

21   Q    Now, no one at Cenlar told you that these fees appeared on

22   your monthly statement to cause you anguish, fear, or distress;

23   correct?

24          THE COURT:  Right.  That's not their claim.

25          MR. WOZNIAK:  Okay.

LUCERO – Cross (by Mr. Wozniak)

1              THE WITNESS:  Right.

2              THE COURT:  No communication from anyone else at all.

3              THE WITNESS:  No physical, verbal, individual

4    communication.  You're absolutely correct.

5    BY MR. WOZNIAK

6    Q    Now, I'd like you to bring your attention to Exhibit

7    Number 39, Plaintiff Exhibit Number 39.

8              THE COURT:  Thirty-nine, okay.

9         This is the February 24, 2014, letter from Ms. Parker to

10   Ms. Lucero.  Okay.

11   BY MR. WOZNIAK

12   Q    And you testified earlier that you received that letter

13   from your attorney; correct?

14   A    That's correct.

15   Q    And your attorney shared it with you; correct?

16   A    That's correct, immediately after he received it.

17   Q    And if you look at Page Number 2 of that letter, which you

18   received after you received your February statement, monthly

19   statement from Cenlar, correct, with attorney's fees.  If you

20   look at Section 7, it states, "Amount to reinstate the loan is

21   delinquent.  We are still investigating the additional charges

22   referenced in Question 1."

23   A    Correct.

24   Q    "Notwithstanding this investigation, the loan is due and

25   owing for the payment due February 1, 2014."

LUCERO – Cross (by Mr. Wozniak)

1    A    Correct.

2    Q    The total amount due would be the monthly payment of

3    $1,500, plus a late fee of $57.84.

4    A    That is correct.

5    Q    Now, in that letter, you were informed that all you owe is

6    that February payment.

7    A    Plus late fee.

8    Q    Plus late fee; correct?

9    A    That is correct.

10   Q    Nobody told you, at that time, and that letter clarified

11   that you had to pay the attorney fees; correct?

12   A    Right.  Because you're saying you're still investigating.

13   Q    Okay.  Now, I want you to take a look at the June 18

14   letter from my firm.

15   A    Which exhibit?

16        THE COURT:  That's 40, the next one.

17   BY MR. WOZNIAK

18   Q    Forty.

19   A    Okay.  Forty.

20   Q    Now, if you look at second page, Section 7, it says,

21   "Amount to reinstate the loan."  Again, it's $1,500.

22        Do you see that?

23   A    Yes.

24   Q    Okay.  And in that letter, Ms. Parker informed you what is

25   my client's position -- or my client -- Ms. Parker informed

LUCERO – Cross (by Mr. Wozniak)

1   your attorney what is my client's position on the attorney's

2   fees issue.  And yet, if you look at Paragraph 7, in June, at

3   which point in time your attorney's fees went up –– on the

4   statements went up to over $10,000, at that time; correct?

5   A    Yeah.  I'd have to look at them again, but probably so,

6   yes.

7   Q    It was a big amount.  It wasn't the amount of your regular

8   monthly payment.  It was high.

9          THE COURT:  It was higher than that, sure.

10  BY MR. WOZNIAK

11  Q    Yeah.  But in this letter, you were informed by Cenlar's

12  counsel that you still owed $1,500 for that month; correct?

13  A    That's correct.  And it did get paid, by the way.

14  Q    Yeah, I'm not disputing that, Ms. Lucero.  I understand

15  that you are current ––

16         THE COURT:  You get his point; that he says, "We

17  never tried to collect on those attorney's fees."

18         THE WITNESS:  Oh.

19         THE COURT:  That's the point.

20         THE WITNESS:  That's the point.  I see.

21  BY MR. WOZNIAK

22  Q    Now, if you want to take a look at my client's October 22

23  letter –– I'm sorry ––

24         MS. DAO:  Eighteen?

25         MR. WOZNIAK:  Yeah.

LUCERO – Cross (by Mr. Wozniak)

1   BY MR. WOZNIAK

2   Q    And that letter was from Cenlar to your attorneys.

3   A    Correct.

4   Q    Now, again, it says -- towards the bottom of the page, it

5   says, "specifically." Do you see that? "Specifically," and

6   there's numbers. Do you see that?

