1          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
2                  AT SEATTLE

3  _____
                                  )
LETICIA LUCERO,                   )     NO. C13-602RSL
4                                 )
        Plaintiff,                )
5                                 )     October 27, 2015
vs.                               )     Seattle, Washington
6                                 )     9:13 a.m.
CENLAR FSB,                       )     Day 3
7                                 )
        Defendant.                )
8  _____)

9          VERBATIM REPORTED PROCEEDINGS FOR:
                    BENCH TRIAL
10      BEFORE THE HONORABLE ROBERT S. LASNIK
          UNITED STATES DISTRICT COURT JUDGE
11

For the Plaintiff:   **MS. HA THU DAO**
12                   787 Maynard Avenue, South
                     Seattle, WA 98104
13                   727-269-9334
                     hadaojd@gmail.com
14  and
                     **MR. VICENTE OMAR BARRAZA**
15                   14245-F Ambaum Blvd. SW
                     Burien, WA 98166
16                   206-933-7861
                     omar@barrazalaw.com
17
For the Defendant:   **MR. LUKASZ I. WOZNIAK,**
18                   **MS. RENEE M. PARKER**
                     WRIGHT FINLAY & ZAK
19                   4665 MacArthur Court, Ste. 200
                     Newport Beach, CA, 92660
20                   949-477-5050
                     lwozniak@wrightlegal.net
21                   rmparker@wrightlegal.net

22  Court Reporter:  **Kari Davidson, CSR, CCR**
                     Vernon & Associates Court Reporters
23                   3641 N. Pearl Street, Bldg. D
                     Tacoma, WA  98407
24

(Proceedings recorded by mechanical stenography; transcript
25  produced with aid of computer.)

```
1                    E X H I B I T S

2     Ex. No.        Offered        Admitted        Denied

3     62             263            263

4     61             263            264

5     507            266            266

6     512            270            270

7     508            271            271

8     513-516        276            277

9     3, 4           280            280

10    16             316            317

11    18             321            321

12    11             362            363

13    15             362            363

14    17             362            363

15    34             362            363

16    37             362            363

17

18

19                     I N D E X

20    Witness        Direct    Cross     Redirect    Recross

21    Asmar Johnson   259       324       351        357

22

23

24

25
```

```
 1                COURTROOM DEPUTY:  All rise, Court is again in

 2      session.  The Honorable Robert S. Lasnik presiding.

 3                THE COURT:  Good morning.  Thank you.

 4                Please be seated.

 5                COURTROOM DEPUTY:  You want me to call the case?

 6                THE COURT:  Yes, call the case.

 7                COURTROOM DEPUTY:  Case C13-602L, Leticia Lucero

 8      versus Cenlar.

 9                Counsel, could you please make your appearances.

10                MS. DAO:  Yes, Your Honor.  Good morning, Your

11      Honor, Ha Dao on behalf of Ms. Lucero.

12                MR. BARRAZA:  Good morning, Your Honor, Vincente

13      Omar Barraza on behalf of Ms. Lucero.

14                THE COURT:  Thanks, Counsel.  I understand

15      Ms. Lucero is on her way; it could be a traffic situation,

16      but you -- at this point, we may as well get started;

17      correct?

18                MS. DAO:  That's correct, Your Honor.

19                THE COURT:  Okay, thank you.

20                And Mr. Wozniak?

21                MR. WOZNIAK:  Good morning, Your Honor. Lukasz

22      Wozniak for the Defendant, Cenlar FSB.

23                MS. PARKER:  Good morning, Your Honor, Renee Parker

24      on behalf of Defendant Cenlar FSB.

25                THE COURT:  Great.  Okay, well, we are back in the
```

1 trial now and, Mr. Wozniak, you have identified Asmar

2 Johnson as your witness?

3          Oh, Ms. Parker, I'm sorry.

4          MS. PARKER:  Your Honor, before we begin, I'd like

5 to make a motion before the Court.

6          THE COURT:  Okay.

7          MS. PARKER:  While Mr. Wozniak was out of town,

8 it's a reasonable belief that I would be checking his e-mail

9 in his absence.

10          In his absence, I received an e-mail from a person

11 very closely associated with Ms. Dao and Mr. Barraza that

12 has a longstanding business relationship with him -- with

13 them.  To the extent that earlier in this case, our CEO's

14 attorney, Heidi Buck Morrison, had to get a protective order

15 from their videographer, because they are taking depositions

16 and posting them on YouTube and for creative purposes.

17          In Mr. Wozniak's absence, I received an e-mail from

18 this person associated with Plaintiff's counsel.  He

19 referenced the transcript of the trial from the first two

20 days.  I confirmed with the court reporter that only two

21 parties had the transcript from the trial, me and Counsel

22 for Plaintiff.

23          In the same e-mail, this person also stated that he

24 would be outside the courtroom, knowing we would be here

25 today, and that he also said that we would find out that,

1  quote, "Jesus was black from his Croatian buddies."

2          And in my religion, the only way you meet Jesus is

3  when you die.  And I have a reasonable apprehension that a

4  death threat has been issued towards me.

5          Now, I brought this to Ms. Dao's attention, and she

6  said she called this person and he basically said, "Mind

7  your own business," and hung up, and they never discussed

8  the content of my concern.

9          But after her e-mail, which I want to take her for

10  her word, she -- she said she never spoke with him about the

11  content of my message; yet, he sent another barrage of

12  messages basically accusing me of racism and basically

13  saying that he never made a death threat.

14          And this person is present in the courtroom today.

15  I've lost a lot of sleep.  I take death threats very

16  seriously.  This person is in the courtroom today, and I can

17  only believe that he is here as a result of Plaintiff's

18  Counsel further trying to intimidate us in our trial.

19          And I would like him removed from the courtroom.  I

20  know that is an unusual request, but it definitely has

21  caused me apprehension and concern to the extent I've lost

22  sleep and I'm actually, right now, in the middle of

23  pneumonia and bronchitis as a result.

24          So if I may ask the Court just to simply have this

25  person removed from the courtroom during this trial, I would

1   greatly appreciate it.

2          THE COURT:  Okay, you may as well use his name,

3   because you know who he --

4          MS. PARKER:  It's Christopher King.  The e-mails

5   came from Christopher King.

6          THE COURT:  Right.  And I was actually copied on

7   something in there also.  And the -- Mr. King is present in

8   the courtroom --

9          MS. PARKER:  He is.

10         THE COURT:  -- standing up and showing me who he

11  is.  Let me ask Ms. Dao to respond to --

12         MS. DAO:  Thank you, Your Honor.

13         THE COURT:  -- to that.

14         MS. DAO:  We had, in the history of this case,

15  disclosed to the Court that we used Mr. King for business

16  purpose.  We also filed with the Court certain motions and

17  papers indicating that we would not use him again, and we

18  haven't.

19         I never had any discussion with Mr. King about any

20  contact with opposing counsel -- none whatsoever.  We don't

21  have a business relationship.  We don't have any

22  relationship other than Mr. King is interested in

23  foreclosure cases in general, and that we happen to try a

24  case that has foreclosure issues.  That's the extent of it.

25  I give the Court my word that we did not cause, you know,

1    or -- or act in any way, and when she -- when Ms. Parker

2    expressed to me that she had concerns, I wrote her back and

3    I said, I would -- we would jointly do whatever necessary to

4    allay her concerns.  And after that, I did not hear anything

5    from her.

6         Mr. King is here on his own volition.  Since that

7    one phone call where he told me to "Mind my business," now,

8    I don't need to know anything about what he was doing.  That

9    was it.  I -- since then, I have not any contact.  And I

10   believe my co-counsel had no contact with him whatsoever.

11        THE COURT:  What about the transcript?

12        MS. DAO:  Your Honor, the transcript -- we ordered

13   the transcript and I had posted it on the Listserv for

14   Consumer Lawyers.

15        THE COURT:  Okay.

16        MS. DAO:  And the purpose of our posting certain

17   transcripts or information really -- relating to our cases

18   is just basically to advise other lawyers as to the common

19   issues that we would face.  And in our mind, this is a

20   public trial.  Whether or not there were people actually

21   being in the courtroom at the time is irrelevant.  And --

22   and I understand this -- this hyper fear of -- you know, and

23   I -- and I don't want to get that.  I don't want to get into

24   the fray of what racism is all about, because, you know,

25   I'm -- we're looking at ourselves saying, "We have concerns

1   as well."  But it's not having anything to do with our

2   client and her cause.

3          We don't want for this issue to bleed into the

4   case, Your Honor, because this is a case before tried --

5   that is being tried to the bench.  And -- and any -- any

6   taint of any wrong-doing on our part as counsel for

7   Ms. Lucero would hurt our client unjustly.

8          And I just ask the Court to take notice of the fact

9   that we haven't done anything like that.  I -- I informed

10  the Court before that I take my job seriously, and I take

11  our representation of the client very, very seriously.  And

12  we didn't do anything that we thought was improper with

13  regards to contact with Mr. King or his presence here today.

14  And I can't comment on where he is coming from or what he's

15  doing.

16         MS. PARKER:  Your Honor, if I may, I had believed

17  Ms. Dao as well when she made her representations to me

18  about concern for safety.  Except that I sent an e-mail only

19  to her and Mr. Barraza stating that Mr. King stated he would

20  be outside the courthouse, and that his Croatian buddies

21  would make sure we met Jesus, to paraphrase.

22         After that, Mr. King wrote several messages that

23  said things to the extent of "I am a peace-leaving person,"

24  et cetera, which means that he somehow knew the contents of

25  the message I sent only to these two attorneys to my left,

 1    (Indicating.) and was trying to either counteract the

 2    damage, so I don't believe that they have had absolutely

 3    zero contact.  Mr. King has obviously obtained the

 4    information from them that I came to her and said, "He made

 5    a threat."  Because he obviously didn't go back and reread

 6    his mail -- e-mail, and sit and think, "Oh, boy, that could

 7    be misconstrued."

 8              THE COURT:  Okay, you can sit down, Ms. Parker.

 9              MS. PARKER:  Thank you, Your Honor.

10              THE COURT:  Thank you.

11         MS. DAO:  And I would represent to the Court that I

12    called Mr. King and said, This is the representations that

13    Ms. Parker had made to me, and that I have concerns.  And at

14    that point, he said, "You don't need to know" and --

15              THE COURT:  Okay.

16         MS. DAO:  -- you should be --

17         MR. KING:  (From the audience) Your Honor, may I

18    approach?  I don't want to be paraphrased. I'd like the

19    Court to hear my integrity and hear my position on all of

20    this so the Court is fully informed of exactly what is going

21    on, and what was actually said in those e-mails.  Not a

22    paraphrase; what was actually said, and the reason for

23    writing that e-mail.

24              THE COURT:  Well --

25              MR. KING:  May I approach?

```
 1              THE COURT:  No.  You can stay if you want to and be

 2   polite and quiet, or you can leave if you want to.  But --

 3              MR. KING:  No, I'm always pleasant.  Your Honor,

 4   I've done hundreds of trials, I was a practicing attorney.

 5   I was -- the whole purpose of that e-mail was because

 6   Mr. Wozniak had illegally threatened to throw me out of a

 7   deposition, in which we had already agreed that I was

 8   allowed to video.  He changed his mind at midstream, turning

 9   me from a licensee or invitee into a trespasser, and

10   threatened to throw me out while I was packing up.  And so

11   that type of conduct was the impetus for the e-mail, because

12   I knew that the transcript --

13              MS. PARKER:  Your Honor --

14              MR. KING:  I'm not finished, Counsel.

15              THE COURT:  Ms. Parker, just sit down.  Just relax.

16              MR. KING:  Because I had known from the transcript

17   that he had mistreated -- or allegedly mistreated a witness.

18   And I would say that this is conduct that's indicative of

19   that counsel.

20              THE COURT:  Mr. King, you're disrupting my trial

21   right now.  You can sit down and shut up, or you can leave.

22   Those are your two options.  Which would you like to do?

23              MR. KING:  I'm prepared to operate within the

24   confines of the First Amendment, Your Honor.  Thank you.

25              THE COURT:  All right.  Ms. Lucero has arrived, and
```

1   believe me, you didn't miss anything.

2            MS. LUCERO:  Thank you.

3            THE COURT:  All right?

4            MS. LUCERO:  All right.

5            THE COURT:  We have -- I have control of my

6   courtroom, Ms. Parker.  And if there's any disruptions, I

7   will take care of them.  I also have a deputy, a United

8   States Marshal in the courtroom, who can handle things if we

9   need to.

10           So don't worry about your safety.  Concentrate on

11  your case.  And are you ready to present your witness?

12           MR. WOZNIAK:  Yes, Your Honor.

13           THE COURT:  All right.  Mr. Johnson, you want to

14  come forward and we'll swear you in.

15           Come on up here.

16           THE WITNESS:  I'm sorry.

17           THE COURT:  That's fine.  Right about there.  Stop

18  and raise your right hand.

19           **ASMAR JOHNSON**, after having been duly sworn in by

20  the courtroom deputy testified as follows:

21           COURTROOM DEPUTY:  Please take your seat.

22           Please state your name and spell it for the court

23  reporter.

24           THE WITNESS:  Asmar Johnson, A-s-m-a-r, last name

25  Johnson, J-o-h-n-s-o-n.

 1             THE COURT:  Thanks, Mr. Johnson.

 2             Go ahead, Counsel.

 3                     **DIRECT EXAMINATION**

 4   **BY MR. WOZNIAK:**

 5   Q.   Mr. Johnson, can you please explain what is your

 6   connection to Cenlar FSB?

 7   A.   I work for them as a Late Stage Default Corporate

 8   Representative.

 9   Q.   And what is your current position?

10   A.   I work as a Late Stage Corporate Representative.

11   Q.   Have you always worked for Cenlar as a corporate

12   representative?

13   A.   Yes, and I have been with them for a year and a half

14   now.

15   Q.   Okay.  And prior to working for Cenlar, did you work

16   for any other mortgage servicers in the past?

17   A.   Yes, I have.

18   Q.   For how long?

19   A.   Totaling approximately almost ten years.

20   Q.   Okay.  And prior to working for mortgage servicers,

21   what did you do?

22   A.   I worked for the United States Air Force.

23   Q.   What did you do for the United States Air Force?

24   A.   Worked in airborne comm and also air medical

25   evacuations.

1   Q.    Okay.  And how long have you been with the Air Force?

2   A.    Six years.

3   Q.    Okay.  As a corporate representative for Cenlar, what

4   are your duties?

5   A.    Review business records and documents and appear for

6   foreclosure hearings, mediations and litigated hearings.

7   Q.    Okay.  So for your employment with Cenlar, as a

8   corporate representative, are you familiar with the services

9   that Cenlar offers to its clients?

10  A.    Yes.

11  Q.    What services are those?

12  A.    Cenlar services residential mortgage loans on behalf of

13  either the client, or for another servicer.  We are a

14  sub-service for another servicer.

15  Q.    And what does "servicing residential mortgage loans"

16  mean?

17  A.    Basically, as a servicer, we act on our clients'

18  behalf, as far as managing the account, maintaining the

19  property, taking payments from borrowers.

20  Q.    The does Cenlar maintain business records?

21  A.    I'm sorry?

22  Q.    Does Cenlar maintain business records --

23  A.    Yes.

24  Q.    -- as part of their servicing?

25  A.    Yes.

1    Q.   And do you have regular access to Cenlar's business and

2    servicing records?

3    A.   Yes, I do.

4    Q.   Are you familiar with how Cenlar maintains this

5    information?

6    A.   Yes, I am.

7    Q.   And how is this information maintained?

8    A.   The information that we receive is -- we have a

9    collateral file that's locked in a vault, secure vault, or a

10   information accountant.  And we also have electronically on

11   our systems -- our Cenlar computer systems, all documents

12   are scanned-in electronically.

13   Q.   And where is the original file kept?

14   A.   Secured.  It would be secured in a vault.

15   Q.   Okay.  Now, are these records that Cenlar keeps kept in

16   the course -- the ordinary course of Cenlar's business?

17   A.   Yes.

18   Q.   Do they constitute business records?

19   A.   Yes.

20   Q.   Is Cenlar always the original servicer of a loan?

21   A.   No.

22   Q.   When Cenlar acquires servicing rights from another

23   servicer, what does Cenlar do to set up its loan records?

