1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LETICIA LUCERO,

                              Plaintiff,

            v.

CENLAR FSB, *et al.*,

                              Defendants.

No. C13-0602RSL

MEMORANDUM OF DECISION

This matter was heard by the Court in a bench trial commencing on September 24, 2015, and, after a month's recess to allow defendant Cenlar FSB to produce its witness, concluding on October 27, 2015. Plaintiff Leticia Lucero brought this action against her mortgage loan servicer alleging that it violated the Real Estate Settlement Procedures Act ("RESPA"), breached its contractual and good faith obligations, and committed the tort of outrage when it charged attorney's fees and costs to plaintiff's mortgage account and refused to explain the charges upon request. Plaintiff seeks compensatory damages and attorney's fees in this litigation.

## FINDINGS OF FACT

By a preponderance of the evidence, the Court finds as follows:

In August 2006, plaintiff and her then-husband took out a mortgage in the amount of $391,000. Plaintiff fell behind on the payments in 2010, and a Notice of Default was issued on behalf of defendant Cenlar, the loan servicer, on August 27, 2012. Plaintiff had a number of

concerns regarding the validity and appropriateness of the Notice of Default under the Washington Deed of Trust Act and was unsatisfied with Cenlar's responses to her request for information. Plaintiff hired an attorney to help her navigate the foreclosure and mediation process. She was able to negotiate a permanent loan modification in January 2013, effectively bringing the loan current and clearing the default as of March 2013.

Based on information plaintiff was receiving from other lenders and servicers in the marketplace, she believed that Cenlar was continuing to report her loan as delinquent despite the modification. She was unable to resolve this issue over the phone and, in April 2013, filed this lawsuit alleging that Cenlar had violated its credit reporting obligations and seeking damages related to the way in which Cenlar (and others) had sought to foreclose on her mortgage. Over the course of many months, Cenlar and the other defendants successfully defended themselves from all of the original claims. In December 2013, however, Cenlar sent plaintiff a letter stating "Dear Mortgagor(s): In keeping with Washington law, please be advised that we have charged your loan account for the fee described, on the date and in the amount indicated on the below list." Plaintiff's Exhibit 13. Consistent with the letter, Cenlar imposed a charge of $1,261.42 in attorney's fees and costs on plaintiff's mortgage account. Plaintiff, with the help of counsel, contested the charge by letter dated December 29, 2013, and requested information regarding the fees and costs. Over the next few months, Cenlar acknowledged receipt of her inquiry and clarified the nature of her request, but was unable or unwilling to provide any additional explanation for the disputed charges.

Plaintiff's regular monthly mortgage payment following the loan modification was $1,525.37, but between January 16, 2014, and October 16, 2014, the "Amount Due" varied greatly and included thousands of dollars of attorney's fees, reaching a high of $19,809.03 in September 2014. Plaintiff sent a notice of error and a second request for information in March 2014. Cenlar did not respond for three months, but continued sending letters telling plaintiff that

attorney's fees were being charged to her account and statements demanding payment of thousands of dollars in attorney's fees and costs. It was not until June 18, 2014, when Cenlar's litigation counsel responded to plaintiff's December 2013 inquiries, that plaintiff learned that Cenlar was charging her for the attorney's fees and costs the servicer was incurring in defending this litigation. Cenlar also stated that the fees were charged pursuant to the Deed of Trust and that notification of the account activity was required by a federal regulation. Until then, plaintiff had no idea what fees and costs were being levied against her account or the legal basis for those charges.