7         THE COURT:  The principal and interest and the taxes?

8         MR. WOZNIAK:  No, no, no. I'm looking at

9   "specifically," and there's one, two, three -- do you see that

10  part of that letter?

11        THE COURT:  Oh, okay. The numbers 1, 2, 3, on the

12  bottom of Exhibit 18.

13        THE WITNESS:  1, 2, 3? Yes.

14  BY MR. WOZNIAK

15  Q    So, now, under "1" it says, "The loan is due for

16  November 1, 2014, installment."

17        Do you see that?

18  A    Yes, I do.

19  Q    Okay. Now, there is -- and then there is the breakdown?

20        THE COURT:  Right.

21        THE WITNESS:  Correct.

22  BY MR. WOZNIAK

23  Q    And then under "5" --

24  A    Uh-huh.

25  Q    -- it says, "As stated above, the loan is due for

LUCERO - Cross (by Mr. Wozniak)

1   November 2014 installment of $1,500."  Do you see that?

2   A     Yes, I see that, November of 2014.  And this letter is

3   October 22, yes.

4   Q     Okay.  And then it says -- it refers you to the -- to

5   other things that were in there; correct?

6   A     Correct.

7   Q     Now, your counsel went through this letter, and at the end

8   of the -- at the last page it said, "corporate advance history

9   screen."  Do you see that -- actually, I'm sorry.  That's

10  October 28 letter.

11        Can you please move to the October 28 letter?

12              THE COURT:  That's Number 19.

13              THE WITNESS:  Exhibit 19, okay.

14  BY MR. WOZNIAK

15  Q     This letter was again in response to your client -- your

16  attorney's letter, which your attorneys did not introduce into

17  evidence.  But it says, "corporate advance history screen."

18        Do you see that, in the last page of that packet?

19  A     Yeah.  All of them say, "corporate advance history

20  screen."

21  Q     Okay, the last page.  I'm talking about the last page --

22  A     Yes, it does say that.

23  Q     -- in which you testified about.

24  A     Correct.

25  Q     Now, do you understand what "corporate advance history"

LUCERO – Cross (by Mr. Wozniak)

1    is?

2              THE COURT:  No.

3              THE WITNESS:  No.

4              THE COURT:  How would she know that?  I don't even

5    know what it is.

6              THE WITNESS:  No.

7    BY MR. WOZNIAK

8    Q    I'm just asking.

9    A    No.  The answer would be no.

10   Q    So do you understand -- do you have any personal knowledge

11   as to what these costs are, what these advances are?

12   A    Not really.  I could just guess.

13   Q    Okay.  Now, do you have any knowledge as to how these

14   costs have been applied to the loan, or if, in fact, they were

15   applied to the loan?

16   A    They were introduced as attorney fees and costs.

17   Q    Okay.  Now, do you know how they were applied to the loan?

18             THE COURT:  When you say "applied to the loan," you

19   mean applied to her payments on the loan?

20   BY MR. WOZNIAK

21   Q    No.  I'm trying -- how they were applied in the context of

22   your -- of your loan's accounting history.

23        Do you know how they were applied?

24             THE COURT:  I'm not sure what you mean by the term

25   "applied."

LUCERO - Cross (by Mr. Wozniak)

1          MR. WOZNIAK:  Okay.  No problem.

2    BY MR. WOZNIAK

3    Q    Do you know what these fees were for?

4          THE COURT:  She said she does not know.

5          MR. WOZNIAK:  Okay.  Now --

6          THE WITNESS:  And I still don't know.

7    BY MR. WOZNIAK

8    Q    Okay.  And it says it -- has different dates.

9          Do you see February 10, 2014?

10   A    Yes.  February 15, 2013, there was five entries.  And then

11   November 25 rings a bell, of 2013, of $10.42.  And then

12   February 10 of 2014.

13   Q    But you have no personal knowledge as to whether -- what

14   any of these fees are; correct?