24   A.   Cenlar has a boarding process in place.  So when loans

25   are brought over, we make sure that they are cross-checked

```
 1   with the prior servicer.  And the prior servicer has a duty

 2   to disclose true and accurate information to us.  We make

 3   sure that we cross-check the information, that everything is

 4   compliant.  And anything that's not, will be inputted in

 5   manually into our systems and corrected.

 6   Q.   Okay.  And do you know if there is a standard industry

 7   practice with regards to relying on prior servicer's records

 8   that transfer over to a new servicer?

 9   A.   Yes.

10   Q.   Okay.  And what is that practice?

11   A.   The practice is to make sure that any information is

12   true and accurate.  And we basically represent our client to

13   the best of our ability.

14   Q.   Okay.  Now, can you take a look at what has been

15   previously marked as Plaintiff's Exhibit 62?

16   A.   (The witness complied.)

17   Q.   Have you seen this document before?

18   A.   Yes, I have.

19   Q.   What is this document?

20   A.   It's an Interim Servicing Master Agreement.

21   Q.   Okay.  What is it -- what is this -- who is this

22   Interim Master Servicing Agreement between?

23   A.   It is between Freddie Mac and Cenlar, basically stating

24   that Cenlar would be temporarily --

25            MS. DAO:  Objection, Your Honor, the document
```

```
 1   should speak for itself.

 2          THE COURT:  Yeah, the document speaks for itself.

 3          MR. WOZNIAK:  Okay.  All right.

 4   BY MR. WOZNIAK:

 5   Q.   Do you understand what "interim servicing" means?

 6   A.   Yes.

 7   Q.   What does it mean?

 8   A.   Temporary servicing.

 9          MR. WOZNIAK:  Okay.  Your Honor, I'd like to make a

10   motion that the Interim Servicing Master Agreement be

11   admitted into evidence as Exhibit 62.

12          MS. DAO:  No objection.

13          THE COURT:  62 is admitted into evidence.

14   BY MR. WOZNIAK:

15   Q.   Okay.  Can you please take a look at what has been

16   previously marked as Plaintiff's Exhibit 61?

17   A.   (The witness complied.)

18   Q.   Do you -- have you seen this document before?

19   A.   Yes.

20   Q.   What is this document?

21   A.   A Limited Power of Attorney.

22   Q.   What is this -- who is this Limited Power of Attorney

23   between?

24   A.   It is between Cenlar and Freddie Mac.

25          MR. WOZNIAK:  Okay.  Your Honor, I'd like to move a
```

```
 1   copy of the Freddie Mac's Limited Power of Attorney into

 2   evidence as Exhibit 61.

 3            MS. DAO:  No objection, Your Honor.

 4            THE COURT:  61 is admitted into evidence.

 5   BY MR. WOZNIAK:

 6   Q.   What was Cenlar's role with Freddie Mac in Exhibit 61

 7   and 62?

 8   A.   Our role was to act as the servicer for Freddie Mac.

 9   Q.   Okay.  Did the power of attorney give Cenlar special --

10   special rights?

11   A.   Yes.  We have the right to act on behalf of Freddie Mac

12   and to represent them.

13   Q.   Okay.  As a servicer and an attorney-in-fact, did

14   Cenlar owe any duties to Freddie Mac?

15            MS. DAO:  Objection, Your Honor, calls for a legal

16   conclusion.

17            THE COURT:  It does call for a legal conclusion.

18            MR. WOZNIAK:  Your Honor --

19            THE COURT:  Objection sustained.

20   BY MR. WOZNIAK:

21   Q.   Okay.  What is your understanding of Cenlar's

22   obligations to Freddie Mac pursuant to the Power of

23   Attorney?

24            MS. DAO:  Objecting, lack of foundation, Your

25   Honor.
```

```
 1              THE COURT:  I'll allow his understanding.  Just

 2     consider it against the bench trial.  You can go ahead and

 3     answer, Mr. Johnson.

 4              THE WITNESS:  It says -- as with our Limited Power

 5     of Attorney, we are acting in the best interests of Freddie

 6     Mac.  And to deflect any -- any -- anything that can harm

 7     Freddie Mac, basically, as we came to understand it.

 8     BY MR. WOZNIAK:

 9     Q.   All right.  Are you familiar with the name of Leticia

10     Lucero?

11     A.   Yes.

12     Q.   How are you familiar with Ms. Lucero?

13     A.   Through business records that we have for Mrs. Lucero.

14     We serviced her account from August, 2009 until March of

15     2015.

16              MR. WOZNIAK:  Okay.  Your Honor, at the time I

17     would like the Court to take notice of the parts submitted

18     to Packets Nos. 2 and 4.

19              THE COURT:  Okay, 2 and 4.  Yes.

20     BY MR. WOZNIAK:

21     Q.   Now, can you please take a look at what has been

22     previously marked as Defendant's Exhibit 507?

23     A.   (The witness complied.)

24     Q.   Have you ever seen this document before?

25     A.   Yes.
```

```
 1    Q.    What is this document?

 2    A.    It's a Notice of Assignment informing Mrs. Lucero of

 3    the servicing transfer.

 4    Q.    To Cenlar?

 5    A.    Yes.

 6          MR. WOZNIAK:  Your Honor, I would like to move a

 7    copy of the Notice of Assignment, Sale or Transfer of

 8    Servicing into evidence as Exhibit 507.

 9          MS. DAO:  No objection.

10          THE COURT:  507 is admitted into evidence.

11    BY MR. WOZNIAK:

12    Q.    Does Cenlar maintain the records for Ms. Lucero's loan?

13    A.    Yes.

14    Q.    Prior to today, did you review any of Cenlar's records

15    for Ms. Lucero's loan?

16    A.    Yes.

17    Q.    Which of Cenlar's servicing records pertain to the

18    servicing of Ms. Lucero's loan did you review?

19    A.    I reviewed all the financial information and payment

20    entries and transactions on the account.

21    Q.    Okay.  Are you familiar with the information contained

22    in these records?

23    A.    Yes.

24    Q.    Would these records show when Ms. Lucero obtained her

25    loan?
```

1    A.    Yes.

2    Q.    When did she obtain her loan, approximately?

3    A.    In August of 2006.

4    Q.    Okay.  And was Ms. Lucero's loan secured?

5    A.    Yes.

6    Q.    Can you --

7    A.    By -- I'm sorry.

8    Q.    Okay.  Can you please take a look at what has been

9    previously admitted into evidence as Plaintiff' Exhibit 1?

10   A.    (The witness complied.)

11   Q.    Do you recognize this document?

12   A.    Yes.

13   Q.    What is this document?

14   A.    It is a copy of the Note.

15   Q.    Is this Ms. Lucero's Note?

16   A.    Yes, it is.

17   Q.    Does this Note provide the terms for repayment of the

18   amount borrowed by Ms. Lucero?

19   A.    Yes, it does.

20   Q.    Okay.  Now, can you please take a look at what has been

21   previously admitted into evidence as Plaintiff's Exhibit 2?

22   A.    (The witness complied.)

23   Q.    Do you recognize this document?

24   A.    Yes.

25   Q.    What is this document?

1   A.   Deed of Trust.

2   Q.   Okay.  Is this Ms. Lucero's Deed of Trust?

3   A.   Yes, it is.

4   Q.   Does this Deed of Trust provide the terms for repayment

5   of the amount borrowed by Ms. Lucero?

6   A.   Yes, it does.

7   Q.   Okay.  Now, under these documents, what happens if

8   Mrs. Lucero stopped paying periodic payments under the Note

9   and the Deed of Trust?

10  A.   Based on these -- these documents, on if -- if

11  Ms. Lucero does not make her payment before the 15th of

12  every month, she will be assessed a late charge.

13  Q.   Okay.  If she still doesn't make a payment after a late

14  charge was assessed --

15  A.   That will --

16  Q.   -- that will --

17  A.   -- it will fully accelerate.

18  Q.   Okay.  Now, these provisions are both in the note and

19  the deed of trust; correct?

20  A.   Yes.

21  Q.   All right.  Did Mrs. Lucero make all of her required

22  payments when Cenlar was servicing her loan?

23  A.   No, she did not.

24  Q.   Which payments did she not make?

25  A.   She missed her June 2011 payment.

1   Q.   And when she missed her June 2011 payment, did she

2   default on her loan?

3   A.   Yes.

4   Q.   Okay.

5        MS. DAO:  Your Honor, I'm going to object as to the

6   relevance of this testimony.  We do not dispute that there

7   was default, and that there was a loan mod.  And we could be

8   all day doing this, but we are not disputing any of that.

9        THE COURT:  Well, I wouldn't allow

10  all-day testimony about it.  But just a review of the

11  records, the answer can stand.  Go ahead, Counsel.

12       MR. WOZNIAK:  Thank you, Your Honor.

13  BY MR. WOZNIAK:

14  Q.   Now, what did Cenlar do after Ms. Lucero defaulted?

15  A.   Informed her that her payment was due.

16  Q.   Okay.  Now, can you please take a look to what has been

17  previously marked as Defendant's Exhibit 512?

18  A.   (The witness complied.)

19  Q.   Do you recognize this document?

20  A.   Yes.

21  Q.   What is this document?

22  A.   It's a Notice of Default.

23  Q.   Did -- was this Notice of Default related to

24  Ms. Lucero's loan?

25  A.   Yes, it was.

1    Q.   Okay.  To your knowledge, was this Notice of Default

2    transmitted to Ms. Lucero?

3    A.   Yes.

4          MR. WOZNIAK:  Okay.  Your Honor, at this time I

5    would like to move a copy of the Notice of Default into

6    evidence as Exhibit 512.

7          THE COURT:  Now, I do have to ask why are we doing

8    that.

9          MR. WOZNIAK:  Your Honor, the relevance of it is

10   that Ms. Lucero, in her initial testimony, testified that

11   she believed that she wasn't in default at the time that she

12   was making the trial payments.  And this Notice of Default

13   addressees these concerns.

14         THE COURT:  She was in default and her counsel has

15   indicated she is, so I'll admit 512 into evidence, but let's

16   not spend a lot of time on it.

17         MR. WOZNIAK:  No, that's pretty much it, Your

18   Honor.

19         THE COURT:  Okay.

20   BY MR. WOZNIAK:

21   Q.   What else, if anything, did Cenlar do after Ms. Lucero

22   defaulted?

23   A.   After she defaulted, we offered her a loan modification

24   after she -- or a trial mod after she submitted her

25   financial information and request.

1    Q.   Okay.  And can you please take a look at what has been

2    previously marked as Exhibit 508?

3    A.   (The witness complied.)

4    Q.   Do you recognize this document?

5    A.   Yes, I do.

6    Q.   What is this document?

7    A.   This is a letter from Mrs. Lucero's counsel, informing

8    us that she agrees to accept the trial modification.

9    Q.   And what was the date of this letter?

10   A.   September 22nd, 2012.

11        MR. WOZNIAK:  Your Honor, at this time I'd like to

12   move a copy of the September 22nd, 2012 letter into evidence

13   as Exhibit 508.

14        THE COURT:  Both pages?

15        MR. WOZNIAK:  Both pages, Your Honor.

16        THE COURT:  Any objection to 508?

17        MS. DAO:  No objection, Your Honor.

18        THE COURT:  508 is admitted.

19   BY MR. WOZNIAK:

20   Q.   Okay.  What kind of information did Ms. Lucero have to

21   maintain in connection with her application?

22   A.   Her financial information --

23   Q.   Okay.

24   A.   -- detailing her hardship.

25   Q.   What kind of evidence does Cenlar generally require in

1    connection with such applications?

2    A.   We require thirty days' pay stubs and 60 days' bank

3    statement -- worth of bank statements to prove -- or to show

4    her financial situation.

5    Q.   Okay.  What happens if the evaluation lasts more than

6    60 or 90 days?

7    A.   We would require her to submit updated financial

8    information.

9    Q.   And why is that?

10   A.   Because during that period, it is possible that her

11   financial situation may have changed by that point.  So we

12   ask for review of updated information.

13   Q.   Okay.  Now, after Cenlar offered to Ms. Lucero a trial

14   plan, did Ms. Lucero's records reflect that she submitted

15   any additional financial information?

16   A.   After she submitted her --

17   Q.   I'm sorry.  Cenlar offered her the trial

18   modification --

19   A.   Right.

20   Q.   -- did she submit any other financial information?

21   A.   No.

22   Q.   Okay.  Did Mrs. Lucero make the required trial

23   payments?

24   A.   Yes, she did.

25   Q.   Was her loan permanently modified?

1    A.   It was permanently modified March 1st, 2013.

2    Q.   Okay.  Now I'd like you to take a look at what has been

3    previously marked as Exhibit 12.

4    A.   (The witness complied.)

5    Q.   And I believe it was admitted into evidence as Exhibit

6    12.

7             Do you recognize this document?

8    A.   Yes.

9    Q.   What is this document?

10   A.   This is our Loan Modification Agreement.

11   Q.   Okay.  Is this definitely an executed Loan Modification

12   Agreement?

13   A.   Yes.

14   Q.   Okay.  Does this agreement reflect the terms -- the

15   payment terms for Ms. Lucero's modification?

16   A.   Yes, it does.

17   Q.   Under this loan modification agreement, when was her

18   first modified payment due?

19   A.   First payment was due on March 1st, 2013.

20   Q.   And that was the date that the modification was

21   effective; correct?

22   A.   That's correct.

23   Q.   What led to Cenlar's decision to offer Ms. Lucero the

24   modification agreement?

25             MS. DAO:  Objection, speculation.

```
 1              THE COURT:  That is speculation, Counsel.  That's
 2    not something he has firsthand knowledge of.
 3              MR. WOZNIAK:  Sure.
 4    BY MR. WOZNIAK:
 5    Q.   To your knowledge, what led to Cenlar's decision to
 6    offer Ms. Lucero a modification?
 7              MS. DAO:  Same objection.
 8              THE COURT:  Right.  The objection is sustained.
 9    BY MR. WOZNIAK:
10    Q.   Does Cenlar have any guidance for what leads to
11    offering a loan modification agreement to a borrower?
12              MS. DAO:  Same objection.
13              THE COURT:  No, I'll -- this is just in general,
14    not specific to this case.  You can answer that question.
15              THE WITNESS:  In general, when a loan modification
16    agreement is offered, we see her -- or see the borrower's
17    financial hardship and try to implement a plan that would
18    effectively make her -- or make the borrower able to make
19    their payments -- continue making payments.  And -- and also
20    bring her out of -- or bring them out of default.
21    BY MR. WOZNIAK:
22    Q.   Okay.  Are there any other goals that Cenlar usually
23    has in connection with loan modification agreements?
24    A.   Well, with those agreements, we try to make sure that
25    anything that is offered does not harm our client.  And also
```

1    in her situation, it was to make sure that the chain -- the

2    original agreements within the Deed and the Note were not

3    changed.

4    Q.   Okay.  Now, is one of the goals that Cenlar has is to

5    make the loan performing again?

6    A.   Yes.

7    Q.   Why is that?

8    A.   Because we -- normally we want to see that the

9    borrowers can continue to keep their home and make payments

10   as they originally intended.

11   Q.   Now, in your review of Ms. Lucero's records, do these

12   records reflect that any of these calls -- any of these --

13   Cenlar's objectives were not met in connection with this

14   Loan Modification Agreement?

15   A.   No, they were met.

16   Q.   Okay.  What was the status of Ms. Lucero's loan prior

17   to the loan modification on March 1, 2013?

18   A.   Prior to March 1, she hadn't made her trial payments,

19   but she was defaulted.  It wasn't a permanent mod until

20   March 1st.

21   Q.   Okay.  Was she in foreclosure?

22   A.   Yes.

23   Q.   Okay.  What happened after Cenlar modified Ms. Lucero's

24   mortgage loan effective March 1, 2013?

25   A.   The account was brought current, and she was to resume

```
 1   making her normal monthly payments -- or the modified

 2   monthly payments.

 3   Q.   Okay.  Did anything else happen with Ms. Lucero's

 4   loan -- mortgage loan after Cenlar modified it on March 1,

 5   2013?

 6   A.   After we modified the account, approximately a month

 7   later, we received a lawsuit from Mrs. Lucero.

 8   Q.   Okay.  Now, can you please take a look at what has been

 9   previously marked as Exhibit -- Defendant's Exhibit 513?

10   A.   (The witness complied.)

11   Q.   Do you recognize this document?

12   A.   Yes.

13   Q.   Have you reviewed this document before?

14   A.   Yes, I have.

15   Q.   What is this document?

16   A.   This is a copy of the Complaint that I referred to.

17           MR. WOZNIAK:  Okay.  Your Honor, I would like to

18   move a copy of the complaint into evidence as Defendant's

19   Exhibit 513.

20           MS. DAO:  My objection is that the complaint has

21   been admitted several times, Your Honor.  The first version

22   may not be relevant any more at this point in time.

23           THE COURT:  Well, these documents are part of the

24   Court's files, and the Court can take judicial notice of all

25   of the complaints.  So 513, 514, 515 and 516 don't need to
```

 1   be admitted into evidence.  But you can refer to them, and I

 2   take notice of the files of the Court.