At trial, Cenlar provided only the barest information regarding the decision-making process that resulted in the imposition of Cenlar's attorney's fees and costs on plaintiff's monthly mortgage statements. Cenlar's sole witness had no personal knowledge of the process and did not participate in the decision. All he could say was that Cenlar's in-house counsel must have made a determination that the fees could be collected from plaintiff. In-house counsel did not testify at trial, nor is there any admissible evidence regarding what motivated Cenlar to start charging plaintiff for its litigation costs or under what legal theory those costs were included in the "Amount Due" portion of the statement. During the course of this litigation, Cenlar has offered no less than eight different justifications for its actions. Three of the purported justifications (paragraphs 14 and 22 of the Deed of Trust and paragraph 6(e) of the Note) were raised in response to plaintiff's inquiries but have never been pursued. Some of the justifications (such as that Cenlar was simply tracking the fees in case they decided to collect them in the future) are factually unsupported, and none of them is particularly persuasive. More importantly, there is no evidence that Cenlar actually relied on any of these justifications when it demanded payment for amounts far and above that specified in the recently negotiated modification agreement.

In late September 2014, the Court issued an order finding that plaintiff had plausibly

alleged a contract and outrage claim based on the attorney's fee charges imposed on her account. Cenlar promptly stopped adding fees to the "Amount Due" line on her loan statements, but continued to note the fees that had been charged during the preceding month. Cenlar's witness testified that the loan history shows that Cenlar removed over $40,000 in fees and costs from plaintiff's account and designated them as nonrecoverable. He acknowledged, however, that plaintiff was never informed that the amounts had been waived or deleted. On October 28, 2014, Cenlar responded to one of plaintiff's requests for information with an itemized list of the attorney's fees and costs it had charged to plaintiff's account from February 2013[1] to October 2014, totaling $26,724. When Cenlar transferred the servicing of plaintiff's loan to NationStar Mortgage LLC in March 2015, the loan history included $26,724 in lender-paid expenses. Plaintiff testified that this amount continues to appear on her loan statements from NationStar.

The Court finds that plaintiff's testimony at trial regarding the existence and extent of her emotional distress related to Cenlar's conduct was entirely credible. In particular, the Court finds that plaintiff's mental state deteriorated markedly when the attorney's fees began appearing on her mortgage statements and she could not get any explanation or justification from Cenlar. While the preceding years had been tough, she had been able to work through personal issues and financial troubles, achieving an amicable divorce and the modification of her mortgage loan. In 2013, she was relieved, excited, and ready to move on, happy to know that she could keep the home for her two boys (they were fourteen and eight at the time of trial). Plaintiff had negotiated a monthly mortgage payment that, while uncomfortable, was manageable if she FedEx'd her payment to Cenlar mid-month and paid a late fee. When she got the December 2013 letter notifying her that Cenlar had charged her loan account an extra

---

[1] The first letter and statement notifying plaintiff that attorney's fees had been charged to her account were dated December 2013. The belated disclosure of charges from February 2013 – which predates this litigation – is largely unexplained, but most of those charges appear to relate to services provided by Northwest Trustee Services during the foreclosure and modification process.

$1,261.42 in attorney's fees and costs, however, she got a sick feeling in the pit of her stomach. There were no specifics, nothing but a vague reference to "Washington law" that she did not understand. Having no idea what activities had generated these fees or why they were her obligation, she panicked and called the attorney who had helped her through the modification process. Unfortunately, she could not meet with counsel until the last week of December. Meanwhile, plaintiff was overwhelmed with worry, not knowing how to budget for such a large expense or whether she could spend any money over the holidays.

Although plaintiff, with counsel's help, sent a request for information before the year ended, Cenlar did not substantively respond until June 2014. Plaintiff testified that Cenlar's failure to respond to her requests for information, the thousands of dollars added to her "Amount Due" each month, and her realization that she was past due and could not possibly afford to pay what was demanded of her caused extreme emotional distress. She had already been in default, and from her perspective the situation looked like she was on the verge of another foreclosure action, with no idea why it was happening or what she could do about it. In March 2014, Cenlar notified plaintiff that it had charged another $5,885.21 in fees and costs to her mortgage account. She was once again informed that the charges were "in keeping with Washington law." She did not know what law Cenlar was relying on, her attorney could not tell her, and Cenlar had refused to answer her December inquiry. Nevertheless, the fees kept coming, and there was no way to predict or stop them.