15   A    No.

16   Q    Now, the delinquent notices that your counsel introduced,

17   and I don't want to go through every single one of them --

18   A    Thank you.

19   Q    -- but you went through them earlier today, they do not

20   refer to attorney's fees themselves; correct?

21          THE COURT:  They don't.

22          THE WITNESS:  No, they just say "costs."

23   BY MR. WOZNIAK

24   Q    Yes.  The only reason why you're worried about them is in

25   connection with the asterisk; correct?  There is an asterisk --

LUCERO – Cross (by Mr. Wozniak)

1    A    Yeah.  There was an asterisk that told me that there was

2    fees and costs and --

3    Q    But you never tried to explore with Cenlar why this

4    asterisk is there; correct?

5    A    Yeah, we did.  We sent out Regulation X to figure out what

6    they were.

7    Q    Okay.  We're going to go through them all.  But that

8    Regulation X letter did not contain a question regarding the

9    asterisk on the loan notices; correct?

10        THE COURT:  Not a specific question as to asterisk;

11   right?

12        MR. WOZNIAK:  Yes.

13        THE WITNESS:  That's correct.

14   BY MR. WOZNIAK

15   Q    So the delinquent notices themselves, they basically

16   related to the fact that you were unable to make your payments

17   by the 15th; correct?

18   A    Yes.

19   Q    And the reason why, you testified to it, is because -- I

20   mean, and I understand this -- I understand it perfectly,

21   Ms. Lucero.  You're a single mother.  You have one income.

22   It's not easy for you to make your mortgage payment when your

23   income --

24   A    On the 1st.

25   Q    -- is split.

LUCERO – Cross (by Mr. Wozniak)

1   A     Yes, that's correct.

2   Q     And I understand that.

3         But the fact is is that these delinquent notices went out

4   because you did not make these payments by the 15th; correct?

5               MS. DAO:  I'm going to object, Your Honor.  The

6   document speaks for itself, and she testified extensively

7   about --

8               THE COURT:  Yeah.  I mean, you're correct, Counsel.

9   They're generated automatically anytime a person is late.  We

10  all get them, one way or another, you know, either for

11  inadvertence or, in Ms. Lucero's case, because that was the

12  only way she could handle it economically.  And if it didn't

13  have the asterisk on it, it wouldn't be a problem.  It's the

14  asterisk that's a problem.  Now, you've said she never did a

15  specific follow-up on the asterisk.  So we've covered it.

16              MR. WOZNIAK:  Okay.  No problem.

17  BY MR. WOZNIAK

18  Q     Now, as of June 18, 2014, when your attorney received the

19  letter from my firm, you knew the reason why Cenlar believed it

20  had the right to assess the attorney's fees to your account;

21  correct?

22  A     Can we go to the exhibit again?

23              THE COURT:  Sure.

24  BY MR. WOZNIAK

25  Q     Sure.  I believe it's 40.

LUCERO – Cross (by Mr. Wozniak)

1  A    Forty?

2  Q    Yes.  It's on the very bottom of Section 1(a).

3  A    Okay.  Yes.  Your question?

4  Q    So the question was, as of June 18, you had knowledge of

5  the reason for the assessment of the fees; correct?

6  A    That's correct.

7  Q    Now, you were also informed on June 18 what my client

8  believes is the reason why these fees appeared on your periodic

9  statements; correct?

10  A    Yes.  They were incurred because of the litigation.

11  Q    And they also explained to you why they're incurred -- why

12  they were included in your monthly statements.

13  A    They felt the litigation was authorized by the deed of

14  trust.

15  Q    Yes.  But the very first sentence of that Section 1(a)

16  says, "There's a requirement to reflect all account activity."