 3          MR. WOZNIAK:  Your Honor, the only problem that I

 4   have with the judicial notice is that judicial notice, under

 5   my understanding of what the Court can take judicial notice,

 6   that they were filed, but the Court can't take notice of the

 7   allegations therein.  As long as the Court is willing to

 8   accept the allegations therein as well, I have no objection

 9   to it.

10          THE COURT:  Sure.  I am.  And you know, for that

11   part, Ms. Dao, you don't mind if I admit them as long as I

12   admit all of them?

13          MS. DAO:  No, Your Honor.

14          THE COURT:  Yeah, so they are all -- 513 through

15   516 are admitted into evidence.

16          MR. WOZNIAK:  Okay.  Thank you, Your Honor.

17   BY MR. WOZNIAK:

18   Q.   Prior to the filing of the Complaint, did Cenlar

19   receive any sort of written correspondence from Ms. Lucero

20   in which Ms. Lucero informed Cenlar that she did not believe

21   that Cenlar was the beneficiary and the noteholder?

22   A.   We did receiv --

23          MS. DAO:  Objection, Your Honor, lacking in

24   foundation.

25          THE COURT:  Well, he's reviewed the records.  You

```
 1    can -- did you see anything to that effect?
 2            THE WITNESS:  Well, we saw two notices in response
 3    from Ms. Lucero.
 4    BY MR. WOZNIAK:
 5    Q.   No.  I'm sorry, I think I'm confusing the witness.
 6            Prior to receiving the lawsuit in April of 2013,
 7    did Cenlar receive any correspondence from Ms. Lucero
 8    informing Cenlar that she did not believe that Cenlar was
 9    the beneficiary and/or the note -- noteholder?
10    A.   No.
11    Q.   Okay.  What about any correspondence stating that she
12    believed that Cenlar mischaracterized its status as the
13    beneficiary or the noteholder?
14    A.   No.
15    Q.   What about that Cenlar did not have the right to
16    commence the foreclosure process?
17    A.   No.
18    Q.   What about that Cenlar did not have the right to
19    proceed with issuance of the Notice of Default?
20    A.   No.
21    Q.   What about that she believed that Cenlar violated
22    Washington foreclosure laws?
23    A.   No.
24            MS. DAO:  Your Honor, if I may, I think what
25    Counsel is doing is what the Court has prohibited, expressly
```

```
1   with regards to giving prior notice to the lawsuit and so on

2   and so forth.  And I would object to this line of

3   questioning.

4           THE COURT:  Objection is overruled.  Go ahead,

5   Counsel.

6           MR. WOZNIAK:  Thank you, Your Honor.

7   BY MR. WOZNIAK:

8   Q.   Now, prior to the time of the complaint, did Ms. Lucero

9   send you a written correspondence providing you with any

10  time to correct any violations she might be claiming Cenlar

11  committed?

12  A.   No.

13  Q.   Did Cenlar do anything in response to Ms. Lucero's

14  complaint?

15  A.   We responded via notice.

16  Q.   Okay.  Did Cenlar retain counsel to represent it in

17  this litigation?

18  A.   Yes, we did.

19  Q.   Did Cenlar pay any attorney's fees to its counsel as a

20  result of receiving attorney's bills?

21  A.   Yes.

22  Q.   Now, please take a look at what has been previously

23  marked as Plaintiff's Exhibit No. 4.

24  A.   (The witness complied.)

25  Q.   Do you recognize this document?
```

1   A.   Yes.  This is the Customer Activity Statement of --

2   showing the transactions on the account.

3   Q.   Okay.  Does it have any dates or a period of time for

4   which it shows?

5   A.   Yes.  From September 26, 2011 through August 20th,

6   2014.

7   Q.   Okay.  And can you please take a look at Exhibit 3?

8   A.   (The witness complied.)

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   What is that?

12  A.   This is also an Activity Statement dated from

13  January 21st, 2014 until March 18th, 2015.

14         MR. WOZNIAK:  Okay.  Your Honor, at this time I'd

15  like to move them into evidence as Exhibits 3 and 4.

16         THE COURT:  3 and 4, Counsel?

17         MS. DAO:  No objection, Your Honor.

18         THE COURT:  3 and 4 are admitted into evidence.

19         MR. WOZNIAK:  Okay.

20  BY MR. WOZNIAK:

21  Q.   Now, turning your attention to Exhibit No. 4, does this

22  Account Activity Statement reflect when Cenlar paid the

23  attorneys for fees in this case for the first time?

24  A.   Yes.

25         MS. DAO:  For the first time as in when?

```
 1   BY MR. WOZNIAK:
 2   Q.   Do you understand the document -- do you understand the
 3   question?
 4   A.   I don't know what date they --
 5   Q.   We started --
 6   A.   Yes, one moment.
 7   Q.   You know, it might be easier if -- can you take a look
 8   at what has been previously admitted into evidence as
 9   Exhibit No. 13?
10   A.   (The witness complied.)
11   Q.   Do you recognize this document?
12   A.   Yes.
13   Q.   What is this document?
14   A.   It's a notice informing Ms. Lucero of the attorney's
15   fees.
16   Q.   Okay.  And what was the date of that document?
17   A.   This document, it was -- well, the date of the document
18   itself was December 4th, 2013.
19   Q.   Okay.  Does this document contain information regarding
20   when the attorney's fees were imposed?
21   A.   Yes.
22   Q.   What is the date?
23   A.   November 25th, 2013.
24   Q.   Going back to Exhibit No. 4, does the accounting
25   history show that these fees were actually paid on that
```

1    date?

2    A.   Yes.

3    Q.   Okay.  And does it show that the amount of attorney's

4    fees were paid on November 25, 2013?

5    A.   Yes.  There is a payment of $1,251 and zero cents and

6    also $10.32.

7    Q.   Okay.  Does the Loan Notification Agreement admitted

8    into evidence as Exhibit No. 6 contain any provisions as to

9    how Cenlar should treat attorney's fees it incurs in

10   connection with litigation?

11   A.   No.

12   Q.   Are there any contractual provisions in Ms. Lucero's

13   loan documents that provide for the treatment of attorney's

14   fees incurred in this litigation?

15           MS. DAO:  Objection, Your Honor.

16           THE COURT:  Yeah, that is beyond the scope of his

17   testimony.

18   BY MR. WOZNIAK:

19   Q.   Okay.  To your knowledge, does the Note and the Deed of

20   Trust contain attorney's fee provisions?

21   A.   Yes.

22   Q.   Okay.  What is Cenlar's understanding of the meaning of

23   these provisions?

24           MS. DAO:  Objection --

25           THE COURT:  The objection is sustained.

1   BY MR. WOZNIAK:

2   Q.    Do you have an understanding of the meaning of the

3   attorney fee provisions?

4             THE COURT:  His personal understanding is not of

5   importance to me, and he can't speak for the company, and he

6   is not a lawyer.

7             MR. WOZNIAK:  Your Honor, I just want to say he has

8   knowledge as to Cenlar's understanding of -- of the

9   provisions.

10            THE COURT:  I don't care what his knowledge is.

11            MR. WOZNIAK:  His knowledge of the corporate --

12  right?

13            THE COURT:  I mean I have knowledge of what the

14  United States Courts here do and say, but I'm not an expert

15  on what the individual cases are about, or the judges, or

16  anything like that.  He's just not competent to testify in

17  that area.  It's nothing personal against Mr. Johnson, it's

18  just not what he's here for.

19  BY MR. WOZNIAK:

20  Q.    Okay.  Does Cenlar have a -- to your knowledge, does

21  Cenlar have an understanding of what attorney fee provisions

22  of the Note and the Deed of Trust are?

23            MS. DAO:  Same objection.

24            MR. WOZNIAK:  It's a "yes" or "no" answer, Your

25  Honor.

```
 1            THE COURT:  No, but it -- the -- my objection --
 2   the objection of counsel is sustained.  So it's not going to
 3   get a "yes" or "no" answer.
 4            MR. WOZNIAK:  Okay.
 5   BY MR. WOZNIAK:
 6   Q.   What is Cenlar's understanding of the attorney fee
 7   provisions --
 8            THE COURT:  Mr. Wozniak, you are trying too hard to
 9   ask an improper question.  Move on to a different area.
10   BY MR. WOZNIAK:
11   Q.   Did Cenlar make a determination whether or not the fees
12   it expended on November 25, 2013 were potentially
13   recoverable from Ms. Lucero?
14   A.   Yes.
15   Q.   And what is the determination?
16   A.   That they could potentially be recoverable from
17   Mrs. Lucero.
18   Q.   How did Cenlar make the determination that attorney's
19   fees were potentially recoverable?
20            MS. DAO:  Again, Your Honor.
21            THE COURT:  Yeah.  Do you have any personal
22   knowledge of how this case was handled, not from review of
23   the records, but were you part of it at all?
24            THE WITNESS:  No.
25            THE COURT:  Okay, he can't answer then.
```

```
 1            MR. WOZNIAK:  Okay, no problem.

 2  BY MR. WOZNIAK:

 3  Q.   Now, does Cenlar have a policy in place as to how

 4  attorney's fees are being accounted for as potentially

 5  recoverable in their litigation?

 6  A.   Yes, we have -- per our guidelines, there are certain

 7  procedures that we have to follow in regards to attorney's

 8  fees.

 9  Q.   And what are these procedures?

10  A.   Basically if we make a determination through our legal

11  counsel if we are able to even collect on them.  And if we

12  are, if we are found able to be collecting, we can collect

13  fees from the borrowers.

14  Q.   Okay.  And who makes that determination, do you know?

15  A.   Our legal department.

16  Q.   Okay.

17            THE COURT:  When you say, "Our legal department,"

18  do you mean in-house, in Cenlar?

19            THE WITNESS:  Sorry, yes, in-house legal --

20            THE COURT:  Okay.

21            THE WITNESS:  -- in-house legal department.

22  BY MR. WOZNIAK:

23  Q.   Okay.  And from your review of the business records

24  related to Ms. Lucero's loan, were these policies and

25  guidelines followed?
```

1    A.    Yes.

2    Q.    Okay.  Is there anything in these records that show you

3    that the policies and guidelines were not followed in this

4    case?

5    A.    No.

6    Q.    Okay.  Now, you previously looked at Exhibit No. 13?

7    A.    Yes.

8    Q.    Does this letter inform Ms. Lucero of the fact that

9    Cenlar accounted for the attorney's fees as potentially

10   recoverable?

11   A.    No, it was just simply to inform her of the attorney's

12   fees.

13   Q.    Okay.  Now, what did Cenlar do after it made the

14   determination that attorney's fees were potentially

15   recoverable?

16   A.    We informed Mrs. Lucero.

17   Q.    And that was that letter?

18   A.    That's correct.

19   Q.    Okay.  Were the fees coded in certain ways -- in a

20   certain way in Cenlar's accounting?

21   A.    Yes, it was coded as -- as corporate advance, third

22   party.

23   Q.    Okay.  And were they reflected in the -- in the -- in

24   the accounting?

25   A.    I'm sorry?

1    Q.   Were these fees reflected in the accounting?

2    A.   Yes.

3    Q.   Now, following the filing of the complaint, Cenlar

4    received amended complaints filed in this case; correct?

5    A.   Yes.

6            MS. DAO:  Objection, leading, Your Honor.

7            THE COURT:  It was.  But it's okay.  Go ahead.

8            MR. WOZNIAK:  Thank you.

9  BY MR. WOZNIAK:

10   Q.   And all these complaints were already admitted into

11   evidence.  Did Cenlar's determination change based on the

12   allegations in the First Amended Complaint, as to whether or

13   not the fees were recoverable -- potentially recoverable?

14   A.   No.

15   Q.   Okay.  How about the Second Amended Complaint?

16   A.   No.

17   Q.   Okay.  Now, if you look at the December 4, 2013 letter,

18   Exhibit No. 13, it states in there, there is language in

19   there, *in keeping with Washington law.*

20            Do you see that?

21   A.   Yes.

22   Q.   Why was this language included in that letter?

23            MS. DAO:  Objection, Your Honor, lack of

24   foundation.

25            THE COURT:  Did you write the letter?

```
 1              THE WITNESS:  I did not write the letter.

 2              THE COURT:  Did you dictate for someone else to

 3    write it?

 4              THE WITNESS:  No.

 5              THE COURT:  Okay.  No, he can't answer that.

 6    BY MR. WOZNIAK:

 7    Q.   Was that letter a form letter?

 8    A.   Yes, it is a form letter.

 9    Q.   Okay.  What does the -- does Cenlar have guidelines

10    with respect to writing these letters?

11    A.   The -- when the letters are generated -- and then in

12    this particular case, since the property originated in --

13    the loan originated in Washington, the language in keeping

14    with Washington law, that's the reason why it was put into

15    the letter.

16              THE COURT:  So it's a form letter.  Then based on

17    wherever the loan is, you would say, "according to Illinois

18    law," or "Massachusetts law" --

19              THE WITNESS:  Exactly, yes.

20              THE COURT:  -- or "Washington law"?

21              THE WITNESS:  Yes.

22              THE COURT:  Gotcha.

23    BY MR. WOZNIAK:

24    Q.   Now, in your review of Cenlar's letter, did you -- do

25    you have any reasons to believe that that was not the reason
```

289

```
 1   why the "Washington law" phrase was put in that letter?
 2            THE COURT:  He said that is the reason why.
 3            MR. WOZNIAK:  Okay.
 4            THE COURT:  Yeah.
 5   BY MR. WOZNIAK:
 6   Q.   Did Cenlar require Ms. Lucero to pay these fees and
 7   costs stated in the December letter?
 8   A.   No.  As I said, this was just a letter to inform her of
 9   what those fees were.
10   Q.   Okay.  Now, can you explain why that letter has -- is
11   saying, "We have charged your loan account"?
12   A.   Because these fees were placed on the account --
13   Q.   Okay.
14   A.   -- when we were -- we had to inform her of -- of those
15   fees.
16   Q.   Okay.  Did Cenlar keep Mrs. Lucero apprised of the fees
17   being accounted for on her loan account as a result for --
18   of the litigation?
19   A.   Yes.
20   Q.   How was Cenlar keeping Ms. Lucero apprised of these
21   facts?
22   A.   With form letters such as this.
23   Q.   Okay.  What would happen if Cenlar coded these
24   attorney's fees as nonrecoverable?
25            MS. DAO:  Objection, speculation.  What if?
```

```
 1              THE COURT:  Right.  The objection's sustained.
 2   BY MR. WOZNIAK:
 3   Q.   Does Cenlar have a policy in place as to -- you
 4   testified earlier that Cenlar has a policy in place as to
 5   the determining -- determining whether -- if the fees are
 6   called -- can be potentially recovered or not recovered;
 7   correct?
 8   A.   Correct.
 9   Q.   Now, does Cenlar have a policy in place or are there
10   any guidelines stating what would happen if the fees that
11   were -- that Cenlar determined potentially recoverable to be
12   nonrecoverable?  Recoverable to nonrecoverable.
13   A.   This -- well, potentially, we would waive our right to
14   collect on them if we -- if we were to do that.
15   Q.   Okay.  So now, if Cenlar -- is it your testimony that
16   if Cenlar coded them as nonrecoverable, that it could be
17   potentially waiving -- it could be potentially waiving these
18   fees?
19   A.   Yes.
20   Q.   All right.  Now, if Cenlar failed to account for these
21   fees, how would it affect Freddie Mac?
22   A.   We feel that if they are waived, then we would be -- we
23   won't be doing our duty to protect Freddie Mac's interests.
24   Q.   Okay.  Now, reviewing Cenlar's Interim Activity
25   Statement, which is Exhibit No. 4, does this statement show
```

1  that Cenlar incurred any additional fees in connection with

2  the litigation in this case?

3  A.   Yes, we had the attorney's fees on -- again on

4  11/25/2013.

5  Q.   Excuse me?

6  A.   On 11/25/2013.

7  Q.   Okay.  And any other dates?

8  A.   Yes, they were assessed on that date, February 10th,

9  2014; March 25th, 2014; April 29, 2014 and June 1st, 2014 --

10  I'm sorry, July 1st, 2014.

11  Q.   Okay.  Now, the fees on the dates that you just

12  referenced varied; correct?