Plaintiff sent another round of inquiries to Cenlar in March 2014. No explanation for the fees and costs was forthcoming. Without knowing how or why, she was again delinquent, just as she had been in 2012, and was again in danger of losing her home. She tried to figure out what was going on by studying the monthly statements, but the amounts did not add up from one month to the next. Without Cenlar's help, she could not understand what was going on. Every time she received a notice letter, deficiency letter, or statement, plaintiff spent the day distracted

1   and worried.

2          Still having no idea that this lawsuit had anything to do with the fees she was seeing on her

3   statements or how she was going to avoid another default, plaintiff was worried. She knew

4   exactly how much she could afford each month and had worked that into the mortgage

5   modification, including all outstanding fees. And yet the new fees, unpredictable and out of

6   control, kept being added to her account and the "Amount Due." Although counsel told her not

7   to worry, it was impossible. Plaintiff found it too much and had a nervous breakdown in May

8   2014. She sought counseling to help deal with her uncontrollable emotions. Plaintiff testified

9   that she would shake, she could not function, she was numb and dazed, she was not sleeping,

10  she could not control her emotions, and she had crying sessions in the car to hide it from her

11  children. Although she tried to keep it together, the stress began to interfere with her work. She

12  had to take breaks to go for walks and asked a supervisor for permission to use his office so that

13  she could get some space and regain concentration. It was a small firm, and her troubles

14  impacted the office. Plaintiff was fired in October 2014 for a lack of focus and remained

15  unemployed until February 2015.

16         In June 2014, Cenlar finally responded to plaintiff's December 2013 inquiry and disclosed

17  that the fees that were charged to her account had been incurred in this litigation, that they are

18  recoverable under the Deed of Trust, and that the notifications were required by a federal

19  regulation. While the explanation raised concerns (with the Deed of Trust in play, plaintiff had

20  concerns that the lender might choose to foreclose), plaintiff's primary emotion was anger. For

21  six months, she had been asking about the fees and requesting an explanation regarding what

22  Washington law she was supposedly breaking, only to find out that Cenlar viewed the fees as

23  some sort of accounting exercise. When the loan was transferred to NationStar with over

24  $26,000 in fees associated with her account, she realized the charges were not going away.

25         Plaintiff has shown by the preponderance of the evidence that she has incurred the

26

following losses/damages:

$26,724 in charges to her account with NationStar

$1,950 (6.5 hours x $300/hour) in attorney's fees for drafting and sending requests for
    information to Cenlar

$208 (6.5 hours x $32/hour) in time spent reviewing documents regarding charges
    imposed on her mortgage account

$30 in gas traveling to and from her attorney's office

$12 in copying and postage expenses related to the requests for information

$2,700 in counseling expenses

$21,504 ($32/hour x 40 hours/week x 4.2 weeks/month x 4 months) in lost wages
    from November 2014 to February 2015

$13,760 (($32/hour x 40 hours/week x 4.2 weeks/month - $4,000/month) x 10 months) in
    reduced wages from March 2015 to December 2015

$55,000 ($500/day for 110 days) in emotional distress damages from December 4, 2013,
to          March 24, 2014

$42,500 ($500/day for 85 days) in emotional distress damages from March 25, 2014, to
    June 18, 2014

$49,500 ($100/day for 495 days) in emotional distress damages from June 19, 2014, to
    October 27, 2015 (the end of trial)

## CONCLUSIONS OF LAW

**A.  Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601** *et seq.*

Plaintiff alleges that Cenlar violated § 2605(e)(2) of RESPA when it failed to timely and
fully respond to her March 25, 2014, requests for information regarding the nature of and
justification for the fees that were appearing on her monthly statements. RESPA is a consumer
protection statute enacted to regulate real estate settlement processes. It requires mortgage loan

servicers to respond to a qualified written request ("QWR") for information within specified time frames. 12 U.S.C. § 2605(e)(1)(A) (five business days to acknowledge receipt of the QWR); 12 U.S.C. § 2605(e)(2) (thirty business days to investigate and provide a substantive response). In the summary judgment context, the Court determined that Cenlar did not adequately respond to the March 25, 2014, requests for information and therefore violated RESPA.