17  A    Under the CFR.

18  Q    Section 1026.41(d).  Do you see that?

19  A    That's correct.  It says that.

20  Q    So as of that date, you were aware of my client's position

21  on the issue.

22  A    I was made aware.

23  Q    Yes.  Now, to be clear, Ms. Lucero, is -- your claim for

24  outrage is not really based on the fact that you had no

25  knowledge as to what these -- what these fees were.  It's on

LUCERO – Cross (by Mr. Wozniak)

1   the fact that they were, in fact, assessed; correct?  Because

2   in your -- in your pleadings, in your declarations, in your

3   testimony earlier today, you said, "I didn't know why they were

4   doing this."

5   A    That is correct.  And I still don't know.

6   Q    Okay.  So --

7   A    That was my outrage, correct.

8   Q    You were -- the fact is that my -- your counsel was sent a

9   letter, in June last year, explaining why -- what my client's

10  position is on that issue.  So the fact of the matter that the

11  claim -- your claim is not really based on why -- "I was not

12  aware why."  Your claim is based on the fact that the fees

13  were, in fact, assessed; correct?

14            MS. DAO:  Argumentative.

15            THE COURT:  I think it's the entire course of

16  conduct, Counsel.  But certainly, an explanation is given.  She

17  doesn't agree with the explanation, and she still thinks that

18  it's -- trying to impose them in any way is outrageous.  But by

19  June, she definitely had an explanation, at least.  But it

20  took -- you have to admit, I forget when her letter from -- the

21  letter from counsel went out, but, you know --

22            THE WITNESS:  March.

23            THE COURT:  February of '14, you're still having it

24  looked at, by Ms. Parker's letter.  And then four months later,

25  in June of '14, an answer is finally forthcoming.  And if I'm

```
 1    sitting there in Ms. Lucero's position, I'm thinking, "If it's
 2    that obvious, why does it take that long to give me a simple
 3    answer to this question?"  And, you know, I don't know in your
 4    case whether you're going to address that or not.
 5         But certainly, it jumps out at me to say, a request comes
 6    in.  You know, Ms. Parker, who I see from the letterhead is a
 7    little down the food chain from you, writes something saying,
 8    "We need more time," writes another letter saying we need more
 9    time, then four months later says, "Well, it's obvious that
10    it's the deed of trust that's involved here."  And then four
11    months after that, a letter comes from your client saying, you
12    know, here's what's going on.  It's a whole course of conduct.
13    It's not just, "We didn't have an explanation, now we have an
14    explanation, so we disagree with it."  It's a whole course of
15    conduct.
16    BY MR. WOZNIAK:
17    Q    Now --
18              THE COURT:  Ms. Parker has something for you to look
19    at.
20         This is probably a good place to stop.
21              MR. WOZNIAK:  Yeah.
22              THE COURT:  It's a long day; isn't it?
23              THE WITNESS:  It has been a long day.  Thank you.
24              MR. WOZNIAK:  Your Honor, may I have a sidebar,
25    just -- may I have a sidebar, right before, right before we --
```

Lucero v. Cenlar, 9/24/15

```
1                THE COURT:  You just want to talk right here?

2                MR. WOZNIAK:  Yes.

3                THE COURT:  Sure.

4                THE WITNESS:  Ms. Dao, okay?

5                THE COURT:  We don't need the court reporter; right?

6                          (Off the record)

7                THE COURT:  So we'll finish -- we're back on the

8      record.

9           You can step down, Ms. Lucero.  You're all done.  As a

10     matter of fact, you could leave, if you want to.  You don't

11     have to, but you could leave, if you were so inclined.  I

12     can't, unfortunately.

13          So we'll finish up with Ms. Lucero, certainly, mid-morning

14     tomorrow.

15          And the plaintiff will rest her case; correct, Ms. Dao?

16               MS. DAO:  Your Honor, we just have housekeeping

17     items, as far as moving to admit a list of exhibits I neglected

18     to.  And if I could -- may I do that now, Your Honor?

19               THE COURT:  Yes, you may.

20               MS. DAO:  I'd move to admit 28, 29.

21               THE COURT:  Say what they are in general too.

22               MS. DAO:  Yes, Your Honor.

23               MR. WOZNIAK:  It's the statements, periodic

24     statements; right?  I think they all have been admitted.

25               MS. DAO:  Yes.  I --
```