13  A.   Yes.

14  Q.   Why did they vary so much?

15  A.   That was -- those are the amounts that we were charged.

16  Q.   Those were what?

17  A.   Those are amounts that we -- we paid for the attorney's

18  fees.

19  Q.   Okay.  So that was the amounts that were billed to

20  Cenlar by its attorneys?

21  A.   Yes.

22  Q.   All right.  Were any of these fees added to

23  Ms. Lucero's total outstanding balance?

24  A.   No.

25  Q.   Please take a look at what has been previously admitted

 1   into evidence as Exhibit No. 14.

 2   A.   Okay.

 3   Q.   Do you recognize this document?

 4   A.   Yes.

 5   Q.   What is this document?

 6   A.   This is another letter informing Ms. Lucero of the

 7   attorney's fees.  Excuse me.  I'm sorry.

 8   Q.   No problem.

 9   A.   Dated March 6, 2014.

10   Q.   Okay.  And was this letter only for informational

11   purposes?

12   A.   Yes.

13   Q.   Okay.  Did Cenlar ever take steps to require Ms. Lucero

14   to pay for the fees and costs referenced in this letter?

15   A.   No, it was just to inform her.

16   Q.   All right.  Now, can you please take a look at what has

17   been previously admitted into evidence as Plaintiff's

18   Exhibit 99?  It will be Volume II.

19   A.   Okay.

20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   What is this document?

23   A.   This is another letter informing Ms. Lucero of the

24   attorney's fees dated April 1st, 2014.

25   Q.   Okay.  Now, did Cenlar do anything to collect the

1   attorney's fees referenced in this letter?

2   A.   No.

3   Q.   Were these fees added to Ms. Lucero's total outstanding

4   balance?

5   A.   No.

6   Q.   Can you please take a look at the next in order,

7   Exhibit No. 100?

8   A.   (The witness complied.)

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   What is this document?

12  A.   This is another letter informing Ms. Lucero of the

13  attorney's fees.

14  Q.   I have the same questions.  Did Cenlar do anything to

15  collect the attorney's fees referenced in this letter?

16  A.   No.

17  Q.   Were these fees added to Ms. Lucero's total outstanding

18  balance?

19  A.   No, they weren't.

20  Q.   Okay.  Did Cenlar still account for the attorney's fees

21  it had expended during the pendency of this litigation?

22  A.   No, we stopped adding fees onto the account, October of

23  2014.

24  Q.   Okay.  And how are -- how were -- how was this stop

25  reflected on the accounting -- on Cenlar's accounting?

```
 1   A.    We --
 2   Q.    Why don't you take a look at -- why don't you take a
 3   look at Exhibit No. -- I believe it would be in Exhibit
 4   No. 3.
 5   A.    Three?
 6   Q.    And explain to us what has fluid -- how was it shown on
 7   the accounting?
 8   A.    Okay.  The fees here were -- well, the -- it was
 9   adjusted from her account on October 16, 2014 in the amount
10   of $25,276.71.
11   Q.    Okay.  Does the log history show any other adjustments
12   between October 20th and 27th?
13   A.    There was another adjustment made on 10/27 in the
14   amount of $15,588.50.
15   Q.    Okay.  And why did Cenlar make that adjustment?
16   A.    Due to a court ruling -- a previous court ruling, we
17   chose to remove them from the pay history on this particular
18   document.
19         MR. WOZNIAK:  Okay.  Your Honor, may I ask for a
20   two-minute break?
21         THE COURT:  Two minutes?
22         MR. WOZNIAK:  Two minutes.  I just need to step to
23   the restroom.
24         THE COURT:  Oh, well, let's just go ahead and take
25   our midmorning break, then, and --
```

```
 1              MR. WOZNIAK:  Okay.

 2              THE COURT:  -- do it that way.  So we'll start up

 3  again at 10:25.

 4              How much longer do you have with Mr. Johnson?

 5              MR. WOZNIAK:  Mr. Johnson has got probably another

 6  45 minutes to an hour.

 7              THE COURT:  Okay.  All right.  So we'll see you in

 8  15 minutes.  Okay?

 9              MR. WOZNIAK:  Thank you, Your Honor.

10              THE COURT:  And I've got court security here.  If

11  there is any problems, the gentlemen in the blue blazers,

12  one in the hallway, one right there, you just go to them,

13  okay?

14              MS. PARKER:  Thank you, Your Honor.

15              MR. WOZNIAK:  Thank you, Your Honor.

16              THE COURT:  We'll be adjourned.

17              COURTROOM DEPUTY:  All rise, Court is in recess.

18                              (Whereupon, a recess was taken

19                              from 10:07 a.m. to 10:27 a.m.)

20              COURT DEPUTY:  All rise, Court is again in session.

21              THE COURT:  Thank you.  Please be seated.

22              Okay, Mr. Wozniak, go ahead.

23              MR. WOZNIAK:  Thank you, Your Honor.

24  ///

25  ///
```

```
 1                    EXAMINATION Continued
 2  BY MR. WOZNIAK:
 3  Q.   Mr. Johnson, did Cenlar at any time between
 4  November 25, 2014 and March 2015 attempt to collect these
 5  attorney's fees from Ms. Lucero?
 6  A.   No.
 7  Q.   Then I'm going to ask you to take a look at a group of
 8  exhibits.  It's Exhibits -- Plaintiff's Exhibits 22 through
 9  36 and then 100 through 104, which are the periodic
10  statements.
11  A.   (The witness complied.)
12  Q.   And starting with Exhibit 22, can you please tell me
13  what this document is?
14  A.   It is a loan statement that was issued to Ms. Lucero.
15          THE COURT:  Can you get a little closer to the
16  microphone, Mr. Johnson --
17          THE WITNESS:  Sorry.
18          THE COURT:  -- so everyone can hear you?
19          Thank you.  Go ahead.
20  BY MR. WOZNIAK:
21  Q.   And what's the date of this statement?
22          THE COURT:  These are already admitted into
23  evidence.
24          MR. WOZNIAK:  Yeah. Yeah. Yeah.
25          THE COURT:  We don't need to talk about what's on
```

```
 1    them.  Just go right to the meat of it.

 2    BY MR. WOZNIAK:

 3    Q.   No problem.  Then why were the attorney's fees that

 4    Cenlar accounted for on the loan included in these

 5    statements?

 6    A.   We had to include them per a CFPB regulation that was

 7    implemented January 2014, stating that we had to disclose

 8    all fees that are associated with the account.

 9    Q.   Okay.  So it was a CFPB regulation?

10    A.   Yes.

11    Q.   Okay.  Why did Cenlar believe it had to disclose these

12    fees pursuant to a CFPB regulation?

13    A.   Cenlar wanted to remain in compliance within that

14    regulation.  And by doing so, we felt that providing all of

15    these fees would -- we would be doing our duty to Freddie

16    Mac in doing that.

17    Q.   Now, can you tell us, how did the inclusion of the

18    attorney's fees on Ms. Lucero's statements did not

19    constitute an attempt to collect them from Ms. Lucero?

20         MS. DAO:  I am going to object to that, Your Honor,

21    as calling for legal conclusion and speculation.

22         THE COURT:  Well, but I'm dying to hear the answer,

23    so --

24         MS. DAO:  Okay.

25         THE COURT:  -- go ahead.
```

1           THE WITNESS:  Okay.  Well, the -- the breakdown has

2      it as a current payment and a past due amount.  They had it

3      broken down, and as far as the attorney's fees are

4      concerned, those are from past due amounts, as it is put on

5      this letter.

6           MR. WOZNIAK:  Okay.

7           THE COURT:  But, Mr. Johnson, just as a regular

8      person, not as a Late Stage Default Corporate Representative

9      or whatever that title is, you get a bill, it says "Amount

10     Due," amount -- I mean don't you look at that and say, "They

11     want me to pay the whole thing"?

12          THE WITNESS:  I understand it can be -- it's

13     confusing if you just look at the total amount and believe

14     that that is the full amount.  But we were just trying to --

15     as far as Cenlar is concerned, our way of trying to abide by

16     the regulation --

17          THE COURT:  Sure.

18          THE WITNESS:  -- was to have it all on the -- on

19     the statement.

20          THE COURT:  Uh-huh.

21          THE WITNESS:  And then break it down from where we

22     have the current payment amount, and the past due payment

23     amount.

24          THE COURT:  And would you agree with me that maybe

25     a little explanation, an accompanying letter that says,

1    "These attorney's fees are actually not due right now, but

2    we have an obligation under certain federal regulations to

3    advise you of it," could maybe help clarify it a little

4    better?

5              THE WITNESS:  Attached to this letterhead, I

6    believe that -- that would be helpful.

7              THE COURT:  Sure.  But the intent of the company

8    was to convey to Ms. Lucero that these fees are out there,

9    we are keeping account of it, but they are not actually due

10   this month?

11             THE WITNESS:  That's correct.

12             THE COURT:  Okay, great.  Go ahead, Counsel.

13             MR. WOZNIAK:  Thank you, Your Honor.

14   BY MR. WOZNIAK:

15   Q.   And you testified that it was -- you just explained to

16   the judge that the intent of the company was to comply with

17   the regulations; correct?

18   A.   That's correct.

19   Q.   And it was a brand new regulation that was passed;

20   correct?

21             THE COURT:  It was a what regulation?

22             MR. WOZNIAK:  An brand new regulation --

23             THE COURT:  Brand new.

24             MR. WOZNIAK:  -- at that time; correct?

25             THE WITNESS:  Yes.

1   BY MR. WOZNIAK:

2   Q.   And did Cenlar do anything to educate itself on that

3   regulation?

4   A.   Yes.  We -- well, Cenlar reviewed the regulation itself

5   and working with, again, in-house legal, we made a

6   determination that in doing this, we would be in compliance

7   within the regulation -- the regs per CFPB.

8   Q.   Okay.  I think they have a procedure of tracking and

9   educating itself on bills or laws that are affecting

10   mortgage servicing?

11   A.   Yes.

12   Q.   And what is that, Cenlar's procedure?

13   A.   We go through the regulations itself, and we educate.

14   Q.   I'm sorry.  I think you misunderstood my question.

15   Does Cenlar have a policy for tracking for current

16   regulations or regulations that are in -- that are being

17   passed through Congress or Senate or being passed into the

18   laws?

19   A.   Yes.

20   Q.   Okay.

21   A.   Through our systems and through our in-house documents,

22   we are able to track them.

23   Q.   All right.  And your review of Cenlar's records, did

24   Cenlar follow its procedures and guidelines in connection

25   with Ms. Lucero's loan?

1   A.   Yes.

2   Q.   Okay.  Now, in the context of the CFPB regulation, did

3   Cenlar have an understanding of what has to be stated in

4   monthly statements under "amount due"?

5   A.   Yes.

6   Q.   What was that understanding?

7   A.   Well, the "amount due" would have to include the

8   principal, interest, escrow, total fees charged, overdue

9   charges.

10  Q.   Okay.  And did Cenlar have an understanding under that

11  debt regulation of what has to be placed under "overdue

12  payment"?

13  A.   Yes.

14  Q.   And what was that understanding?

15  A.   "Overdue" would be any fees that were past due on -- on

16  the account, that needed to be reflected on the statement.

17  Q.   Okay.  And did that amount -- "overdue amount" include

18  any fees that were disbursed on the account more than 30

19  days prior to that statement?

20  A.   Right.  No.  I'm sorry.  Correct. Yes.

21  Q.   All right.  Now, can you please take a look at

22  Plaintiff's Exhibits, which have been previously admitted in

23  to evidence as Exhibits 106 through 108 in Volume II.

24  A.   (The witness complied.)

25  Q.   Do you recognize these documents?

1    A.   Yes.

2    Q.   What are these documents?

3    A.   These are also loan statements that were sent to

4    Ms. Lucero.

5    Q.   What was the date of the first statement?

6    A.   First statement date is January 6, 2015.

7    Q.   And this statement does not include the attorney's

8    fees; correct?

9    A.   No, it does not.

10   Q.   And why doesn't it include the attorney's fees?

11   A.   Because those fees were reversed per my -- the account

12   history in October.

13   Q.   Okay.  And they were reversed following the Court's

14   ruling on the motion; correct?

15   A.   That's correct.

16   Q.   All right.  Now, between November 25, 2013 and March of

17   2015, did Cenlar make any collection calls to Ms. Lucero's

18   home in an effort to collect the attorney's fees?

19   A.   No, it did not.

20   Q.   At the same time, during the same time period, did

21   Cenlar make any collection calls to Ms. Lucero's work in an

22   effort to collect the attorney's fees?

23   A.   No.

24   Q.   In the same timeframe did Cenlar send collection

25   letters to Ms. Lucero's home in an effort to collect the

1    attorney's fees?

2    A.    No.

3    Q.    In the same timeframe, did Cenlar send collection

4    letters to Ms. Lucero at work in an effort to collect the

5    attorney's fees?

6    A.    No.

7    Q.    So other than sending Ms. Lucero letters informing her

8    of Cenlar's decision to account for attorney's fees, which

9    you testified earlier, and someone had periodic statements,

10   what else did Cenlar do in connection with the attorney's

11   fees incurred in this action?

12   A.    We didn't do anything else.

13   Q.    Did Cenlar preclude Ms. Lucero from making her regular

14   modified payments as a result of inclusion of the attorney's

15   fees in the monthly statements?

16   A.    No.

17   Q.    Did Cenlar accept Ms. Lucero's payments when she

18   tendered them?

19   A.    Yes.

20   Q.    Did Cenlar apply them according to the loan

21   modification agreement to the principal, interest and

22   escrow?

23   A.    Yes, we did.

24   Q.    Did Cenlar apply them, if necessary, to create charges?

25   A.    Yes.

1    Q.    Did Cenlar apply any part of these payments to the

2    attorney's fees?

3    A.    No.

4    Q.    Okay.  Now, did Cenlar charge Ms. Lucero interest on

5    these attorney's fees?

6    A.    No.

7    Q.    Now, can you please take a look at Exhibit 4?

8    A.    (The witness complied.)

9    Q.    And starting with October 31st, which is a month prior

10   to the assessment of attorney's fees for the first time.

11   Can you walk us through and explain to us, if Ms. Luc -- if

12   the long history reflects that Mrs. Lucero made her payments

13   timely?

14   A.    Okay, beginning on -- you said November?

15   Q.    October -- October 31st.

16   A.    October.  All right.  Just one moment.  I apologize.

17   One moment.  Okay.  On October 31, 2013 we did receive a

18   principal payment of a thousand dollars, reducing the

19   principal balance to $400,552.54.  The next payment was

20   received December 9th, 2013, okay, of $1,525.37.

21   Q.    Was this payment timely?

22   A.    This was made on the 9th.

23   Q.    So was it timely?

24   A.    No.

25   Q.    It was timely, right?

1  A.   It was -- it was made -- well, this is before the 15th.

2  Q.   Yes.

3  A.   I'm sorry.

4  Q.   So your understanding of the payment being made late is

5  the payment has to be made -- is made after the 15th?

6  A.   After the 15th --

7  Q.   Okay.

8  A.   -- correct.

9  Q.   All right.  So the next payment?

10  A.   Next payment was received January 21st, 2014.

11  Q.   So was the payment timely?

12  A.   No, this payment was made late.

13  Q.   Okay.  Did Cenlar assess a late fee in connection with

14  that payment?

15  A.   Yes, of $57.84.

16  Q.   And when Cenlar received that payment, can you explain

17  to us how the payment was applied?

18  A.   Sure.  $530.69 was applied to principal; $626.04 was

19  applied in interest; $368.64 was applied to the escrow, and

20  again, the $57.84 was for late fees.

21  Q.   Okay.  What about the next payment?

22  A.   Next payment was received February 24, 2014.

23  Q.   Okay.

24  A.   In the amount of $1,583.21.

25  Q.   So that payment was also late; correct?

1   A.   Yes.

2   Q.   Okay.  And was Cenlar -- did Cenlar also assess a late

3   charge in connection with that payment?

4   A.   Yes.

5   Q.   Okay.  Now just looking at that -- at this, and that

6   long history, can you tell us in 2014 on which months

7   Ms. Lucero made her payments late?

8   A.   Beginning with February 24th.

9   Q.   Sure.  So the next one?

10  A.   The next one was March 24th, 2014; April 21st, 2014;

11  May 21st, 2014; June 23rd, 2014; July 23rd, 2014, and

12  August 20th, 2014.

13  Q.   Okay.  And if you flip over to Exhibit No. 3.

14  A.   (The witness complied.)  There is a payment

15  January 21st, 2014.

16  Q.   We already went down there, so the next one would be

17  September, 2014; right?

18  A.   Yes, my apologies.

19  Q.   No problem.

20  A.   So the next payment was September 22nd, 2014.

21  October 20th, 2014, and another payment was made November

22  4th, 2014.