Failure to comply with the requirements of RESPA exposes a servicer to an award of "actual damages" resulting from the failure. 12 U.S.C. § 2605(f)(1)(A).[2] "Actual damages" recoverable under RESPA include compensation for both economic losses and emotional distress. Marais v. Chase Home Finance LLC, 736 F.3d 711, 720-21 (6th Cir. 2013) (lost interest and the costs associated with preparing the QWR are cognizable damages under § 2605(f)(1)); Houston v. U.S. Bank Home Mortg. Wis. Servicing, 505 Fed. App'x. 543, 548 n.6 (6th Cir. 2012) ("We find nothing in the text of § 2605(f), or in RESPA more broadly, to preclude 'actual damages' from including emotional damages, provided they are adequately proven.").

Based on the foregoing facts, the Court concludes that plaintiff has suffered $4,900 in economic losses and $42,500 in emotional distress damages arising from Cenlar's failure to adequately and timely respond to the March 25, 2014, requests for information.

**B. Breach of Contract and Breach of Implied Duty of Good Faith and Fair Dealing**

Throughout the course of this litigation, Cenlar pointed to five different contractual provisions as justification for charging its attorney's fees and costs directly to the "Amount Due" on plaintiff's mortgage statements. In its June 18, 2014, response to plaintiff's requests for information, Cenlar stated that "[t]hese are fees and costs that have been incurred in litigation

---

[2] The Court previously found that plaintiff had failed to establish "a pattern or practice of noncompliance" that could justify an award of statutory damages under 12 U.S.C. § 2605(f)(1)(B).

1  [and] are authorized by the Deed of Trust, more specifically Paragraphs 9, 14, and 22 and

2  Paragraph 6(e) of the Note." Plaintiff's Exhibit 40. In 2015, however, Cenlar switched gears and

3  argued that paragraph 26 of the Deed of Trust justified the charges. By the time of trial, the only

4  provision relied upon was paragraph 9 which states that if "there is a legal proceeding that might

5  significantly affect Lender's interest in the Property and/or rights under this Security Instrument

6  (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of

7  a lien which may attain priority over this Security Instrument or to enforce laws or

8  regulations)," the Lender may take whatever steps are reasonable and appropriate, including

9  "paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this

10  Security Instrument" which "shall become additional debt of Borrower secured by this Security

11  Instrument" payable upon notice and request from the lender to the borrower.

12      Cenlar cites twelve unpublished district court cases from around the country for the

13  proposition that "lawsuits that challenge the foreclosure process and/or question the note-

14  holder's right to foreclose" trigger paragraph 9. Dkt. # 258 at 7; Dkt. # 289 at 4. Most of these

15  cases (1) involved requests for relief or proceedings which, if successful, would invalidate the

16  underlying security interest,[3] (2) awarded fees under the equivalent of paragraph 26 of the Deed

---

[3] Kahn v. Wells Fargo Bank, N.A., 2014 WL 794193 (S.D. Texas Feb. 26, 2014) (a review of the docket shows that plaintiff asserted a quiet title claim alleging that the Deed of Trust was invalid); Moseley v. CitiMortg., Inc., 2011 WL 6151414 (W.D. Wash. Dec. 12, 2011); Coppes v. Wachovia Mortg. Corp., 2011 WL 4852259 (E.D. Cal. Oct. 12, 2011); Moore v. ING Bank FSB, 2011 WL 3586152 (W.D. Wash. Aug. 16, 2011); Smith v. World Savings and Loan Assoc., 2011 WL 1833088 (E.D. Cal. May 12, 2011) (a review of the docket shows that plaintiff asserted that the underlying loan was fraudulently induced or originated); Argys v. Greenpoint Mortg. Funding, Inc., 2009 WL 16550077 (D. Colo. June 12, 2009).

of Trust,[4] and/or (3) were unopposed.[5] Plaintiff's original and amended complaints, in contrast, simply seek a declaration that Cenlar's conduct violated certain statutes and request damages and attorney's fees related to the violations: there was no request for quiet title or invalidation of the security interest. Dkt. # 1 at 15; Dkt. # 32 at 30-31; Dkt. # 34 at 31; Dkt. # 78 at 39; Dkt. # 172 at 43.