Lucero v. Cenlar, 9/24/15

```
 1              THE COURT:  Okay.  All the statements, loan
 2   statements, are admitted into evidence, 28, 29.
 3        What else?
 4              MS. DAO:  Forty-six is the delinquent notice for May,
 5   Your Honor.
 6              THE COURT:  Forty-six is admitted.
 7                    (Exhibit 46 was admitted)
 8              MS. DAO:  And 74 and 75 are Regulation X increase.
 9              MR. WOZNIAK:  We amended them already.
10              MS. DAO:  That's it.
11              THE COURT:  Seventy-four and 75.
12              MS. DAO:  Those are the notice of error and request
13   for information.
14              THE CLERK:  Those are already in.
15              THE COURT:  Those are in.
16              THE CLERK:  So are 28 and 29.
17              THE COURT:  So are 28 and 29.  Okay.
18        Check with Kerry if you have any questions about whether
19   certain exhibits are admitted, and we'll admit them even
20   after -- tomorrow.
21        So, Counsel, so then you'll be finished; right?
22              MS. DAO:  Yes, Your Honor.
23              THE COURT:  Now, tell me, what is it -- I'm not
24   exactly sure -- you know, when it comes to the defense here,
25   what is your witness -- you know, if you make an offer of
```

Lucero v. Cenlar, 9/24/15

1    proof, whether it's this person or that person, what are they

2    going to say?  What are they going to talk about?

3              MR. WOZNIAK:  Well, Your Honor, what they're going to

4    talk about is, they're going to talk about, first of all, the

5    reasons why the notices -- the delinquent notices went out.

6              THE COURT:  That's understood; that if you're late,

7    you get a delinquent notice.  No big deal there.

8              MR. WOZNIAK:  Yes.  They're also going to explain the

9    reasoning for the attorney's fees, why they appeared on the

10   statement.

11             THE COURT:  And that's basically because the deed of

12   trust covers it.

13             MR. WOZNIAK:  Part of it, yes.  The second part is

14   going to be how they were explained.  And the second -- and the

15   third reason is why they appeared in the monthly statements.

16             THE COURT:  And that's because the Code of Federal

17   Regulations says any activity on the account needs to be

18   reflected somewhere on the statement.

19             MR. WOZNIAK:  And they're going to testify as to what

20   the interpretation was, why they appeared the way that they

21   appeared, and everything else.

22             THE COURT:  So, I mean, with all due respect,

23   Mr. Wozniak, this isn't rocket science we're talking about

24   here.  I know you want to have your primary witness there.

25             MR. WOZNIAK:  Your Honor, we're going to find

Lucero v. Cenlar, 9/24/15

1    somebody else.  We will find somebody else who will fly in here

2    and testify and present the testimony, Your Honor.

3         The problem is, is that -- you know, that they need to

4    review the records, and they need to familiarize themselves

5    with them, and so that they can submit to direct testimony and

6    then the cross examination.  And the bottom line is, is that we

7    need time to go over them, to go meet with them, talk to them,

8    and prepare them for this testimony in order to be -- you know,

9    Ms. Lucero had the opportunity to meet with her counsel.  My

10   client is in New Jersey.  They're going to be flying somebody

11   else, brand new, that hasn't been prepared.  We need time to do

12   this.

13             THE COURT:  Your client is in New Jersey?

14             MR. WOZNIAK:  Yes.

15             THE COURT:  And you're in Newport Beach?

16             MR. WOZNIAK:  Yes.  Our primary office is in Newport

17   Beach, Your Honor.

18             THE COURT:  You got the better of that deal.

19             MR. WOZNIAK:  We have an office in Seattle, as well.

20             THE COURT:  Okay.  So when do you think you're going

21   to have somebody ready, given your vacation schedule too?