23  Q.   So the November 4th was the only month in 2014 that was

24  made pay -- that the payment was made timely; correct?

25  A.   That's correct.

1    Q.    All right.  Now, can you tell us when Ms. Lucero

2    started -- first started making the payment with the first

3    payment dated October 31st, 2014, and November 2014 payment,

4    did Ms. Lucero's total principal balance lowered?

5    A.    Yes.  November of 2014 it was lowered to $393 -- I'm

6    sorry, $393,075.74.

7    Q.    Okay.  So approximately 7000; correct?

8    A.    Correct.

9    Q.    All right.  Now, in that time period, did Cenlar assess

10   late fees to the loan?

11   A.    Yes, late fees were assessed.

12   Q.    Okay.  And did Cenlar notify Ms. Lucero of the

13   assessment?

14   A.    Yes.

15   Q.    Okay.  Why don't you take a look at what has been

16   previously admitted into evidence as Exhibit 44.

17   A.    (The witness complied.)

18   Q.    Do you recognize this document?

19   A.    Yes.

20   Q.    What is this?

21   A.    It's a notice of delinquency.

22   Q.    Okay.  And what is the date of that notice?

23   A.    This was dated February 18th, 2014.

24   Q.    Okay.  And what does this notice -- what is this notice

25   for?

1   A.   It's issued whenever -- as information to the borrower,

2   to let them know that their payment for that month had not

3   been received and will be assessed a late charge.

4   Q.   Okay.  And that was the purpose of this notice in this

5   case; correct?

6   A.   That's correct.

7   Q.   All right.  Now, if you look at the amount due of that

8   notice, there is an asterisk next to it.  Do you see that?

9   A.   Yes, I do.

10  Q.   And can you please read -- because that asterisk has a

11  definition next to it and underneath it; correct?

12  A.   Yes.

13  Q.   Can you please read that definition?

14  A.   *This does not include other fees and costs that might*

15  *be due on your loan.*

16  Q.   Okay.  And what is this asterisk meant to be -- mean?

17         MS. DAO:  Objection, Your Honor, that document

18  speaks for itself.  He just read it.

19         THE COURT:  Yeah, that's --

20         MR. WOZNIAK:  Okay, sure.  No problem, Your Honor,

21  let me lay a foundation for it.

22  BY MR. WOZNIAK:

23  Q.   Is this a form letter, or this letter is -- has been

24  created only for Ms. Lucero's loan?

25  A.   This is a form letter.

1    Q.   Okay.  And does Cenlar have any guidelines and

2    procedures in connection with these form letters, Notices of

3    Delinquency?

4    A.   These -- these are standard letters that are issued to

5    the borrowers whenever they are late.

6    Q.   All right.  As a part of -- part of -- of the

7    standard -- the standard letter, letter drafting thing, is

8    the asterisk included on the standard form?

9    A.   Yes.

10   Q.   Why?

11   A.   To inform the borrower that there may be other fees

12   associated, not outside of the late charge that's stated on

13   the form.

14   Q.   Okay.  And when would these late fees be exhibited?

15   Which -- what late fees is Cenlar referring to?

16   A.   The late fee when the payment isn't received by the

17   15th.

18   Q.   Okay.

19   A.   So when -- in this case, it was the $57.84.

20   Q.   Okay.  But it also says, the asterisk says that there

21   might be other charges included in there?

22   A.   That's correct.

23   Q.   Why would there be other charges on the loan?

24   A.   There may be other fees assessed on the account outside

25   of just the late charge.

1    Q.   Okay.  And would these fees be available to Cenlar at

2    the time the letter was generated, or would there be -- or

3    would they be unavailable at the time they were generated --

4    the letters were generated?

5    A.   They would be available upon request.

6    Q.   Upon request.  So -- but not when the letter was

7    generated; correct?

8    A.   No.

9    Q.   Okay.  Now, in Ms. Lucero's case, did she have any

10   amounts due and payable at that time when the letter was

11   sent out that would -- that that asterisk would pertain to?

12   A.   No, because her fees were reversed in October.

13   Q.   No.  Okay, so the attorney's fees were not due and

14   payable at the time?

15   A.   No.

16   Q.   Okay.  So the asterisk in Ms. Lucero's case had no

17   meaning?

18   A.   No.  She was on -- she was making her payments and the

19   only charge that was assessed was a late fee.

20   Q.   Okay.  So the only thing that she was -- she had at

21   that time, when that letter was issued, was the late fee?

22   A.   That's correct.

23   Q.   All right.  Now, can you please take a look at Exhibits

24   45 through 51?

25            And before you do that, let me just -- let me just

1    ask you one more question before, that refers back to the

2    previous exhibit.

3            So to bring the loan current, at that time, when

4    the time the Delinquency Notice was issued, would be that

5    amount of the payment, the modified amount, and then the

6    late charge; correct?

7    A.   That's correct.

8    Q.   All right.  So now please take a look at the Exhibits

9    45 through 51.

10   A.   (The witness complied.) Yes.

11   Q.   These documents are also Delinquency Notices; correct?

12   A.   Correct.

13   Q.   And they were issued in connection with Ms. Lucero's

14   late payments; correct?

15   A.   That's correct.

16   Q.   All right.  And all of these documents -- all of these

17   letters were form letters; correct?

18   A.   That's correct.

19   Q.   All right.  And all of them contained the asterisk in

20   the amount due; correct?

21   A.   That's correct.

22   Q.   And at the time each of these letters was issued, were

23   the amount -- were the attorney's fees due and payable?

24   A.   No.

25   Q.   Okay.  So these asterisks had no meaning with respect

1    to Ms. Lucero's loan; correct?

2    A.   That's correct.

3          MS. DAO:  Objection, Your Honor, calls for

4    speculation.

5          THE COURT:  This is your closing argument.  This is

6    not something for him to testify to beyond what he did

7    already, so --

8          MR. WOZNIAK:  Okay, no problem.

9    BY MR. WOZNIAK:

10   Q.   Anytime the notice of delinquency -- delinquency went

11   out in order to bring the loan current, Ms. Lucero only had

12   to pay the principal, interest, escrow and the late charge;

13   correct?

14         MS. DAO:  Objection, Your Honor.

15         THE COURT:  That has been asked and answered

16   already.

17         MS. DAO:  Counsel is testifying, and leading.

18         THE COURT:  That's right.  But he's not -- I'm not

19   going to -- don't worry about it.

20         MS. DAO:  I get it, Your Honor, but it's --

21         THE COURT:  Yeah.  Okay.

22         MS. DAO:  -- excessive.

23         THE COURT:  It is, right.

24   BY MR. WOZNIAK:

25   Q.   So from November 25, 2013 until March 16, 2015, how

1    much money had -- did Ms. Lucero pay toward Cenlar's

2    attorney's fees?

3    A.    She didn't pay any fees towards our attorney's fees.

4    Q.    Okay.  Now, why did Cenlar, in 2014, why did it send

5    more than one periodic statement per month to Ms. Lucero?

6    A.    Because as she was making her payments, we issued a new

7    letter updating -- showing the update on the account,

8    reflecting the payment that was made.

9    Q.    Can you please expand on that?  I am not sure I follow.

10   A.    So on the original statements, or the previous

11   statements, her payments, including late fees, $1,583.21 as

12   we would receive that amount, a new letter would be issued

13   out to the borrower, showing that the payment amount has

14   been reduced by the amount that she made.

15   Q.    Okay.  So the new statement would be issued to show

16   that she made the payment, the previous -- on the previous

17   month?

18   A.    That's correct.

19   Q.    All right.  And then if she didn't make the payment

20   timely?

21   A.    Then she would be assessed a late fee.

22   Q.    Okay.  Now, how much money from Ms. Lucero's payments

23   between November 25, 2013 -- I'm sorry, between

24   November 2013 and March 2015 did Cenlar divert to the

25   attorney's fees?

1   A.    None.

2         MR. WOZNIAK:  Okay.  Your Honor, at this point in

3   time, I would like to ask the Court to take notice of the

4   Parties' admitted facts No. 18 and 19 in the Pretrial Order.

5         THE COURT:  Okay.

6   BY MR. WOZNIAK:

7   Q.    And, Mr. Johnson, did Cenlar declare Ms. Lucero's loan

8   to be in default between November, 2014 and March, 2015?

9   A.    No.

10  Q.    Did Cenlar refer Ms. Lucero's loan for foreclosure

11  between November, 2014 and March, 2015?

12  A.    No.

13  Q.    Now, is Cenlar still servicing Ms. Lucero's loan?

14  A.    No.

15  Q.    Okay.  When the servicing was transferred to the new

16  servicer, were the attorney's fees transferred?

17  A.    No.  They were coded to inform the new servicer that

18  these fees were not recoverable.

19  Q.    Okay.  So you informed the new servicer that that --

20  that there was an advance, but the advance was coded as

21  nonrecoverable; correct?

22  A.    That's correct.

23  Q.    And what does that coding mean?

24  A.    Third.

25  Q.    Pardon?

1    A.    In parenthesis, it will say, "Third party."

2    Q.    Okay.  So that means that the servicer should not be

3    collecting these fees from Ms. Lucero?

4    A.    That's correct.

5    Q.    All right.  Now, did Ms. Lucero do anything in

6    connection with Cenlar's treatment of the attorney's fees as

7    potentially recoverable?

8    A.    I believe she issued statements in regards to those

9    fees.

10   Q.    Okay.  Now can you please take a look at Exhibit -- it

11   has been previously admitted into evidence as Plaintiff's

12   Exhibit 75.

13   A.    (The witness complied.)  Okay.

14   Q.    Do you recognize this document?

15   A.    Yes.

16   Q.    What is this document?

17   A.    This is a Notice of Error that was sent to Cenlar by

18   Ms. Lucero's attorney.

19   Q.    Is this the notice you were talking -- you just

20   referenced a minute ago?

21   A.    Yes.

22   Q.    Okay.  Now, what did Ms. Lucero's counsel reference as

23   an error in this letter?

24         MS. DAO:  Objection, Your Honor.

25         THE COURT:  Overruled.  Can you answer.

316

```
 1            THE WITNESS:  Well, according to this letter, they
 2     allege that the full principal and the interest payments
 3     that were received weren't applied as -- as stated.
 4            MR. WOZNIAK:  So this letter basically states that
 5     Cenlar --
 6            THE COURT:  You are testifying again.
 7            MR. WOZNIAK:  My apologies.
 8            THE COURT:  Yeah.
 9     BY MR. WOZNIAK:
10     Q.   When did Cenlar receive this letter?
11     A.   It was received March 25, 2014.
12     Q.   That was -- that was the date the letter was sent;
13     correct?
14     A.   I'm sorry.  Your Honor, I apologize.  We received it
15     April 17, 2014.
16     Q.   Okay.  And can you please take a look at what has been
17     previously marked as Exhibit 16?
18     A.   (The witness complied.)
19     Q.   Do you recognize this document?
20     A.   Yes.
21     Q.   What is this document?
22     A.   This was Cenlar's response to Ms. Lucero's attorney.
23            MR. WOZNIAK:  Okay.  Your Honor, at this time, I
24     would like to move Cenlar's May 1, 2014 letter into evidence
25     as Exhibit 16.
```

```
 1              THE COURT:  16 --

 2              MS. DAO:  No objection.

 3              THE COURT:  -- is admitted into evidence.

 4              MR. WOZNIAK:  Okay.

 5  BY MR. WOZNIAK:

 6  Q.   Did -- did -- this letter responded -- you testified --

 7  you said that this letter responded to Ms. Lucero's

 8  attorneys' letter; correct?

 9  A.   Yes, that's correct.

10  Q.   All right.  And did it -- were there any attachments to

11  this letter?

12  A.   With this letter there was an Annual Escrow Account

13  Disclosure Statement.

14  Q.   Okay.  Anything else?

15  A.   Also her loan history showing where those payments were

16  applied.

17  Q.   Okay.  So as of May 1, 2014, Cenlar has provided

18  Ms. Lucero's -- Ms. Lucero with information requested in

19  that letter; correct?

20  A.   That's correct.

21  Q.   All right.  Now, can you please take a look at

22  Plaintiff's Exhibit 74?

23  A.   (The witness complied.)

24  Q.   Do you recognize this document?

25  A.   Yes.
```

318

1    Q.    What is this document?

2    A.    This was a letter from -- another letter from

3    Ms. Lucero's attorney to Cenlar.

4    Q.    And what is this letter entitled?

5    A.    Request for Information.

6    Q.    Okay.  And what information did Ms. Lucero's counsel

7    request in this correspondence?

8    A.    They wanted an explanation of the attorney fees that

9    were charged to the account, and an explanation of our

10   authority to impose those fees.

11   Q.    Okay.  And when did Cenlar receive this letter?

12   A.    We received this on April 17th as well.

13   Q.    Okay.  Now, did Cenlar initially respond to this

14   request for information in its May 1 correspondence?

15   A.    Well, the initial was sent to the wrong address, I

16   believe.

17   Q.    No, I'm talking about if you look at -- did Cenlar's

18   letter, the May 1 letter you just test -- you just

19   referenced, did that letter constitute an initial response

20   to Ms. Lucero's Request for Information letter?

21        MS. DAO:  Objection --

22        THE WITNESS:  Yes.

23        MS. DAO:  -- Your Honor.

24        THE COURT:  The objection is overruled.  The answer

25   "Yes," can stand.

```
 1   BY MR. WOZNIAK:
 2   Q.   Now, can you please look at what has been previously
 3   admitted into evidence as Exhibit 40?
 4   A.   (The witness complied.)
 5   Q.   Do you recognize this document?
 6   A.   Yes.
 7   Q.   What is this document?
 8   A.   It is a response to a QWR.
 9   Q.   Okay.  So did that letter provide information requested
10   by Ms. Lucero in its Request for Information?
11   A.   Yes.
12   Q.   All right.  Now, can you please explain to me why it
13   took Cenlar until June 18 to provide that response?
14   A.   The delay stems from the fact that our sole in-house
15   attorney had a tragic incident in -- with the loss of her
16   son due to illness.  And I actually worked a few doors down
17   from her, so I noticed her being visibly shaken during that
18   period of time.  She was -- she did take bereavement leave
19   for a -- for a period of time.  So with that, compounded
20   by -- with her being -- going through her -- her personal
21   issue, certain departments, it was difficult for us to
22   coordin -- coordinate responses from different departments
23   without her being there for us.
24   Q.   Okay.  So that delay was com -- the -- the fact that
25   Cenlar's attorney was in grievance [sic] due to the loss of
```

1    her son --

2          THE COURT:  You are summarizing his testimony.

3    That's not what you should do.

4    BY MR. WOZNIAK:

5    Q.   Okay.  Did Cenlar charge the attorney's fees -- I mean

6    did Cenlar account for attorney's fees to punish Mrs. Lucero

7    for bringing her lawsuit?

8    A.   No.

9    Q.   Okay.  Did Cenlar want to cause Ms. Lucero anguish,

10   fear or distress?

11         MS. DAO:  Objection, Your Honor.  This

12   witness won't --

13         THE COURT:  I don't see how he can testify to that.

14   He can say whether he personally did.  Did you?

15         THE WITNESS:  No.  Yeah, no, not at all.

16         THE COURT:  Okay.

17   BY MR. WOZNIAK:

18   Q.   Thank you.  Did Cenlar inform Ms. Lucero at any time

19   that she did not have to pay these attorney's fees?

20   A.   No.

21   Q.   She was not informed?

22   A.   She did not -- oh, she was informed --

23   Q.   Okay.

24   A.   -- she didn't have to pay those attorney's fees.

25   Q.   And now can you please refer to what has been

1    previously marked as Exhibit 18?

2    A.   (The witness complied.)

3    Q.   Do you recognize that document?

4    A.   Yes.

5    Q.   What is this document?

6    A.   This is a letter that was sent to Mrs. Lucero --

7    Q.   Okay.

8    A.   -- and counsel.

9    Q.   And does this letter inform Ms. Lucero that she is

10   only -- that her pay -- that she's only due for -- the

11   payment due that -- that -- that month, and the late charge?

12   A.   Yes, it breaks it down on total amount due as

13   $1,552.97.

14          MR. WOZNIAK:  Okay.  Now, I'd like to move, Your

15   Honor, Exhibit No. -- the October 22nd, 2014 letter into

16   evidence as Exhibit 18.