One of the cases cited by defendant (and the cases cited therein), arguably stands for the proposition that a lawsuit which delays or seeks to undo a foreclosure sale "significantly affects" the lender's rights and therefore triggers the fee provision of paragraph 9. Wivell v. Wells Fargo Bank, N.A., 2013 WL 6512487 (W.D. Mo. Dec. 12, 2013). Even if that were the law in Washington, no such claim has been asserted here. Plaintiff's complaint was filed after Cenlar had abandoned its foreclosure attempts and modified the loan – it in no way delayed the nonjudicial foreclosure process. While plaintiff objected to the way Cenlar went about enforcing the Note and reporting the default, she did not request that the Court undo the loan modification agreement, invalidate the lender's security interest, or release her from the agreed-upon payments on the loan, or enjoin future foreclosures. Cenlar has not explained how demands for compensatory damages and attorney's fees related to alleged statutory violations would "significantly affect" the lender's interest in the property or rights under the Deed.

Just as importantly, the Wivell court's application of paragraph 9 whenever the borrower initiates a suit that delays or thwarts a nonjudicial foreclosure does not comport with

---

[4] Malin v. JP Morgan Chase Bank, N.A., 2014 WL 820003 (Mar. 3, 2014); Moseley, 2011 WL 6151414; Fromkin v. IndyMac Bank FSB, 2010 WL 3614650 (D. Ariz. Sept. 9, 2010). Paragraph 26 does not justify the unilateral imposition of attorney's fees on a borrower's loan account in the circumstances presented here. See Dkt. # 118 at 12.

[5] Castiblanco v. Wells Fargo Bank, N.A., 2013 WL 6079519 (S.D. Tex. Nov. 19, 2013); Schmidt v. Wells Fargo Bank, N.A., 2013 WL 5529711 (N.D. Cal. Oct. 7, 2013); Coppes, 2011 WL 4852259; Argys, 2009 WL 16550077; Zimmerman v. Aurora Loan Servs., 2009 WL 81392 (N.D. Cal. Jan. 12, 2009).

Washington's principles of contract interpretation. The goal of contract interpretation in this state is to ascertain the intent of the parties. <u>Dice v. City of Montesano</u>, 131 Wn. App. 675, 683 (2006). The contract must be viewed as a whole, interpreting particular language in the context of the surrounding contract provisions (<u>Weyerhaeuser Co. v. Commercial Union Ins. Co.</u>, 142 Wn.2d 654, 669-70 (2000)) and construing any remaining ambiguities against the drafter (<u>Viking Bank v. Firgrove Commons 3, LLC</u>, 183 Wn. App. 706, 713 (2014)). Under the established interpretive canons of *noscitur a sociis* and *ejusdem generis*, the types of events that trigger paragraph 9 are known by the particular subjects mentioned, namely "a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations." <u>In re Marriage of Tahat</u>, 182 Wn. App. 655, 671 (2014).

The Deed of Trust at issue here contains two attorney's fee provisions, paragraphs 9 and 26. Determining which one applies requires consideration of both provisions. The claims asserted in this litigation fall squarely within the language of paragraph 26. Rather than seek to recover its reasonable fees in this action, however, Cenlar chose to impose the fees directly on plaintiff's mortgage account, without judicial oversight, based on the apparently post hoc rationalization that paragraph 9 applies. The two attorney's fee provisions are not duplicative: they address different circumstances. Whereas paragraph 26 may allow the servicer to recover attorney's fees when the servicer prevails in a mortgage-related action between the borrower and lender, paragraph 9 gives the lender the ability to react quickly and without judicial process to deal with  more immediate, extraneous threats to its underlying security interest and rights. The threats which trigger paragraph 9 are significant and in the nature of bankruptcy proceedings, probate, liens, and condemnation actions. An action to compel a lender to comply with the terms and conditions of the Deed of Trust is not of the same kind as the listed proceedings because there is no threat to the lender's priority position in the property or its