22             MR. WOZNIAK:  Your Honor, I would ask that, you know,

23   we can come back two weeks after my vacation schedule.  This is

24   only my side of the case.  I mean, there is no prejudice to the

25   plaintiff here.  And, you know, so, I mean, I apologize, but

Lucero v. Cenlar, 9/24/15

```
1    I'm going to Europe.  And, you know, there's -- it has been
2    preplanned a long time ago.
3           THE COURT:  You're entitled to your vacation.  I have
4    no problem with that.  But what I don't understand is why we
5    couldn't have somebody ready, you know, like, Monday or Tuesday
6    or Wednesday of next week.
7           MR. WOZNIAK:  Well, Your Honor, because, to be honest
8    with you, is I'm flying out on Thursday night.
9           THE COURT:  A week from today?
10          MR. WOZNIAK:  Thursday night, yes.  I'm flying out,
11   so I have to -- you know, I have to go home, prepare, get
12   everything done.  I cannot do it -- I cannot come here and then
13   jump right back out on the plane.
14          The second issue, Your Honor, is that I need time to go
15   over stuff -- to go over these things with my client.  If we
16   have somebody here on Monday, I cannot physically -- you know,
17   I'm flying out tomorrow, come back here, meet with them and
18   prepare for them, and then get them ready to testify on Monday
19   morning.  I would really appreciate it if you were
20   understanding as to this.  It's really not -- it wasn't
21   intentional.  I didn't go to New Jersey and break the guy's
22   leg, you know.
23          THE COURT:  I hope Cenlar doesn't do that to people
24   who don't make their payments.
25          MS. DAO:  May I, Your Honor?
```

Lucero v. Cenlar, 9/24/15

```
 1              THE COURT:  So let me just get this straight.
 2        You're gone until the 15th?
 3              MR. WOZNIAK:  I'm gone for two weeks.  My sister is
 4    getting married.
 5              THE COURT:  No, no.  Believe me, it's fine -- I'm
 6    just trying to get the dates down.
 7        You're back on the 15th?
 8              MR. WOZNIAK:  I'm back on the 13th, at night.
 9              THE COURT:  Okay.  So you'd be ready, like, a week
10    later?
11              MR. WOZNIAK:  If I can --
12              THE COURT:  Or ten days later?
13              MR. WOZNIAK:  If I can, like, ten days, two weeks,
14    because of the jet lag and everything else.  I mean, it's a
15    time zone change, everything else.  End of October is fine.
16              THE COURT:  Okay.  So, like, the last --
17    second-to-the-last week of October, or the last week of
18    October.  And we'd only need a half day or so for that.
19              MR. WOZNIAK:  For my client, I think, yes, but I
20    don't know about the cross examination.
21              THE COURT:  Okay.  Got you.  All right.
22              MR. WOZNIAK:  And the closing statements, closing
23    arguments.
24              THE COURT:  Let me hear from Ms. Dao.
25              MS. DAO:  Certainly, Your Honor.
```

Lucero v. Cenlar, 9/24/15

```
 1      We filed a motion asking for sanctions based on the entire
 2   course of conduct that the opposing side has demonstrated.
 3   Now, with Your Honor's experience with these mortgage cases, in
 4   each of these servicers' corporations, they have dozens, if not
 5   hundreds, of vice presidents.  And --
 6           THE COURT:  They don't stick around very long,
 7   though.
 8           MS. DAO:  Well, and I can't really -- none of us can
 9   be responsible for that.  We've done our work to be here and to
10   be ready.
11           THE COURT:  Sure.
12           MS. DAO:  My co-counsel and I have another trial,
13   Your Honor, on October 19.  And so -- and it's a jury trial
14   down in Kent, in front of Judge LeRoy McCullough.  And we have
15   to prepare for that, in earnest.
16           THE COURT:  Sure.
17           MS. DAO:  And really it's -- in the motion that we
18   asked, we asked the Court to really look at these claims for
19   what they are, or the defenses, which is really an argument of
20   law, rather than facts.  They're asking you to consider these
21   new modified defenses about interpretation of a contract
22   between them and Freddie Mac.  They're not proposing to bring
23   in anybody from Freddie Mac.  And the law is pretty simple,
24   Your Honor.  The contract is what it is.  They can't really go
25   and fantasize that -- you know, fancy it up and give you some
```