17          MS. DAO:  No objection.

18          THE COURT:  Eighteen is admitted into evidence.

19   BY MR. WOZNIAK:

20   Q.   Now, can you please look at what has been previously

21   admitted into evidence as Exhibit 19?

22   A.   (The witness complied.)

23   Q.   Do you recognize this document?

24   A.   Yes.

25   Q.   What is this document?

1   A.   This is our response to their Request for Information.

2   Q.   What is the date of this letter?

3   A.   The date is October 28, 2014.

4   Q.   Now, this letter contains attachments to it; correct?

5   A.   Yes.

6   Q.   Can you please look at the last page of the package of

7   that exhibit?

8   A.   (The witness complied.)

9   Q.   Do you recognize what the last page is?

10  A.   Yes, it's a -- the Corporate Advance History.  It was

11  one of Cenlar's business records.

12  Q.   Now, there is still seven entries in that -- in that

13  last page; correct?

14  A.   Yes.

15  Q.   Can you please explain to us what the first top two

16  lines represent?

17  A.   The first two lines were fees assessed through

18  litigation through RCM.

19  Q.   Okay.  Now, the bottom five, what was the bottom five?

20  A.   Those were through foreclosure.

21  Q.   Okay.  Now, can you take a look at Exhibit No. 4, which

22  is the Account History, and tell us if these fees, these

23  bottom fines were reflect -- bottom five fees were reflected

24  in the accounting history?

25  A.   Yes, on February 15th, 2013.

1    Q.   Does this document reflect the advances?

2    A.   Yes.

3    Q.   Okay.  And can you -- and these advances were -- were

4    paid by Cenlar before the loan was modified; correct?

5    A.   That's correct.

6    Q.   All right.  And does Cenlar's accounting history

7    reflect whether or not these fees were included in the

8    modified balance?

9    A.   I'm sorry?

10   Q.   Does this accounting history reflect whatever these

11   fees that were paid by Cenlar on February 15, in the

12   modified balance?

13   A.   No, they were not in the modified balance.

14   Q.   And can you please explain that?

15   A.   The -- the attorney's fees weren't assessed -- were

16   involved with the loan modification.

17   Q.   Okay.  All right.  And did the accounting history

18   reflect that in March, Cenlar adjusted the principal balance

19   to the modified amount; correct?

20   A.   That's correct.

21   Q.   Now, did Cenlar hire anyone in 2014 or 2015 to follow

22   Ms. Lucero around?

23   A.   No.

24   Q.   Did Cenlar ask anyone in 2014 or 2015 to follow

25   Ms. Lucero around?

1    A.    No.

2    Q.    Did anyone associated with Cenlar park their car

3    outside of Ms. Lucero's house in 2014 or 2015?

4    A.    No.

5          MR. WOZNIAK:  Your Honor, I have no further

6    questions.

7          THE COURT:  Okay.  Cross examination, Counsel?

8          MS. DAO:  Thank you, Your Honor.

9                    **CROSS EXAMINATION**

10   **BY MS. DAO:**

11   Q.    Mr. Johnson, isn't it true that you were not around

12   when Ms. Lucero and her ex-husband obtained the loan?

13         MR. WOZNIAK:  Vague.

14         THE COURT:  By "around," you mean?

15         MS. DAO:  You were not employed by Cenlar -- let me

16   rephrase.  I'm sorry, Your Honor.  Let me rephrase.

17   BY MS. DAO:

18   Q.    You were only employed by Cenlar about a year and a

19   half ago?

20   A.    Yes.

21   Q.    So that puts you in 2013, late?

22   A.    Around that time, that's correct.

23   Q.    Okay.  So isn't it true that you have no personal

24   knowledge with regards to how Ms. Lucero borrowed money back

25   in 2006?

```
 1   A.   No.
 2   Q.   And you have no idea with regards to where -- strike
 3   that.
 4        And you were not around either when the Interim
 5   Servicing Agreement, which is Exhibit 62, was signed; is
 6   that correct?
 7   A.   One moment.
 8   Q.   62, Plaintiff Exhibit.
 9   A.   62?
10   Q.   Yes.  Is that correct?
11   A.   That is correct, I was not employed at that time.
12   Q.   You have no knowledge of the circumstances surrounding
13   the signing of that agreement between Freddie Mac and
14   Cenlar?
15   A.   All of my knowledge is based off our business records.
16   Q.   That's what I want to ascertain.  Besides reviewing
17   records, I just want to make clear, do you review the actual
18   collateral file, or did you review simply the electronic
19   file?
20            MR. WOZNIAK:  Objection, relevance.
21            THE COURT:  Overruled.  Go ahead.
22            THE WITNESS:  I review the electronic file.
23   BY MS. DAO:
24   Q.   Okay.  And besides that, you were -- besides talking to
25   your counsel about being prepared for testimony today, you
```

1    did not seek out people who signed these agreements or the

2    exhibits to talk to them; is that a fair statement?

3    A.   I'm sorry, as far as the actual people who generated

4    it, the documents?

5    Q.   Yes, or signing them.

6    A.   No.

7    Q.   You testified regarding Exhibit 61, Power of Attorney.

8    Can you turn to that exhibit, please?

9    A.   (The witness complied.)

10   Q.   And you testified at length about your understanding of

11   that document.  And I just want to confirm, can you take

12   that -- can you read it and ascertain for me that the scope

13   of the power of attorney only pertains to signing documents?

14          MR. WOZNIAK:  Objection, the document speaks for

15   itself, Your Honor.

16          THE COURT:  Well, it's true, but this question goes

17   to his understanding of it, so go ahead.

18          THE WITNESS:  Okay, where did you want me to read?

19   I'm sorry.

20   BY MS. DAO:

21   Q.   If you read the first paragraph, I believe the -- let

22   me find it.

23   A.   Under "Cenlar FSB," or "County of."

24   Q.   I'm sorry.  Did I say 62?

25          THE COURT:  61.

1    BY MS. DAO:

2    Q.    61.

3    A.    61.

4    Q.    It would be under that heading that says, *Cenlar FSB*,

5    Mr. Johnson.

6    A.    Okay, *It's true and lawful -- attorney in fact -- in*

7    *the name, place and stead for the use of benefit to execute*

8    *any and all documents with respect home mortgage service by*

9    *the undersigned, by so determining the fact which are*

10   *customary, reasonable and necessary and appropriate to*

11   *release a mortgage, deed of trust, deed to secure debt upon*

12   *payment, and discharge of all sums secured, thereby on*

13   *behalf of Freddie Mac and assignment of mortgage, deed of*

14   *trust or deed to secure debt from Freddie Mac to seller or*

15   *servicer.  As to 1 to 4 family mortgages, deeds of trust or*

16   *deeds to secure debt on --*

17            MS. DAO:  Okay, you can -- you can stop there.

18            THE WITNESS:  Okay.

19   BY MS. DAO:

20   Q.    It's okay.  So in reading that, do you agree that that

21   particular -- the scope of the limited power of attorney is

22   for Cenlar to sign documents?

23            MR. WOZNIAK:  Again, Your Honor, the document

24   speaks for itself.

25            THE COURT:  Overruled.  You can answer.

```
 1              THE WITNESS:  As far as my understanding, as I
 2     said, that we have limited power of attorney to represent
 3     Freddie Mac.  I don't know --
 4              MS. DAO:  We don't deny what the document says.
 5              THE WITNESS:  Right.
 6     BY MS. DAO:
 7     Q.   I want to refer you to Exhibit 62 now.  And 62 is
 8     the -- you testified that is the Interim Servicing agreement
 9     between Freddie Mac and Cenlar; is that correct?
10     A.   That's correct.
11     Q.   Is it your understanding that the servicing of loans by
12     Cenlar on behalf of Freddie Mac is governed by the Freddie
13     Mac guidelines?
14     A.   Yes.
15     Q.   Okay.  So I want to talk about the guidelines a little
16     bit, with regard to the reference --
17              MR. WOZNIAK:  Objection, Your Honor, it's beyond
18     the scope of direct examination.
19              THE COURT:  Overruled.  Go ahead.
20     BY MS. DAO:
21     Q.   In terms of Cenlar servicing on behalf of Freddie Mac,
22     do you agree that the servicing is guided by Freddie Mac
23     guidelines?
24     A.   For this particular, yes.
25     Q.   Okay.  And are you aware or familiar with the fact that
```

1  Freddie Mac would reimburse expenses incurred by servicers

2  such as Cenlar?

3  A.   I'm not aware of that, I'm sorry.

4  Q.   You're not aware that servicers such as Cenlar would

5  get reimbursements from Freddie Mac for certain expenses?

6          MR. WOZNIAK:  Asked and answered, Your Honor.

7          THE COURT:  Well, go ahead.  He -- he's not aware

8  of it.

9          THE WITNESS:  I'm just not aware of it.

10         THE COURT:  He's not aware of it.  Okay.

11  BY MS. DAO:

12  Q.   How -- how do you -- what is your understanding in

13  terms of charges or expenses that Cenlar pays out on loans

14  that it services on behalf of Freddie Mac?

15         MR. WOZNIAK:  Your Honor, objection.  It is

16  extremely vague.  And I also think it's irrelevant.

17         THE COURT:  You need to be a little more specific

18  when you say "charges" and things like that.

19  BY MS. DAO:

20  Q.   You testified at length about Mrs. Lucero being in

21  default in -- back in 2011; is that correct?

22  A.   Correct.

23  Q.   And you were aware, by reviewing the record, that she

24  was also under foreclosure; is that --

25  A.   That's right.

1    Q.   -- correct?

2         And do you agree that Cenlar incurred certain

3    expenses relating to the default and the foreclosure at that

4    time?

5    A.   That's correct.

6    Q.   And is it -- is it true that Cenlar paid out money to

7    vendors and other parties for those expenses?

8         MR. WOZNIAK:  Lacks foundation.

9         THE COURT:  Do you understand that?  Do you know

10   that?

11        THE WITNESS:  Yes.

12        THE COURT:  Yeah, okay.  Objection is overruled.

13   Go ahead.

14   BY MS. DAO:

15   Q.   Did Cenlar pay out money or expense -- for expenses

16   incurred in relation to default and foreclosure in the

17   Lucero file?

18   A.   Yes.

19   Q.   Now -- and what happened to those expenses with regards

20   to the Interim Servicing Agreement between Cenlar and

21   Freddie Mac?

22        MR. WOZNIAK:  Objection, vague and ambiguous, Your

23   Honor.

24        THE COURT:  Overruled.  Go ahead.

25        THE WITNESS:  Which -- I'm not sure.  Which fees

```
1    are you referring to specifically?
2              MS. DAO:  Fees relating to default and foreclosure.
3              THE WITNESS:  Are we -- do we pay those fees to --
4    I'm not -- I'm just saying what you're asking me.
5    BY MS. DAO:
6    Q.   You testified that Cenlar pays those -- pays those
7    fees.
8    A.   Right.
9    Q.   And they -- Cenlar did pay fees -- those fees in the
10   Lucero case; is that correct?
11   A.   Yes.
12   Q.   Does Cenlar get money back from Freddie Mac at all, for
13   those expenses, to the best of your knowledge?
14   A.   As far as I know of, no.
15   Q.   So how does a servicer like Cenlar recover the expenses
16   related to servicing the loan?
17             MR. WOZNIAK:  Objection, vague.
18             MS. DAO:  Such as in this case, the Lucero loan. If
19   you know.
20             THE COURT:  If you know.  Go ahead.
21             THE WITNESS:  How we -- recovering?
22   BY MS. DAO:
23   Q.   Yeah.  How do you recover those expenses?
24   A.   Which expenses are you referring to?  We -- just in
25   general --
```

 1              THE COURT:  The foreclosure and the default, only

 2      before the modification, when you said there were some fees

 3      that were paid by Cenlar.

 4              THE WITNESS:  Yes.

 5              THE COURT:  How would you recover those fees, from

 6      the borrower?  From Freddie Mac?

 7              THE WITNESS:  Well, they would be -- I mean we --

 8      specific fees.  Well, what I was referring to, you mean the

 9      recoverables or nonrecoverable fees?

10              THE COURT:  Recoverables.

11              THE WITNESS:  Okay, yeah.  We would pay for those.

12              THE COURT:  And who -- how would you be reimbursed,

13      though?  Would it be by Freddie Mac, or would you charge

14      them against the lender?

15              THE WITNESS:  It would be charged to Freddie Mac.

16              THE COURT:  Okay.

17      BY MS. DAO:

18      Q.   Okay, it would be charged to Freddie Mac.

19              Did you, before you came to court today,

20      Mr. Johnson, review Exhibit 62 in details or at length?

21              THE COURT:  The Interim Servicing Master Agreement.

22              THE WITNESS:  Yes.

23      BY MS. DAO:

24      Q.   Okay.  And if I tell you that that particular document

25      contains explanations on how Cenlar is compensated, or how

333

```
 1   Cenlar recovers money or expenses paid on certain loans,

 2   would you doubt those representations in the document?

 3            MR. WOZNIAK:  Your -- Your Honor, this is

 4   speculation that Exhibit 62 does not contain any --

 5            MS. DAO:  Can't --

 6            MR. WOZNIAK:  -- provision for this --

 7            THE COURT:  You need to refer to a specific --

 8            MS. DAO:  Yes.  Yes, Your Honor.

 9            THE COURT:  -- part of it.  Yeah.

10   BY MS. DAO:

11   Q.   If I could refer you to Page 2.

12   A.   Of Exhibit 62?

13   Q.   Of the Interim Servicing Agreement, yes.

14            THE COURT:  Exhibit 62.

15   BY MS. DAO:

16   Q.   Now, calling your attention to Paragraph 1.4 and 1.6.

17   Are you done reading?

18   A.   I'm sorry.  I didn't know --

19   Q.   I'm sorry.  If I could -- if I could refer you to the

20   last sentence of Paragraph 1.6, Page 2.

21   A.   Okay.

22   Q.   And you can read that silently to yourself, or you can

23   read it out loud.  It doesn't matter.

24   A.   (The witness complied.)

25   Q.   Do you agree with that statement as contained in the
```

1  exhibit?

2  A.   Yes.

3  Q.   Or do you form any other understanding?

4  A.   No.

5  Q.   Okay.  So is it still your testimony that you are not

6  familiar with the Freddie Mac guidelines for servicing?

7          MR. WOZNIAK:  Misstates his testimony.

8          MS. DAO:  Residential.

9          THE COURT:  I don't think that's exactly what he

10  said, so --

11  BY MS. DAO:

12  Q.   Are you -- so does the reading of that statement, that

13  sentence, refresh your memory as to whether or not you have

14  any knowledge or any understanding of the relevance of the

15  guidelines by Freddie Mac?

16  A.   Yes.

17  Q.   Okay.  So your statement that Freddie Mac would pay

18  Cenlar for the expenses that Cenlar incurred, that would be

19  pertaining to the guidelines; would that be correct?

20  A.   Correct.

21  Q.   I'm calling your attention to Exhibit 60.  And Exhibit

22  60 has many pages, but I just want to direct your attention

23  particularly to --

24          MR. WOZNIAK:  Your Honor, I'm going to object to

25  Exhibit 60 on the grounds it lacks foundation, and it --

 1   it's hearsay.

 2          MS. DAO:  These are documents produced in discovery

 3   by the Defendant, Your Honor.

 4          MR. WOZNIAK:  Still has to establish foundation,

 5   Your Honor.

 6          THE COURT:  Well, I'm not sure what question

 7   Counsel is going to ask yet.  So wait until the question is

 8   asked, and then you can object.

 9   BY MS. DAO:

10   Q.   So I would like for you to take a look at the exhibit,

11   and let me know if you're familiar at all with the document,

12   if you've seen it before, you've come across in your work

13   with Cenlar.

14   A.   Yes, I have come across it.

15   Q.   Okay.  And calling your attention to Page 48.

16          MR. WOZNIAK:  Again, Your Honor, I'm going to

17   object to it on the grounds that this is -- this document

18   lacks foundation and are hearsay.

19          THE COURT:  He's already said he's come across it,

20   so --

21          MR. WOZNIAK:  Well, I understand that.  But these

22   are Freddie Mac-generated documents, Your Honor.  These are

23   not Cenlar-generated documents.