contractual rights (which are cabined by the Deed of Trust Act). If such claims are meritless and the lender prevails, its fees can be recovered, in good time and after the court considers various factors, under paragraph 26. Considering the contract as a whole and the language of paragraph 9, the Court concludes that Cenlar's reliance on that provision to unilaterally charge attorney's fees incurred in litigation between the parties simply because the borrower has asserted claims that may delay or thwart a foreclosure is misplaced. Where the only thing in jeopardy is the lender's ability to foreclose unhindered and allegedly in contravention of statutory requirements, the fee award is appropriately considered by the presiding court under paragraph 26.

If Cenlar's decision to charge its litigation expenses to plaintiff's mortgage account in this case was not an outright breach of the Deed of Trust, the Court alternatively finds that it was a breach of the implied duty of good faith and fair dealing. "Under Washington law, there is in every contract an implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Rekhter v. Dep't of Social and Health Servs., 180 Wn.2d 102, 112-13 (2014) (internal quotation marks and citations omitted). The duty of good faith arises in the performance of specific contractual obligations. Johnson v. Yousoofian, 84 Wn. App. 755, 762 (1996). It is not a free-floating obligation to be nice to each other, but rather a check on whatever discretionary authority is granted to the parties under the contract. Scribner v. Worldcom, Inc., 249 F.3d 902, 910 (9th Cir. 2001); Rekhter, 180 Wn.2d at 113.[6]

In this case, paragraph 9 of the Deed of Trust gave the lender (and, presumably, Cenlar

---

[6] To clarify, abuse of discretion granted under the contract is simply one type of conduct that violates the duty of good faith and fair dealing. "[T]he duty varies somewhat with the context in which it arises. See Restatement (Second) of Contracts § 205, cmt. d. It may violate the duty of good faith and fair dealing to, for example, (1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the other party's performance; (4) abuse discretion granted under the contract; or (5) perform the contract without diligence. Id." Microsoft Corp. v. Motorola, Inc., 963 F. Supp.2d 1176, 1184 (W.D. Wash. 2013) (internal footnote omitted). The first and fourth considerations are relevant here.

acting as the lender's attorney in fact) discretion in evaluating and responding to threats to the lender's interest in the property. The determination that plaintiff's lawsuit regarding the manner in which the servicer initiated non-judicial foreclosure proceedings, negotiated her loan modification, and reported the default was "a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Interest" was in no way compelled by the contract. Because Cenlar had the discretionary authority to interpret and apply the contract provision, it was bound to do so in good faith. Cenlar's discretionary decision to impose unpredictable and enormous fees effectively made the negotiated terms of the loan irrelevant. Cenlar's interpretation of paragraph 9 erased at least one of the primary benefits plaintiff hoped to obtain out of the modification agreement, namely a manageable and regular monthly payment amount, thereby abusing its discretion and evading the spirit of the bargain.

Cenlar argues that it had no choice but to charge its attorney's fees to plaintiff's mortgage account because it had to act in the best interests of its principal, Freddie Mac. The agent has no greater rights or privileges than the principal, however. Had Freddie Mac charged its litigation expenses to plaintiff's mortgage account in the circumstances presented here, it too would have exercised its discretion in bad faith and deprived plaintiff of the benefit of the parties' bargain. Cenlar cannot do what its principal could not simply because it fears doing too little.

Finally, Cenlar argues that plaintiff suffered no damages cognizable in contract because it did not actually collect the fees and costs that were charged to her account. The outstanding debt remains on the books, however. Although Cenlar's representative testified at trial that the offending charges had been removed from plaintiff's account history in or around October 2014, $26,724 in attorney's fees and costs – the exact same amount as was disclosed in an itemized list in response to plaintiff's information requests – remain and were transferred to the new servicer, NationStar Mortgage LLC, as lender-paid expenses. This amount continues to appear on plaintiff's loan statements. In these circumstances, a contract remedy exists. If Cenlar were

still the servicer of plaintiff's loan, the Court would simply order it to remove the last vestiges of the improper charges and enjoin it from collecting those charges. As it is, however, the loan was transferred during the pendency of this action and the new servicer is not before the Court or otherwise bound by the rulings herein. Nor was there any indication at trial that NationStar had agreed not to collect on the charges or that Cenlar could prospectively affect NationStar's recordkeeping, servicing, or collection decisions. Thus, plaintiff remains burdened by a $26,724 charge that was not authorized by contract and which violated the implied duty of good faith and fair dealing. A damage award in that amount is appropriate.