Lucero v. Cenlar, 9/24/15

```
1   notion that they can extrapolate from that.

2        So I ask the Court to really think of fairness and equity

3   here.  It puts us in a real disadvantage.

4            THE COURT:  Well, I understood the argument that, you

5   know, Ms. Lucero had cleared her calendar, and we need to do

6   this.  And that's why I said we'll start the case.  But I have

7   to be fair to the defense too.  And you're not just seeking

8   contractual damages.  You're seeking tort damage too.  And, you

9   know, bad faith or outrage, sometimes you're looking at some of

10  the issues of what was the thinking behind the company, what

11  was the motivation for doing what they did.  So I don't want to

12  tie Mr. Wozniak's hands in a manner that would be unfair to

13  Cenlar.

14       So let me look at my calendar.  You look at your calendar.

15  And we'll see when we can pick a date in October when we can

16  finish this thing up.

17           MR. WOZNIAK:  It would be probably, like -- with the

18  closing arguments, it would probably be like a day, day and a

19  half, Your Honor.

20           THE COURT:  It won't be a day and a half.

21           MR. WOZNIAK:  Well, maybe, like, a day.

22           THE COURT:  A full day is what we'll do.  And so

23  bring your calendars tomorrow, and we'll try to find a day to

24  do that.

25       Okay.  See everybody tomorrow.  Thank you.
```

Lucero v. Cenlar, 9/24/15

```
1              MR. WOZNIAK:  And, Your Honor, so you would like --
2     I'm sorry.  It doesn't need to be on the record.
3          May I have a sidebar?
4              THE COURT:  No more sidebars, really.  Let's just
5     talk about it right now.
6          You can ask Ms. Lucero about communications between her
7     and her counsel, about what was being conveyed to her about
8     Cenlar's position, tomorrow on cross.
9              MS. DAO:  Does that give us the equal chance to
10    inquire into the contents of the letters that their lawyer
11    wrote, Your Honor?  Like, the June 18 letter that they've
12    discussed thoroughly about what the reasons were, and so on and
13    so forth, are we going to get a fair chance at that?
14             THE COURT:  What do you mean, to call Ms. Parker as a
15    witness?
16             MS. DAO:  Yes.
17             THE COURT:  No.  You're not.  You're not calling
18    Mr. Barraza as a witness either.
19             MS. DAO:  Okay.
20             THE COURT:  But when you have Cenlar's witness on the
21    stand, you can surely ask him about, you know, "What was going
22    on between you and counsel?  Why did it take four months to
23    write a letter if it was" --
24             MS. DAO:  That's fair, Your Honor.
25             MR. WOZNIAK:  Thank you, Your Honor.
```

Lucero v. Cenlar, 9/24/15

1              THE COURT:  Okay.  Thanks.

2                        (Adjourned)

Lucero v. Cenlar, 9/24/15

1

2

3                           C E R T I F I C A T E

4

5

6

7           I, Andrea Ramirez, RPR, CRR, Court Reporter for the

8    United States District Court in the Western District of

9    Washington at Seattle, do hereby certify that I was present in

10   court during the foregoing matter and reported said proceedings

11   stenographically.

12           I further certify that thereafter, I have caused said

13   stenographic notes to be transcribed under my direction and

14   that the foregoing pages are a true and accurate transcription

15   to the best of my ability.

16

17

18           Dated this 1st day of October, 2015.

19

20                           /s/ *Andrea Ramirez*

21                           Andrea Ramirez
                             Official Court Reporter
22

23

24

25