24          MS. DAO:  Your Honor, this is a document --

25          THE COURT:  Go ahead and ask the question.  The

336

```
 1  objection is overruled.
 2          MR. WOZNIAK:  Thank you, Your Honor.
 3  BY MS. DAO:
 4  Q.   So if you -- if you start on Page 48, and go through
 5  them for me, to Page 56.
 6  A.   I'm sorry.  You want me to go through 48 through 56?
 7  Q.   Uh-huh.  Yep.  Starting on 48 until the end of the
 8  exhibit.
 9  A.   (The witness complied.)
10  Q.   And take your time.  And what I want you to find in
11  reading this, whether or not they refer to recoverable or
12  nonrecoverable, as you testified.
13          Do those terms appear anywhere at all, Mr. Johnson?
14  A.   I'm sorry, can you repeat the question?
15  Q.   In reading those pages or glance -- glancing through
16  them, did you find those terms that you testified to earlier
17  with regards to recoverable fees and nonrecoverable fees?
18  A.   No.
19  Q.   Okay.  Calling your attention specifically to Page 55,
20  you could look at Page 55.  Page 55 talks about
21  non-reimbursable expenses; do you see that?
22  A.   Yes.
23  Q.   And under non-reimbursable expense on the -- on the
24  left-hand side there, it has a definition, does it -- does
25  it not?
```

1    A.   There is a passage on A3, non-reimbursable expense.

2    Q.   All right.  And do you -- do you -- does this

3    particular document, to the best of your knowledge, apply to

4    the Lucero loan?

5          MR. WOZNIAK:  Objection, vague.

6          THE COURT:  I'm not sure what the question means

7    here.  Do you understand the question?

8          THE WITNESS:  No.

9          THE COURT:  Okay.

10   BY MS. DAO:

11   Q.   The reimbursable expenses and non-reimbursable

12   expenses, are they different than the recoverables and

13   nonrecoverables that you testified earlier, that's what I'm

14   trying to get at.

15   A.   The way that is worded here, it seems like they would

16   be similar.

17   Q.   Okay.  Similar, but not the same?

18   A.   I would not know if they are the same.  I don't think

19   they are the same.  We would call them non-reimbursable

20   funds -- or fees.

21   Q.   So explain -- so explain to us, please, what -- what is

22   your understanding of recoverable and nonrecoverable as

23   compared to the reimbursable and non-reimbursable as defined

24   by Freddie Mac?

25         MR. WOZNIAK:  Your Honor, I'm going to object on

338

1  the grounds that basically what Mr. -- what Mr. Johnson

2  was -- testified was with respect to litigation attorney's

3  fees.  I believe that Ms. Lucero's counsel is asking him to

4  testify to compare those to the foreclosure fees incurred

5  prior to the modification, and that's where the confusion

6  goes.

7        THE COURT:  Well, I agree, there is confusion here.

8  But this is cross examination.  I'm going to give her a

9  little leeway.  But try to be very precise with your

10 questions, Ms. Dao.   Try another one.

11 BY MS. DAO:

12 Q.   You testified that Cenlar made the decision to charge

13 litigation/attorney's fees to the Lucero loan; is that

14 correct?

15 A.   The fees were assessed in order to for us to hire

16 counsel, so it's -- potentially can be recoverable from

17 Mrs. Lucero.

18 Q.   Okay.  And that is entirely different than -- and

19 I'll -- you know, I will accept your testimony.

20        Is it different than the reimbursable and

21 non-reimbursable expenses being referred here by Freddie

22 Mac?

23        MR. WOZNIAK:  Calls for speculation, Your Honor.

24        THE COURT:  If you looked at it.  If you don't

25 know, just say, "I don't know."

```
 1              THE WITNESS:  I don't know.

 2   BY MS. DAO:

 3   Q.   Okay.  You don't happen to know who decided, as far as

 4   a person within Cenlar, to assess fees against the Lucero

 5   loan for litigation expenses, do you?

 6   A.   The person who made a determination that they should be

 7   charged?

 8   Q.   Yes.

 9   A.   No.

10   Q.   Okay.  I'm going to refer you to Exhibit 40, please.

11   A.   (The witness complied.)

12   Q.   You are familiar with Exhibit -- I apologize.  That is

13   not the one I want -- 10.  I'm sorry.

14              It should be the HAM Modification Agreement,

15   No. 10.

16   A.   (The witness complied.)

17   Q.   All right.  I'm wrong again.  Let me look at my matrix.

18   See that one?  Oh, okay.  I'm sorry.

19              If you could refer to 11.  I apologize.

20   A.   (The witness complied.)

21   Q.   You are familiar with 11?

22   A.   This is a -- terms to a -- for a modified agreement.

23   Q.   I'm sorry.  I'm referring you to a *Home Affordable*

24   *Modification Agreement.*

25   A.   Okay, yes.
```

340

```
 1    Q.    Okay.  And if you refer to the second page of that

 2   document, it has under the -- under Paragraph No. 3, B and

 3   C.  Do you see those?

 4   A.    Yes.

 5    Q.    Okay.  Were you involved, or how -- do you know how

 6   these terms of the HAM Modification came about?  Do you know

 7   who decided that?

 8   A.    No, I don't work in the loss investigation department.

 9    Q.    Okay.  So you have no idea the terms -- how they came

10   about, or how they were decided?

11   A.    Based -- I know that the terms were decided based on

12   the review and the guidelines that went -- that I'm

13   confident that they followed in order to determine this

14   modification agreement.

15    Q.    Okay.  Your testimony regarding the recoverables and

16   non-recoverables, the policy that you were testifying about,

17   it's not in writing; isn't it?

18   A.    Which -- which policy are you referring to?

19    Q.    The policy for Cenlar, and maybe I -- you testified

20   that the in-house counsel for Cenlar made the decision to

21   assess fees to the Lucero loan.

22          MR. WOZNIAK:  Misstates his testimony, Your Honor.

23   BY MS. DAO:

24    Q.    Is that -- is that correct?

25   A.    Correct.
```

```
1   Q.   And was it based on any written policy that you are

2   aware of?

3   A.   As far as how -- how we determine how these are

4   assessed --

5   Q.   Yes.

6   A.   -- on the account?

7   Q.   Yes.

8   A.   Just through our normal procedures.

9   Q.   And are these in writing?

10  A.   Through our company procedure, if we do have procedures

11  in place through our internal systems of how we operate.

12  I'm sorry.  I'm not -- I'm -- I don't think I'm

13  understanding what you're asking.

14  Q.   Okay.  That's fine.  I'll -- I'll move on.

15        I'm referring you to Exhibits 13 through 15.  And

16  you testified that these are form letters, and the reference

17  was "Washington law," because the loan originated from

18  Washington; is that correct?

19  A.   That's correct.

20  Q.   Can you take a look at those form letters and tell me

21  whether or not anything in those letters informed Ms. Lucero

22  for her peace of mind that the attorney's fees shown there

23  are not going to be affected -- not going to be affecting

24  her mortgage loan?  Is there any language in that, that

25  would indicate that to her?
```

342

```
 1              MR. WOZNIAK:  Your Honor, speculation.

 2              THE WITNESS:  There's no --

 3              THE COURT:  Overruled.  You can answer.  Go ahead.

 4              THE WITNESS:  There is no language in this letter

 5    stating that we're seeking to collect any fees from

 6    Ms. Lucero.

 7    BY MS. DAO:

 8    Q.   But there's no language assuring her that you were not,

 9    either; were there?

10    A.   Either way, no.

11    Q.   Okay.

12    A.   But we do have one that she can contact, if she had any

13    additional information.

14    Q.   Okay.  And she did contact Cenlar; would you agree?

15    A.   Yes.

16    Q.   Okay.  So let's move to the Notice of Error and Request

17    for Information.

18    A.   I'm sorry, which --

19    Q.   Yeah, let me find it.  It would be 74 and 75.  You look

20    at 74 first for me.

21    A.   Okay.

22    Q.   And go to the second page -- of the signature page, if

23    you will.

24    A.   Yes.

25    Q.   Do you see that Ms. Lucero -- her Counsel asked
```

343

1    specifically for a detailed explanation of attorney's fees

2    charged to the account?

3    A.    Yes.

4    Q.    And the notice -- or the request also included -- the

5    request for knowing the purpose of the attorney's fees, and

6    the parties who received such fees.  Do you see that?

7    A.    Yes.

8    Q.    And the inquiry also asked for *a detailed explanation*

9    *of the authority to impose such fees*.

10   A.    Yes.

11   Q.    Do you see that?

12         And your contention is that Cenlar responded to

13   Exhibit 74?

14   A.    Yes.

15   Q.    Is it your contention that Cenlar's responses addressed

16   those contentions, or your -- the increase there

17   specifically?

18   A.    Yes.

19   Q.    Okay.  Can you identify for me which response from

20   Cenlar that addresses those specific questions?

21   A.    This is going to refer to the letter that we issued.

22   Q.    Okay.  And I will tell you that you were looking at

23   37 -- 36 -- I'm sorry.

24         MR. WOZNIAK:  It is 40.

25         MS. DAO:  Well, you testified to --

344

```
 1           MR. WOZNIAK:  He testified to 16 and 40.

 2           MS. DAO:  I apologize, Your Honor.

 3   BY MS. DAO:

 4   Q.   So 16, if you could go to 16.

 5   A.   (The witness complied.)

 6   Q.   16 has a cover letter.  Do you see that?

 7   A.   Yes.

 8   Q.   Does it address those questions that Ms. Lucero's

 9   counsel asked in Exhibit 74?

10   A.   Well, there is a response letter that says, *Our*

11   *response to your request for a detailed explanation of the*

12   *attorney's fees is forthcoming.*

13   Q.   Okay.  So that doesn't -- with the attorney's fees

14   explanations, would you agree?

15   A.   Not with this letter.

16   Q.   Okay.  So let's go to 17.

17   A.   (The witness complied.)

18   Q.   17 is another response by Cenlar; is that correct?

19   A.   That's correct.

20   Q.   And you see there whether or not Cenlar has addressed

21   the questions that Ms. Lucero's counsel had asked in 74?

22           MR. WOZNIAK:  That misstates his testimony. I don't

23   think that that letter concerned -- referred -- referred to

24   Exhibit 74.

25           THE COURT:  Well, he can answer for himself up
```

```
1    here.
2              THE WITNESS:  This particular -- it does have the
3    loan history, but this isn't the letter that we sent in
4    direct response to her fees.
5    BY MS. DAO:
6    Q.   Okay.  And I direct you to 18.
7    A.   (The witness complied.)
8    Q.   Does 18 answer the questions that 74 asks?
9              MR. WOZNIAK:  Your Honor, the same objection.  It
10   just points to a letter dated September 30, 2014, not to the
11   March 25th letter.
12             THE COURT:  Well, that's not really an objection.
13             MR. WOZNIAK:  I don't know.
14             THE COURT:  Go ahead, you can answer the question.
15             THE WITNESS:  This particular does not address the
16   attorney's fees.
17   BY MS. DAO:
18   Q.   Okay.  So you -- you testified to various reasons on
19   the stand, you said it's -- Cenlar had -- does this because
20   the lien originated from Washington, will reference
21   Washington law.
22   A.   Uh-huh.
23   Q.   It doesn't explain that in the answers provided to 74,
24   you also testified that Cenlar complied with new
25   regulations, and these exhibits do not address that.  Did
```

```
 1   they?

 2              MR. WOZNIAK:  Lacks foundation.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  As far as providing where the

 5   regulations are located, or -- I'm sorry.

 6              MS. DAO:  Oh, stop --

 7              THE COURT:  Her question is, you've testified today

 8   that the reason we put in "under Washington law," is it's a

 9   form letter, we just put the state in where the loan

10   originated.

11              THE WITNESS:  Correct.

12              THE COURT:  And you also testified that Cenlar had

13   to list those fees on the statement, because of a

14   regulation.

15              THE WITNESS:  Right.

16              THE COURT:  Is there any communication from Cenlar

17   to Mrs. Lucero or her lawyers in the exhibits you looked at

18   that gives those two explanations that you gave today?

19              THE WITNESS:  From her exhibit that she directed me

20   to, no.

21              THE COURT:  Okay.

22              MS. DAO:  Okay.

23   BY MS. DAO:

24   Q.   And -- and neither does the fact that in-house counsel

25   for Cenlar made the decision to assess attorney's fees to
```

1  her account relating to litigation expenses; is that

2  correct?  She was never informed of that decision at any

3  time?

4          MR. WOZNIAK:  Objection, argumentative.

5          THE COURT:  Overruled.  Go ahead.

6          THE WITNESS:  Correct.

7  BY MS. DAO:

8  Q.   If I could direct your attention to 36, please.

9  A.   (The witness complied.)

10 Q.   Mr. Johnson, 36 is a Periodic Statement dated October

11 16, 2014.  Would you agree?

12 A.   Yes.

13 Q.   Do you recall your testimony that in October, Cenlar

14 decided not to assess any more fees against the account?

15 A.   That's correct.

16 Q.   And in October, you also -- your testimony was that

17 some adjustments were made in the loan history or in the

18 account history; is that correct?

19 A.   That's correct.

20 Q.   Okay.  Now, if I direct your attention to Exhibit 36

21 under *Transaction Activity*, do you see that section?

22 A.   Yes.

23 Q.   And it -- the section still shows a large -- or several

24 large sums of attorney's fees; do you agree?

25 A.   Yes.

348

1   Q.   And it has dates -- well, there -- there's one date of

2   October 3rd for all the attorney's fees; would you agree?

3   A.   Yes.

4   Q.   Would you agree also that these numbers were not added

5   on to the amount due, when you looked up -- in the box which

6   shows *amount due*; is that correct?

7   A.   No, they do not.

8   Q.   The attorney's fees were not carried up to the *amount*

9   *due*; is that correct?

10  A.   No, not in this letter, no.

11  Q.   Okay.  Can you tell -- can you tell us why?

12  A.   No.

13  Q.   I'm directing your attention to 37.

14  A.   (The witness complied.)

15  Q.   Again under "transaction activity," do you see that

16  box?

17  A.   Yes.

18  Q.   And there are several line items for fees, attorney's

19  fees and actually costs, do you see that?

20  A.   Yes.

21  Q.   Right.  So 37 is a Periodic Statement dated November

22  4th, 2014; is that correct?

23  A.   That's correct.

24  Q.   And the same scenario here, which is Cenlar charges

25  these fees and put them under *transaction activity*, but they

1   are not added to the *amount due*; is that correct?

2   A.   No, they are not.

3   Q.   Okay.  And then is it your testimony that in --

4   beginning in December of 2014, that these charges were

5   completely off -- not shown on the account, no letter

6   sending out to her saying, "in keeping with Washington law,"

7   is that your testimony?

8   A.   Correct, after -- yes, that's correct.

9   Q.   Okay.  Is it also your testimony that in transferring

10  the loan to Nationstar, Cenlar has deemed the attorney's

11  fees to be nonrecoverable?

12  A.   Correct.

13  Q.   Meaning she cannot -- Mrs. Lucero cannot be assessed

14  the amounts -- the total amount -- all attorney's fees and

15  costs relating to litigation on her lawsuit?

16  A.   Meaning that the next servicer is not able to collect

17  on them.

18  Q.   Okay.  And how do we get that reassurance from Cenlar?

19  We only have your testimony.  I want to -- I want to explore

20  and see if we could confirm that, because --

21          MR. WOZNIAK:  Objection, Your Honor, that's

22  relevance, argumentative.