**C. Outrage**

The elements of the tort of outrage are "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of plaintiff." Rice v. Janovich, 109 Wn.2d 48, 61 (1987). Based on the evidence submitted at trial, plaintiff has raised a reasonable inference and the Court finds that Cenlar, annoyed that plaintiff had sued it after obtaining a loan modification and looking for leverage to force her to abandon this litigation, adopted a strained and unprincipled analysis of the Deed of Trust[7] to justify the imposition of unpredictable and enormous charges directly onto plaintiff's mortgage statements as "Amounts Due." Cenlar, having reviewed plaintiff's financial situation less than a year before and being fully aware that plaintiff was paying late charges every month, had no reason to believe that she could cope with these charges. Cenlar reasonably should have known (and was likely counting on the fact) that these charges would cause immense emotional distress, which they did. Cenlar compounded the distress by denying plaintiff information about these charges or the justification therefore. The first notice of the charges stated that they were

---

[7] The evidence shows only that Cenlar's in-house counsel, who did not testify at trial, made the decision to charge Cenlar's litigation expenses directly to plaintiff's mortgage account. It is not clear how the issue came before her, what facts she reviewed, or the nature of her analysis. Nor do we know which of the many justifications offered by Cenlar throughout the litigation seemed persuasive to her.

charged "in keeping with Washington law." This assertion is wholly unsupported: Cenlar's witness acknowledges that the letter was a form into which the reference to "Washington law" was inserted simply because the loan originated in Washington. No Washington case law, statute, or regulation has been identified that authorize the charges levied against plaintiff's mortgage account. When plaintiff requested information regarding the charges, she was ignored for months. Eventually various contract provisions were identified, and Cenlar asserted that it was simply keeping track of charges it might eventually seek to recover from plaintiff.[8] Regardless of whether Cenlar was demanding immediate payment or was simply threatening to collect them in the future, the message was clear: continue this litigation and we will take your home. Such conduct is beyond the bounds of decency and is utterly intolerable.

Damages caused by Cenlar's outrageous conduct include:

$26,724 in charges to her account with NationStar

$1,950 in attorney's fees for drafting and sending requests for information to Cenlar

$208 time spent reviewing documents regarding charges imposed on her mortgage account

$30 in gas traveling to and from attorney's office

$12 in copying and postage expenses related to the requests for information

$2,700 in counseling expenses

$21,504 in lost wages from November 2014 to February 2015

$13,760 in reduced wages from March 2015 to December 2015

$55,000 in emotional distress damages from December 4, 2013, to March 24, 2014

$42,500 in emotional distress damages from March 25, 2014, to June 18, 2014

$49,500 in emotional distress damages from June 19, 2014, to October 27, 2015

for a total of $213,888.

---

[8] This particular contention is contradicted by the documents plaintiff was receiving from Cenlar on a regular basis which indicated that the fees and charges were part of the "Amount Due."

1    For all of the foregoing reasons, the Clerk of Court is directed to enter judgment in favor

2  plaintiff and against defendant in the amount of $213,888.[9] To the extent plaintiff has a

3  contractual or statutory right to attorney's fees, she may file a motion pursuant to Fed. R. Civ. P.

4  54(d)(2).

5

6    Dated this 28th day of January, 2016.

7

8                                              *MWf S Casnik*
                                               Robert S. Lasnik
9                                              United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 ─────────────────

26    [9] Duplicative recoveries have been reduced appropriately.

MEMORANDUM OF DECISION              -16-