23          THE COURT:  Yeah, I think you are past the point

24  where --

25          MS. DAO:  Okay.

```
 1              THE COURT:  -- we're dealing with the issues here.
 2   But --
 3              MS. DAO:  Can I have a moment, Your Honor?
 4              THE COURT:  Sure.
 5                        (Short pause in the proceedings.)
 6   BY MS. DAO:
 7   Q.   Did Cenlar ever send any communication to Ms. Lucero to
 8   inform her that the amount of attorney's fees -- you
 9   testified to some $26,000 in total were not going to be
10   taxed against her account once her account goes over to
11   Nationstar.  In your review, did you see any of those
12   documents?
13   A.   No.
14   Q.   In your total review -- in your review of the file,
15   have you come across any letter, any communication from
16   Cenlar, either by phone, in writing, that Ms. Lucero should
17   not worry about these attorney's fees at all, because they
18   may not be recoverable?
19              MR. WOZNIAK:  Objection, compound and vague as to
20   time.
21              THE COURT:  Do you understand the question?
22              THE WITNESS:  Yes.
23              THE COURT:  Okay.  You can answer.
24              Overruled on the objection.
25              THE WITNESS:  I -- no.
```

351

```
 1              THE COURT:  Okay.
 2              MS. DAO:  That's all I have.
 3              THE COURT:  All right, then.
 4              Redirect, Mr. Wozniak?
 5              MR. WOZNIAK:  Thank you, Your Honor.
 6                    REDIRECT EXAMINATION
 7  BY MR. WOZNIAK:
 8  Q.    Now, Mr. Johnson, you were asked about your
 9  understanding of Exhibit 60, which is a printout of Freddie
10  Mac's guidelines.
11  A.    I'm sorry, 60?
12  Q.    Six-zero.
13  A.    Six-zero.  Yes.
14  Q.    And you were asked, based on your understanding as a --
15  as a Cenlar rep; correct?
16  A.    That's correct.
17  Q.    All right.  And based on your prior involvement in
18  different cases; is that correct?
19  A.    That's correct.
20  Q.    All right.  Is it your understanding that the Freddie
21  Mac guidelines govern the particular sections of the Freddie
22  Mac guidelines regarding recoverables and non-recoverables,
23  are they related to the foreclosure costs, or are they
24  related to litigation?
25  A.    Those are related to litigation.
```

```
1   Q.   You're talking about litigation in judicial

2   foreclosures, or are you talking about in litigation like we

3   are here?

4   A.   I mean judicial foreclosures.

5   Q.   Okay.  And with respect to the nonjudicial

6   foreclosures, they are related to foreclosure costs;

7   correct?

8   A.   That's correct.

9   Q.   All right.  And your testimony as to the recoverables,

10  versus non-recoverables in connection with this case,

11  constitutes attorney -- you're applying for the attorney's

12  fees incurred in litigation of this case; correct?

13  A.   That's correct.

14  Q.   So the Freddie Mac guidelines, in your opinion, do they

15  govern -- do they govern these attorney's fees incurred in

16  this litigation, or do they not govern?

17  A.   No.

18  Q.   Okay.  Now, I'd like you take a look at -- which is

19  Exhibit 70 -- I believe 74 -- which is the request for

20  information, March 25, 2014.  Do you see that?

21  A.   Yes.

22  Q.   Now, Counsel asked you regarding Exhibits No. 17 and

23  18, and asked if these letters constitute a response to the

24  Request for Information, Exhibit No. 74.  Now, can you

25  please tell me -- can you turn to Exhibit 17?
```

1    A.    (The witness complied.)  Okay.

2    Q.    And can you please read the first sentence in this

3    letter after *Dear Ms. Dao and Mr. Barraza*?

4    A.    *This is in response to Notice of Error dated*

5    *September 30th, 2014 related to above loan.*

6    Q.    Okay. Now, would you go back to Exhibit 74?

7    A.    (The witness complied.)

8    Q.    Isn't it a Notice of Error?

9    A.    No, this is a Request for Information.

10   Q.    Is it dated September 30, 2014?

11   A.    No, this is dated March 25th --

12   Q.    Okay.

13   A.    -- 2014.

14   Q.    Did -- did Counsel give you the Notice of Error letter

15   dated September 30, 2014?

16   A.    No.

17   Q.    Okay.  So she asked you -- so do you know what the

18   letter -- the Notice of Error letter dated September 30,

19   2014 referred to?

20   A.    (No audible response.)

21   Q.    Did you -- do you know what kind of information

22   Ms. Lucero asked in her September 30th, 2014 letter?

23   A.    She asked for an explanation of the attorney's fees

24   and --

25   Q.    No.  Do you know that?

1    A.    Yes.

2    Q.    That she asked it?

3    A.    Yes.

4    Q.    What do you know that from?

5    A.    From reading the documents.

6    Q.    Okay.  Now, did you, right now, as you're testifying,

7    were you pointed to the September 30, 2014 Notice of Error

8    letter?

9    A.    No, I was pointed to the March 25th, 2014 letter.

10    Q.    Now, if you look at Exhibit 18 --

11    A.    (The witness complied.)

12    Q.    Can you please read the very first sentence under,

13    *Dear Ms. Dao and Mr. Barraza.*

14    A.    *This is in response to your request for information*

15    *dated September 30th,* 2015 -- oh, I'm sorry -- *2014, related*

16    *to the above loan.*

17    Q.    Again, this letter does not respond to Ms. Lucero's

18    Request for Information dated March 25, 2014; correct?

19    A.    No.

20    Q.    Okay.  Where you pointed by Ms. Lucero's counsel to the

21    Request for Information, dated September 30, 2014?

22    A.    No.

23    Q.    Do you know what she -- what he asked -- what she asked

24    for in that letter?

25    A.    In?

1  Q.   In the September 30, 2014 letter, Request for

2  Information.

3  A.   No.

4  Q.   Okay.  Now, if you would look at Exhibit No. 40.

5  A.   (The witness complied.)

6  Q.   You have the Exhibit 40?

7  A.   Yes.

8  Q.   Which is the June 18th letter from my firm?

9  A.   Yes.

10  Q.   Okay.  Can you point to the section which addresses

11  Ms. Lucero's concerns regarding the authority for

12  assessments of the attorney's fees?

13  A.   On Section 1, I believe it says, *Attorney's fees in*

14  *cause dated November 25, 2013*.  There's a requirement,

15  reflect all activity under CFO --

16  Q.   You don't have to read that.

17  A.   Okay.

18  Q.   Okay?  Now, if you look at Page No. 2 of that letter.

19  A.   (The witness complied.)

20  Q.   Under Section 7, do you see that?

21  A.   Yes.

22  Q.   That Section 7 informs Ms. Lucero what amount is needed

23  to reinstate the loan and bring the loan current; correct?

24  A.   That's correct.

25  Q.   All right.  And the attorney's fees are not mentioned

1  in that Section 7; correct?

2  A.   That's correct.

3  Q.   Now, I'd like you to take a look at Exhibit No. 36.

4  A.   (The witness complied.)

5  Q.   Do you see that?

6  A.   Yes.

7  Q.   And that Loan Statement which is dated October 16th,

8  2014 does not contain an amount --

9  A.   Yes.

10 Q.   -- of the attorney's fees under the *amount due*;

11 correct?

12 A.   That's correct.

13 Q.   All right.  And to your knowledge, was it because of

14 the Court's ruling on the motion?

15 A.   Yes.

16 Q.   All right.  Now, these fees were still reflected

17 under the -- under the *transaction activity*; correct?

18 A.   That's correct.

19 Q.   Was it so that Cenlar still can somehow comply with its

20 understanding of the CFPB regulation?

21 A.   Yes.

22 Q.   And now, if you look at the -- the Transaction

23 Activity, Exhibit No. 3.

24 A.   (The witness complied.)

25 Q.   When, in October of 2014, does this document reflect

1    the reversal of the accounting with respect to the

2    attorney's fees?

3    A.   October 16th.

4            MR. WOZNIAK:  No further questions, Your Honor.

5            THE COURT:  Anything else?

6            MS. DAO:  Yeah, very quick, one more.

7            THE COURT:  Okay, last one.

8                    **RECROSS EXAMINATION**

9    **BY MS. DAO:**

10   Q.   I am going to refer you back to Exhibit 40, if you

11   will, Mr. Johnson.

12   A.   (The witness complied.)

13   Q.   Are you there?

14   A.   Yes.

15   Q.   Okay.  And I want you to see that first sentence.  This

16   is a letter written by Cenlar's counsel?

17   A.   Counsel, yes.

18   Q.   And it says, *This is our final correspondence in*

19   *response to your recent Qualified Written Request*.

20           Do you see that?

21   A.   Yes.

22   Q.   So Counsel's questions regarding the March 25th Notice

23   of Error and Request for Information, they -- this

24   particular document, Exhibit 40, doesn't relate to those

25   increases at all, do they?

1          MR. WOZNIAK:  Argumentative, Your Honor.

2          THE COURT:  It's cross-examination, Counsel.  You

3     are allowed to be a little argumentative in

4     cross-examination.

5          MR. WOZNIAK:  I understand, but my -- my objection

6     is that -- that under legal -- under -- under legal

7     language, Request for Informations and Notices of Error are

8     qualified as QWRs.

9          THE COURT:  Well, you've got a witness up here who

10    is capable of handling himself.  You don't have to answer

11    for him.

12         MR. WOZNIAK:  I'm not answering for him, your

13    honor, that's my objection.  Because --

14         MS. DAO:  I --

15         THE COURT:  All right.  The objection is overruled.

16    Go ahead, you can answer the question.

17         THE WITNESS:  I'm sorry, what --

18    BY MS. DAO:

19    Q.   This document does not address the March 25th, notices

20    and request that Ms. Cenlar -- Ms. Lucero's counsel sent to

21    Cenlar; is that true?

22    A.   Correct.

23    Q.   Okay.  Can you point to a letter from Cenlar on this

24    lawyer's letterhead, Wright, Finley & Zak, at all in your

25    review of the file that addresses the March 25th letters

```
1   that were sent by Ms. Lucero's counsel?
2   A.   In your -- as in relation to the attorney's fees, is
3   that what you're asking?
4   Q.   Any letter on this lawyer's letterhead -- the law
5   firm's letterhead that addresses our March 25 inquiry.
6            THE COURT:  That makes reference to the March 25th
7   letter.
8            THE WITNESS:  Nothing that refers directly to the
9   letter of March 25th.
10           MS. DAO:  That is all I have, Your Honor.
11           THE COURT:  Okay, great.  All right.
12           Mr. Johnson, you put in a full morning on the
13  witness stand.  I bet you'd like to leave now; wouldn't you?
14           THE WITNESS:  No, that's fine.  I love it here,
15  actually.
16           THE COURT:  All right.  You can step down.
17           THE WITNESS:  Thank you, Your Honor.
18           THE COURT:  Thanks for coming in.
19           All right.  So that completes the defense case; is
20  that right, Counsel?
21           MR. WOZNIAK:  That's correct, Your Honor.
22           THE COURT:  And did you have any rebuttal testimony
23  that you wanted to put on?  I am going to have to take a
24  break now.  So you can talk about it over lunch and come
25  back at 1:30.
```

```
 1              If you do, it will be Ms. Lucero and relatively

 2   brief; right?

 3              MS. DAO:  That's correct, Your Honor.

 4              THE COURT:  Yes.  All right.

 5              MS. DAO:  Does the Court expect closing statements

 6   today at all?

 7              THE COURT:  I expect that you should submit them in

 8   writing.

 9              MS. DAO:  Okay.

10              THE COURT:  So I'm not going to require you to do

11   closing argument.  But if you want to, you can.

12              Do you want to, Mr. Wozniak?

13              MR. WOZNIAK:  Well, but I was -- I was operating

14   under the assumption that you said you prefer oral argument

15   for closing.

16              THE COURT:  That was like a month ago, wasn't it?

17              MR. WOZNIAK:  It was.  I mean if you want me to

18   submit it in writing, I have no objection to that.

19              THE COURT:  How long is your closing?

20              MR. WOZNIAK:  About 45 minutes, Your Honor.

21              THE COURT:  Oh, yeah, I'd like it in writing.

22              MS. DAO:  I would prefer in writing, too, Your

23   Honor.

24              THE COURT:  Do it in writing, yeah, with some legal

25   references, too, in there.
```

```
 1              MS. DAO:  Certainly, Your Honor.

 2              THE COURT:  Okay?

 3              MR. WOZNIAK:  No problem, Your Honor.  Can I --

 4    we can discuss it afterwards, but maybe given the fact that

 5    we are going to be traveling, maybe we can get some time

 6    before we can send them in.

 7              THE COURT:  Oh, sure.

 8              MR. WOZNIAK:  Okay.

 9              THE COURT:  Yeah.  No, I understand that you are

10    taking off, and that was part of the process.  But, yeah,

11    when we come back at 1:30, I will talk to you about

12    timelines; okay?

13              MR. WOZNIAK:  Okay, Your Honor.

14              MS. DAO:  Your Honor, may I?

15              THE COURT:  Yes.

16              MS. DAO:  I've conferred with my client.  She

17    decided that she does not want to take the stand again for

18    rebuttal purposes.

19              THE COURT:  Okay.

20              MS. DAO:  So we are going to waive it and we're

21    done.

22              THE COURT:  All right.

23              MS. DAO:  Yeah.  So the Court can decide on the

24    scheduling for the afternoon.

25              THE COURT:  So how much time would you like?
```

1          MR. WOZNIAK:  Your Honor, I just need to go back to

2    my office, and then we can probably submit it within ten

3    days.

4          THE COURT:  Okay, that's reasonable for me.  Let's

5    do simultaneous written submittals for closing argument.

6          And Kerry, what's the second Friday?

7    That's November --

8          COURT DEPUTY:  13th.

9          THE COURT:  Let's make it Monday the 16th, okay?

10   And no rebuttals, just simultaneous closings and I will get

11   something out within a few days.  Okay?

12         MR. WOZNIAK:  And you want the reference to law and

13   to case law; right?

14         THE COURT:  Sorry?

15         MR. WOZNIAK:  And you want the legal arguments in

16   there with reference to case law?

17         THE COURT:  You don't have to, because I have your

18   trial briefs.  But if something new came out, or you wanted

19   to add it to it, you could do it.

20         Now, Plaintiff's Exhibits 11, 15, 17, 34 and 37

21   have not yet been admitted.  Is that fine?  You didn't want

22   to offer them; right?

23         MS. DAO:  We want to offer them into evidence;

24   don't we?  We want to have everything that has been

25   discussed here.

1            MR. BARRAZA:  Yes.

2            MS. DAO:  Yes, Your Honor.

3            THE COURT:  Counsel, do you have any objection to

4    11?

5            MR. WOZNIAK:  I'm sorry.  You just listed them.

6    I'm looking at 11.  I don't have an objection on 11.  The

7    next one was which --

8            THE COURT:  15.

9            MR. WOZNIAK:  I have no objection to 15.  I thought

10    it was already admitted.

11            THE COURT:  17.

12            MR. WOZNIAK:  No objection to 17.

13            THE COURT:  34.

14            MR. WOZNIAK:  No objection to 34.

15            THE COURT:  And 37?

16            MR. WOZNIAK:  No objection to 37.

17            THE COURT:  Okay, they are all admitted.  Thanks,

18    Kerry.

19            MS. DAO:  One more housekeeping item, Your Honor.

20    Someone filed a brief on the -- I want to say Friday.

21            MR. WOZNIAK:  On Friday, yes.

22            THE COURT:  Yes.

23            MS. DAO:  It's Document No. 282.

24            THE COURT:  Right.  Defendant's Brief Regarding

25    Damages.

```
 1          MS. DAO:  We refrained from responding, we just
 2     didn't want load the Court with briefing.  But that brief is
 3     not authorized by local rules or any other rules that I can
 4     think of.  I ask the Court to refrain from considering it
 5     until the parties have their chance to submit their closing
 6     argument.
 7          THE COURT:  I would consider it part of that
 8     process, so --
 9          MR. WOZNIAK:  Yeah.  That's what we wanted.  We
10     wanted to provide a pocket brief to Your Honor.  And we did
11     it in advance so that Plaintiff knows it was supposed to be
12     under a thousand.
13          MS. DAO:  A pocket brief, I'm learning something
14     new every day.
15          THE COURT:  I'll put it in my pocket, but I won't
16     look it an until November.
17          MS. DAO:  We would ask you to do that.
18          MR. WOZNIAK:  Thank you, your Honor.
19          THE COURT:  All right.  Thanks, Counsel.  We will
20     be adjourned.
21          MR. WOZNIAK:  Thank you for your time.
22          COURT DEPUTY:  All rise.  Court is now adjourned.
23                    (Hearing Concluded at 12:01 p.m.)
24
25
```

365

```
1   STATE OF WASHINGTON )
                        ) ss.  C E R T I F I C A T E
2   County of King      )

3       I, Kari Davidson, a duly authorized Washington Certified

4   Court Reporter, and Notary Public in and for the State of

5   Washington, residing on Vashon Island, authorized to

6   administer oaths and affirmations pursuant to RCW 5.28.010

7   do hereby certify:

8       That the foregoing proceedings were taken before me and

9   thereafter transcribed by me or at my direction by means of

10  computer-aided transcription; that the transcript is a full,

11  true, and complete transcript of said proceedings;

12      That I am not a relative, employee, attorney, or counsel

13  of any party to this action, or relative or employee or any

14  such attorney, counsel, and I am not financially interested

15  in the action or the outcome thereof;

16      That upon completion of signature, if required, the

17  original transcript will be securely sealed and the same

18  served upon the appropriate party.

19      IN WITNESS WHEREOF, I have hereunto set my hand this 3rd

20  day of November, 2015.

21

22              /s/ Kari Davidson_____
                Certified Court Reporter No. 3061
23              in and for the State of Washington
                Residing at Vashon, Washington.
24              My CCR certification expires 8/10/16

25
```